UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION
www.flsb.uscourts.gov

IN RE:

MOOCHO, Inc.,                                    Case No. 26-10911-CLC

                Debtor.                          Chapter 11

_____/

**MOTION OF BLACKHAWK NETWORK, INC. TO
CONVERT CHAPTER 11 CASE TO CASE UNDER CHAPTER 7**

Blackhawk Network, Inc. ("Blackhawk") files this motion ("Motion") requesting entry of

an order converting the above-captioned chapter 11 case (the "Chapter 11 Case") of Moocho, Inc.

("Moocho" or "Debtor") to a case under chapter 7 and states as follows in support:

**INTRODUCTION[1]**

1.      Although it is early in the Chapter 11 Case, cause exists for conversion to a case

under chapter 7 given the pre-petition events leading to the filing that evidence the Debtor's

fraudulent conduct—specifically, the Debtor's misuse of $65,000,000 in trust funds. The Debtor

received $65,000,000 that should have been held in trust until remitted to Blackhawk, but those

funds were never paid to Blackhawk. It is unclear where those funds ended up, but as a result of

the Debtor's misappropriation of these trust funds, the Debtor owes Blackhawk no less than

$69,307,273.29, all of which is secured by a first-priority lien on and security interest in certain of

the Debtor's property. What is clear is that gross mismanagement of the Debtor took place prior

to the Petition Date that caused the Debtor to incur an exorbitant amount of debt in a short period

of time and abruptly wind down its business. Given this background, the Debtor's management is

_____

[1] Capitalized terms used but not otherwise defined in this Introduction shall have the meanings ascribed to them in this Motion.

conflicted and should not be permitted to use the bankruptcy process to hide their fraudulent conduct. Moreover, the Debtor initiated this Chapter 11 Case with false and misleading information in its petition and has failed to meaningfully prosecute its case while reaping the benefits afforded to a chapter 11 debtor. This is exactly the type of case that warrants conversion to chapter 7. A chapter 7 trustee is needed to investigate the Debtor's pre-petition financial activity and pursue all available claims, including claims against insiders, for the benefit of the Debtor's estate and its creditors.

2.      Prior to the Petition Date and winding down its business, the Debtor operated a mobile payment and rewards platform that allowed shoppers to purchase, register, manage, and redeem prepaid cards from retailers and brands with their smartphones or computers, receive discounts, and earn rewards. The Debtor offered its customers instant cash back for purchases made using its smartphone application or its website. The Debtor's entire business operation was dependent on the purchase and sale of prepaid gift cards and other digital services that it received from Blackhawk.

3.      Pursuant to the terms of the Distribution Partner Master Agreement, Blackhawk provided the Debtor with mutually approved gift cards (the "Gift Cards"), which the Debtor then sold to its consumers. The Debtor would receive the sales proceeds for the activation of the Gift Cards (the "Gift Card Sales Proceeds") and earn a commission (the "Commission") based on the face value of the cards sold. The Debtor was obligated to hold the Gift Card Sales Proceeds in trust and then remit the proceeds to Blackhawk, minus the Commission. The Distribution Partner Master Agreement explicitly provides that the Gift Card Sales Proceeds received by Debtor for the activation of the Gift Cards "***are held in trust by [Moocho] for the benefit of the applicable Gift Card issuers until paid to Blackhawk***" and that the Debtor "***has no right, title or interest***

2

*(including any equitable interest) in or to any Gift Card Sales Proceeds*[.]" Distribution Partner Master Agreement, Schedule 1, at § 9.

4.      In April 2025, the Debtor abruptly stopped remitting Gift Card Sales Proceeds to Blackhawk as required under the Distribution Partner Master Agreement, and the outstanding balance owed to Blackhawk quickly grew to approximately $65,000,000. It is unclear where the $65,000,000 went, but it is unequivocal that it was to be held in trust and was not property of the Debtor. Because terminating the Distribution Partner Master Agreement would certainly cause the Debtor's business to collapse, Blackhawk instead negotiated an alternative resolution that would permit the Debtor to continue operating. The parties agreed to convert the outstanding balance to a loan, evidenced by that certain Secured Note made by Debtor in favor of Blackhawk in the principal amount of $65,000,000. In connection with the Secured Note, the parties also executed that certain Security Agreement, granting Blackhawk a first-priority lien on and security interest in the Collateral (as defined in the Security Agreement).

5.      Despite the efforts Blackhawk made to help keep the Debtor's business operating, the Debtor almost immediately defaulted under the Secured Note by failing to pay an interest installment. Blackhawk served a written Notice of Default on September 4, 2025, identifying the missed payment and the expiration of the cure period.

6.      On September 8, 2025, the Debtor sent Blackhawk a letter, providing "written notice of a material adverse change in its financial condition and operations," specifically that "***Moocho is now preparing to initiate an orderly wind down of its operations***," that Moocho "is seeking to liquidate its assets for the benefit of its creditors," and that Moocho has approximately "$15 million in senior secured debt obligations that take priority over the debt held by Blackhawk Network." *See* September 8 Letter (emphasis added).

3

7.      In response, Blackhawk served the Acceleration of Secured Note on the Debtor, accelerating the obligations under the Secured Note. At no time after receiving the Notice of Default nor after receiving the Acceleration of Secured Note did the Debtor remit payment for any of the amounts due and owing under the Secured Note or the Security Agreement.

8.      Blackhawk filed a Complaint in Florida state court on September 19, 2025, bringing claims (i) to enforce the Secured Note, (ii) to enforce and foreclose its security interest, and (iii) for breach of contract. The Debtor did not answer or otherwise respond to the Complaint, and on November 18, 2025, Blackhawk obtained the Final Default Judgment, awarding Blackhawk $69,307,273.29 (excluding attorneys' fees and costs).

9.      Following entry of the Final Default Judgment, Blackhawk served post-judgment discovery on the Debtor. Upon information and belief, the Debtor filed this Chapter 11 Case to stall Blackhawk's post-judgment discovery efforts and shield its assets from Blackhawk.

10.     Although the Debtor has obtained the benefits of filing for Chapter 11 (*e.g.*, imposition of the automatic stay), to date, the Debtor has filed no substantive pleadings and only filed barebones documents, which are incomplete, inaccurate, and misleading. For example, in its Petition, the Debtor states under penalty of perjury that it has only $0–$50,000.00 in liabilities and that it believes funds will be available for distribution to unsecured creditors. This is materially and demonstrably false. The Debtor is aware of the Final Default Judgment against it. In addition, the Debtor has admitted to having at least $15 million in other secured debt. *See* September 8 Letter.

11.     The Debtor does not belong in Chapter 11. It cannot reorganize; indeed, it has nothing to reorganize. The Debtor has indicated that it intends to obtain post-petition financing to pursue certain causes of action. However, it would be wasteful for the Debtor to expend significant

4

time and incur additional debt and administrative expenses associated with confirming a Chapter 11 plan solely to pursue causes of action that may or may not result in a recovery for creditors. Moreover, given the Debtor's pre-petition misconduct and likelihood the that the Debtor has claims and causes of action against its insiders, the Chapter 11 Case should be converted to a case under chapter 7 to permit an unconflicted chapter 7 trustee to investigate and pursue all claims for the benefit of the Debtor's estates and its creditors, including any claims against the Debtor's insiders.

## JURISDICTION

12.     This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334. Venue lies properly in this Court pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A). The statutory predicate for this Motion is 11 U.S.C. § 1112(b)(1) and (4).

## BACKGROUND

### A.  The Distribution Partner Master Agreement.

13.     On January 27, 2021, Blackhawk and Debtor entered into that certain Distribution Partner Master Agreement (as amended by that certain First Amendment To Distribution Partner Master Agreement, effective September 29, 2022; that certain Second Amendment To Distribution Partner Master Agreement, effective January 26, 2023; that certain Third Amendment To Distribution Partner Master Agreement, effective December 17, 2024; and that certain Fourth Amendment To Distribution Partner Master Agreement, effective April 25, 2025, the "Distribution Partner Master Agreement"). A true and correct copy of the Distribution Partner Master Agreement is attached hereto as **Exhibit A**.

14.     Pursuant to the Distribution Partner Master Agreement, Blackhawk agreed to

5

provide Debtor with Gift Cards and certain digital services related thereto. In exchange, the Debtor would sell the Gift Cards through its digital platform, receive a Commission, and remit the Gift Card Sales Proceeds to Blackhawk.

15. Section 9 to Schedule 1 of the Distribution Partner Master Agreement provides that:

> Partner represents and warrants that: (i) ***all monies received by Partner or its Affiliates for the Activation of BHN Retailer Gift Cards*** ("Gift Card Sales Proceeds"), except for the Partner Commission, ***are held in trust by Partner for the benefit of the applicable Gift Card issuers until paid to Blackhawk***; (ii) ***it has no right, title or interest (including any equitable interest) in or to any Gift Card Sales Proceeds***, except for the Partner Commission; (iii) it has an obligation to, and shall, remit to Blackhawk the full face value of the Activated BHN Retailer Gift Cards, less the Partner Commission; and (iv) it has not and will not pledge, grant any interest in or to or otherwise encumber such funds to be remitted to Blackhawk in favor of any third party; and (v) it will not object or take any contrary position hereto.

Distribution Partner Master Agreement, Schedule 1, at § 9 (emphasis added).

16. Given the Gift Card Sales Proceeds are trust funds, the Distribution Partner Master Agreement also requires the Debtor to take certain actions in the event of a bankruptcy filing, including to, "no later than the second day following said bankruptcy filing, file a motion with the bankruptcy Court ("Motion of Debtor") asking for authorization to release to Blackhawk any funds received or held pre-petition by Partner arising from Partner's pre-petition sale of BHN Retailer Gift Cards hereunder." *Id.* at § 10. To date, the Debtor has not complied with this provision.

17. The Debtor defaulted under the Distribution Partner Master Agreement in early 2025 by failing to turn over approximately $65,000,000 in Gift Card Sales Proceeds.

**B. <u>The Secured Note, Security Agreement, and Amendment to Distribution Partner Master Agreement.</u>**

18. As a result of defaulting under the Distribution Partner Master Agreement, the parties agreed to convert the outstanding balance to a loan, evidenced by that certain Secured Note made by Debtor in favor of Blackhawk in the principal amount of $65,000,000 on April 25, 2025

(the "Secured Note"). Pursuant to the Secured Note, the Debtor agreed that interest would be payable monthly beginning May 31, 2025. *See* Secured Note, at § 4.2 ("Interest shall be payable monthly in arrears to the Noteholder beginning on May 31, 2025, and on the last day of each month thereafter."). A true and correct copy of the Secured Note is attached hereto as **Exhibit B**.

19.     On April 25, 2025, in connection with the Secured Note and to secure Debtor's obligations thereunder, the parties executed that certain Security Agreement, pursuant to which Debtor granted Blackhawk a first-priority lien on and security interest in the Collateral. A true and correct copy of the Security Agreement is attached hereto as **Exhibit C**.

20.     Also on April 25, 2025, the parties executed that certain Fourth Amendment to Distribution Partner Master Agreement (the "Fourth Amendment"). Pursuant to the Fourth Amendment, the parties amended the Distribution Partner Master Agreement to, among other things, grant Blackhawk additional rights and remedies (*e.g.,* right to suspend performance, right to change payment frequency, and right to audit), grant Blackhawk releases, reaffirm Section 9 to Schedule 1 of the Distribution Partner Master Agreement, and establish a restricted account for all Gift Card Sales Proceeds. Section 13 of the Fourth Amendment provides: "Partner reaffirms Section 9 of Schedule 1, below, and Partner agrees to hold all funds received from the sale of BHN Retailer Gift Cards hereunder in a restricted account for the sole benefit of Blackhawk approved by Blackhawk (the "Restricted Account")." A true and correct copy of the Fourth Amendment is attached hereto as **Exhibit D**.

21.     Pursuant to Section 9.1 of the Secured Note, failure to pay interest or any other amount when due, and such failure continuing for three (3) days, constitutes an Event of Default (as defined in the Secured Note). *See* Secured Note, at § 9. Upon an Event of Default, Blackhawk may accelerate all amounts due for immediate payment. *See* Secured Note, at § 10.

22.     Debtor failed to pay the August 31, 2025 interest installment due under the Secured Note.

23.     Blackhawk served a written Notice of Default on September 4, 2025, identifying the missed payment and the expiration of the three-day cure period on September 3, 2025 (the "Notice of Default"). A true and correct copy of the Notice of Default is attached hereto as **Exhibit E**.

24.     On September 8, 2025, Debtor sent Blackhawk a letter (the "September 8 Letter") providing "written notice of a material adverse change in its financial condition and operations," specifically that "Moocho is now preparing to initiate an orderly wind down of its operations," that Moocho "is seeking to liquidate its assets for the benefit of its creditors," and that Moocho has approximately "$15 million in senior secured debt obligations that take priority over the debt held by Blackhawk Network." A true and correct copy of the September 8 Letter is attached hereto as **Exhibit F**.

25.     On September 16, 2025, Blackhawk served a written notice of Acceleration of Secured Note (the "Acceleration of Secured Note"), which provided, among other things, "formal notice that the full Accreted Value of the Note, together with all accrued interest and any other amounts payable, is hereby declared immediately due and payable." A true and correct copy of the Acceleration of Secured Note is attached hereto as **Exhibit G**.

26.     At no time after receiving the Notice of Default nor after receiving the Acceleration of Secured Note did the Debtor remit payment for any of the amounts due and owing under the Secured Note or the Security Agreement.

C.  **The Complaint and Final Default Judgment.**

27.     On September 19, 2025, Blackhawk filed that certain Complaint for Breach of

Secured Promissory Note, Enforcement of Security Interest, and Breach of Contract (the "Complaint") in the Circuit Court of the Ninth Judicial Circuit, in and for Orange County Florida (the "State Court"), bringing claims (i) to enforce the Secured Note, (ii) to enforce and foreclose its security interest, and (iii) for breach of contract. A true and correct copy of the Complaint is attached hereto as **Exhibit H**.

28.     The Debtor did not answer or otherwise respond to the Complaint.

29.     On November 18, 2025, the State Court entered a Final Default Judgment (the "Final Default Judgment"). A true and correct copy of the Final Default Judgment is attached hereto as **Exhibit I**.

30.     Pursuant to the Final Default Judgment, Blackhawk has a liquidated, non-contingent secured claim against the Debtor for no less than $69,307,273.29 (excluding attorneys' fees and costs) (the "Blackhawk Secured Claim").

31.     Following entry of the Final Default Judgment, Blackhawk served post-judgment discovery on the Debtor. To date, the Debtor has not responded to any of Blackhawk's post-judgment discovery requests.

### D.  The Debtor Filed This Case to Shield Its Assets from the Default Judgment.

32.     Upon information and belief, the Debtor filed the Chapter 11 Case on January 26, 2026 (the "Petition Date") to frustrate Blackhawk's post-judgment discovery and enforcement of its Final Default Judgment.

33.     Since filing the Chapter 11 Case, the Debtor has failed to comply with its duties as a debtor-in-possession and has withheld complete and accurate information from parties in interest. Examples of the Debtor's non-compliance are set forth below:

a. The Debtor provided materially false information in its Petition. The Debtor asserts in its Petition that funds will be available for distribution to unsecured creditors and that it has only $0–$50,000 in liabilities. *See* Docket No. 1, Question Nos. 13 and 16. This information is materially false and misleading given Blackhawk's Secured Claim;

b. The Debtor has failed to file any substantive motions or prosecute its case in any way; and

c. The Debtor filed an incomplete List of Creditors Who Have the Twenty Largest Unsecured Claims and are not Insiders. *See* Docket No. 3 (failing to provide nature of each claim, whether the claims are contingent, unliquidated, or disputed, and amount of claim). The Debtor provided only the names and contact information of creditors and included no other information required by Official Form 204.

34. The Debtor has admitted that it has no operating business. *See* September 8 Letter. Instead of pursuing a reorganization or sale and liquidation, it intends to seek debtor-in-possession financing to pursue certain causes of action. Permitting the Debtor to use Chapter 11 solely to pursue causes of action would be wasteful. Moreover, given the likelihood that the Debtor has claims and causes of action against its insiders, the Chapter 11 Case should be converted to a case under chapter 7 to permit an unconflicted chapter 7 trustee to investigate and pursue all claims for the benefit of the Debtor's estates and its creditors.

**RELIEF REQUESTED**

35. Blackhawk respectfully requests this Court enter an order converting this Chapter 11 Case to a case under chapter 7 and granting all other appropriate relief.

**BASIS FOR RELIEF REQUESTED**

36. Section 1112(b)(1) of the Bankruptcy Code provides that ". . . on request of a party in interest, and after notice and a hearing, the court *shall* convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, for cause . . ." 11 U.S.C. § 1112(b)(1) (emphasis added). Conversion or dismissal is mandatory once cause is demonstrated unless the Debtor demonstrates unusual circumstances.

10

*See In re YC Atlanta Hotel, LLC*, 630 B.R. 348, 363 (Bankr. N.D. Ga. 2021) ("[O]nce cause has been established, use of the word 'shall' by Congress in the subsection makes conversion mandatory.").

37.     Section 1112(b)(4) contains a non-exhaustive list of grounds that constitute cause, including "substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation;" and "unexcused failure to satisfy timely any filing or reporting requirement established by this title or by any rule applicable to a case under this chapter." 11 U.S.C. § 1112(b)(4)(A) and (F); *see also In re Schultz*, 436 B.R. 170, 175 (Bankr. M.D. Fla. 2010) ("Section 1112(b)(4) sets forth a nonexhaustive list of grounds that may constitute 'cause' for dismissal or conversion.").

38.     Courts within the Eleventh Circuit further find cause exists under Section 1112(b) where the case is filed in bad faith or its insiders are conflicted. *See, e.g.*, *In re Albany Partners, Ltd.*, 749 F.2d 670, 674 (11th Cir. 1984) ("[A] debtor's lack of 'good faith' may constitute cause for dismissal of a petition."); *In re No Rust Rebar, Inc.*, 641 B.R. 412, 425 (Bankr. S.D. Fla. 2022) (finding cause to convert where the debtor in possession had a conflict of interest in properly investigating and pursuing potential fraudulent transfers or other claims against insiders that may benefit the estate).

39.     Here, cause exists to convert under Section 1112(b)(4)(A) because the Debtor's estate is subject to continuing loss or diminution and there is no likelihood of rehabilitation. Cause also exists under Section 1112(b)(4)(F) because the Debtor has filed only barebones documents in this case that contain false and misleading information. Cause further exists for lack of good faith due to Debtor's pre-petition misconduct (*e.g.*, misusing $65,000,000 in trust funds). Finally, cause exists because the Debtor's insiders are conflicted and should not be permitted to continue

managing the Debtor given the Debtor's pre-petition conduct. Accordingly, conversion to chapter 7 is in the best interest of the Debtor's estate and its creditors so that an unconflicted chapter 7 trustee can investigate the Debtor's prepetition conduct and its finances.

### A.   Cause Exists to Convert Under Section 1112(b)(4)(A).

40.   Cause exists to convert under Section 1112(b)(4)(A) where there exists a "substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation[.]" 11 U.S.C. § 1112(b)(4)(A). Courts within the Eleventh Circuit routinely find that cause exists for conversion or dismissal under Section 1112(b)(4)(A) where, similar to the facts of this case, a debtor is no longer operating, has no business to reorganize and its liabilities greatly exceed its assets. *See, e.g.*, *In re A-1 Specialty Gasolines, Inc.*, 238 B.R. 876, 878 (Bankr. S.D. Fla. 1999) (dismissing case under Section 1112(b)(4)(A) *sua sponte* where the debtor's liabilities greatly exceeded its assets and the debtor was no longer operating its business); *In re First Fed. Corp.*, 50 B.R. 417, 419 (Bankr. M.D. Fla. 1985) (converting case to Chapter 7 and finding that the debtor's "ability to achieve an effective reorganization under Chapter 11 is more than problematic if not totally non-existent" where debtor "no longer maintains any operating force; it no longer sells anything, and lacks viable means to reorganize its affairs and resume the operation of any business in the conventional sense"); *In re Glob. Emergency Res., LLC*, 563 B.R. 76, 83 (Bankr. S.D. Ga. 2016) (converting case where debtor had no business to reorganize or rehabilitate and debtor maintained no business and no employees).

41.   Here, the Debtor has no operating business and likely no cash flow (without incurring additional debt) with which to pay administrative expenses, pay US Trustee fees, or provide adequate protection to its secured creditors. The Debtor's liabilities greatly exceed its assets. And every day that the Debtor continues in chapter 11, the Debtor's estate suffers a

continuing loss by accruing fees and expenses necessary to administer its estate. The Debtor admitted pre-petition that it was winding down its business and liquidating for the benefit of creditors. *See* September 8 Letter. The Debtor further admitted to having $15 million in secured debt in addition to amounts owed to Blackhawk (*see id.*), which greatly exceeds the $1 to $10 million in estimated assets claimed by the Debtor in its Petition. *See* Docket No. 1, Question No. 15. Thus, both prongs of Section 1112(b)(4)(A) are satisfied because there exists a substantial or continuing loss or diminution of the estate and there is no likelihood of rehabilitation of the Debtor's business.

### B.    Cause Exists to Convert Under Section 1112(b)(4)(F).

42.    In this case, cause exists because the Debtor has failed to satisfy disclosure and reporting requirements under the Bankruptcy Code and Bankruptcy Rules. Courts within the Eleventh Circuit have found cause for dismissal where a debtor provides incomplete, false or misleading information. *See, e.g.*, *In re No Rust Rebar, Inc.*, 641 B.R. 412, 427 (Bankr. S.D. Fla. 2022) (finding cause existed based on the Debtor's failure to include a debt in its schedules, which "without explanation, constitutes an unexcused failure to disclose material information" and further finding that "[s]uch a failure, whether willful or reckless, supports conversion"); *In re Tucker*, 411 B.R. 530, 532 (Bankr. S.D. Ga. 2009) (converting case were debtor's "monthly operating reports are incomplete, misleading, and materially false in some respects"); *In re Stanford*, No. 19-01846-TOM-11, 2021 WL 973996, at *10 (Bankr. N.D. Ala. Mar. 15, 2021) (converting case to chapter 7 where movant had various nondisclosures and instances of inaccurate reporting).

43.    Here, since filing the Chapter 11 Case, the Debtor has failed to comply with its duties as a debtor-in-possession and has provided false and misleading information to this Court

13

and other parties in interest.

44.     First, the Debtor provided materially false information in its Petition. The Debtor asserts in its Petition that funds will be available for distribution to unsecured creditors and that it has only $0–$50,000 in liabilities. *See* Docket No. 1, Questions 13 and 16. This information is materially false and misleading given Blackhawk's Secured Claim of no less than $69,307,273.29 and the Debtor's own admission that it has another $15 million in secured debt. *See* September 8 Letter.

45.     The Debtor has not filed any substantive motions or prosecuted its case in any way. Instead, the Debtor has filed the barebones forms necessary to commence a chapter 11 case and obtain the protection of the automatic stay. Even the forms Debtor did file are incomplete. For example, the Debtor filed an incomplete List of Top Twenty Creditors, which failed to provide any information other than the names and addresses of the creditors. *See* Docket No. 3.

46.     Accordingly, cause exists to convert under Section 1112(b)(4)(F) due to the Debtor providing materially inaccurate and misleading information in its initial filings.

**C.     Cause Exists to Convert For Failing to File the Chapter 11 Case in Good Faith.**

47.     Cause exists for conversion to chapter 7 because the Debtor did not file the Chapter 11 Case in good faith. Although there is no particular test for determining whether a debtor has filed a petition for reorganization in good faith, "[i]n finding a lack of good faith, courts have emphasized an intent to abuse the judicial process and the purposes of the reorganization provisions." *Albany Partners, Ltd. v. Westbrook (In re Albany Partners, Ltd.)*, 749 F.2d 670, 674 (11th Cir. 1984). In evaluating whether a bankruptcy case was commenced or has been prosecuted in "bad faith," courts consider a number of factors, including:

     a.  Whether the debtor has an ongoing business or is engaged in significant business activities;

14

      b.   Whether the debtor has few employees or no employees except for the principals;

      c.   Whether the debtor has little or no cash flow;

      d.   Whether the debtor has sufficient income to sustain a plan of reorganization;

      e.   Whether the debtor has any possibility of reorganizing;

      f.   Whether the debtor has only a few unsecured creditors whose claims are small in relation to the claims of the secured creditors;

      g.   Whether the debtor engaged in improper prepetition conduct.

*See, e.g.*, *In re Little Creek Dev. Co.*, 779 F.2d 1068, 1072–73 (5th Cir. 1986) (collecting factors from multiple cases); *In re Phoenix Piccadilly, Ltd.*, 849 F.2d 1393, 1394–95 (11th Cir. 1988) (same); *In re Nat. Land Corp.*, 825 F.2d 296, 298 (11th Cir. 1987).

48.      Here, the balance of the factors tips sharply in favor of finding that "cause" exists to convert the Bankruptcy Case due to bad faith. First, the Debtor has no ongoing business. *See* September 8 Letter. The Debtor merely exists to liquidate its assets, including causes of action, for the benefit of its creditors. *See id.* Second, because the Debtor has no ongoing business other than liquidating, it is unclear whether the Debtor has any employees other than its principals. Third, because the Debtor is not operating it likely has no cash flow. Fourth, due to the absence of an ongoing business, the Debtor lacks sufficient funds to confirm a plan of reorganization, especially where confirmation of any plan would be highly contested. Fifth, the Debtor also lacks a reasonable possibility of reorganizing. Given the significant Blackhawk Secured Claim, any plan proposed by the Debtor would be woefully infeasible. Moreover, the Debtor lacks any income and, thus, will be unable to pay the ordinary costs associated with administering the estate (without unnecessarily incurring additional debt)—especially pursuant to a plan requiring the pursuit of various causes of action and continued payment of professionals. Sixth, the Debtor's secured debts are likely far greater than any unsecured debt it holds given the amount of the Blackhawk Secured Claim and the additional $15 million in secured debt Debtor has admitted having. Finally, and perhaps most importantly, it is essentially irrefutable that the Debtor engaged in improper pre-

petition conduct by misappropriating $65,000,000 in trust funds to which it had no legal or equitable title.

49.     In addition to the causes provided under Section 1112(b)(4) and the good-faith factors identified above, "bankruptcy courts have frequently identified other factors that support a finding of cause, including where the debtor in possession has a conflict of interest in properly investigating and pursuing potential fraudulent transfers and other claims of the estate." *In re No Rust Rebar, Inc.*, 641 B.R. 412, 423 (Bankr. S.D. Fla. 2022) (internal quotation marks omitted); *see also In re Picacho Hills Utility Co., Inc.*, 518 B.R. 75, 82 (Bankr. D.N.M. 2014); *In re Ashley River Consulting, LLC*, No. 14-13406 (MG), 2015 WL 1540941, at *9 (Bankr. S.D.N.Y. Mar. 31, 2015).

50.     Here, the Debtor's management is unquestionably conflicted and should not be permitted to continue managing the Debtor. The Debtor received $65,000,000 of Gift Card Sales Proceeds that should have been held in trust until remitted to Blackhawk, but those funds were never paid to Blackhawk and were presumably misappropriated by the Debtor and improperly remitted to other parties. A Chapter 7 trustee is needed to investigate what happened to those funds. Debtor's management should not be permitted to continue in charge of the Debtor when such worrying questions exist regarding the Debtor's prepetition conduct, especially where that conduct could result in significant causes of action against those very insiders. Thus, cause exists for conversion due to the pre-petition conduct and mismanagement of the Debtor.

**D.     Conversion of the Chapter 11 Case to a Case Under Chapter 7 is in the Best Interests of Creditors and the Debtor's Estate.**

51.     Conversion to Chapter 7 rather than dismissal or appointment of a chapter 11 trustee is in the best interests of the Debtor's estate and its creditors. Because there is no business to reorganize or rehabilitate, no Chapter 11 purpose would be served by allowing this case to

continue in chapter 11. *See In re Glob. Emergency Res., LLC*, 563 B.R. 76, 83 (Bankr. S.D. Ga. 2016). In *In re Glob. Emergency, Res., LLC*, the Bankruptcy Court for the Southern District of Georgia converted the Chapter 11 Case of a debtor that was no longer operating, finding that "[a] neutral chapter 7 trustee is needed to collect the assets and make distributions according to the Bankruptcy Code" and that "Chapter 7 will streamline the process and will avoid a costly and perilous confirmation process, avoid continued accrual of quarterly fees, and avoid any further Debtor's attorney fees being paid from the chapter 7 bankruptcy estate." *Id.* at 84; *see also Matter of Fiesta Homes of Georgia, Inc.*, 125 B.R. 321, 326 (Bankr. S.D. Ga. 1990) (concluding "that once a decision to remove the Debtor-in-Possession is made and there is no business to operate, but only a liquidation to administer, conversion is the obvious choice").

52.     Here, conversion is the best option. If the Chapter 11 Case is dismissed, creditors will once again be at the whim of the Debtor's management to continue dissipating the Debtor's assets and evade creditors. If the case remains in Chapter 11 under a chapter 11 trustee, the Debtor will still be subject to unnecessary fees and expenses pursuing confirmation of a chapter 11 plan. Accordingly, Blackhawk submits that cause exists under Section 1112(b) and the Chapter 11 Case should be converted to a case under chapter 7.

**RESERVATION OF RIGHTS**

53.     Blackhawk expressly reserves the right to supplement this Motion prior to any hearing with any additional grounds for conversion and evidence related thereto.

**CONCLUSION**

54.     The Debtor's pre-petition misconduct, lack of an operating business, unlikelihood of rehabilitation, conflicted management, and failure to provide accurate information to this Court in its initial filings all amount to cause for conversion under Section 1112(b) of the Bankruptcy

17

Code. This case should be converted so that so that an independent fiduciary can take control of the Debtor's assets and conduct an orderly liquidation for the benefit of the Debtor's estate and its creditors.

WHEREFORE, Blackhawk respectfully requests this Court enter an order converting this Chapter 11 Case to a case under chapter 7 and granting all other relief the Court deems appropriate.

Dated: February 13, 2026

**BAKER & HOSTETLER LLP**

*/s/ Danielle L. Merola*
**Jimmy D. Parrish, Esq.**
FL Bar No.: 0526401
E-mail: jparrish@bakerlaw.com
**Danielle L. Merola, Esq.**
FL Bar No.: 120120
E-mail: dmerola@bakerlaw.com
SunTrust Center, Suite 2300
200 South Orange Avenue
Orlando, Florida 32801-3432
Telephone: (407) 540-7920
Facsimile: (407) 841-0168

*Counsel for Blackhawk Network, Inc.*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 13th day of February 2026, I electronically filed the foregoing motion with the Clerk of the Court by using the Court's CM/ECF System which will send a Notice of Electronic Filing and copy to all parties requesting such notice.

*/s/ Danielle L. Merola*
Danielle L. Merola, Esq.

18

# Exhibit A

## DISTRIBUTION PARTNER MASTER AGREEMENT

**THIS DISTRIBUTION PARTNER MASTER AGREEMENT**, including all attached exhibits and schedule(s) (collectively the "Agreement"), effective January 27, 2021 ("Effective Date"), is entered into by and between Blackhawk Network, Inc., an Arizona corporation ("Blackhawk"), and Moocho, Inc., a Delaware corporation ("Partner"). Blackhawk and Partner may be referred to herein individually as a "Party" and collectively as the "Parties."

**WHEREAS**, Blackhawk provides certain digital services related to prepaid gift cards as set forth in the applicable Schedule(s) to this Agreement ("BHN Offerings");

**WHEREAS**, Partner offers a digital commercial platform, inclusive of user-interfaces such as websites and/or Apps (defined in Section 1 below) and other technology ("Partner Platform"), accessible via personal computer, mobile device or other user interface through which participating consumers may, among other things, purchase, register, manage, and redeem prepaid cards from retailers and brands;

**WHEREAS**, Partner and Blackhawk intend to work together to enable and use BHN Offerings on the Partner Platform.

**NOW, THEREFORE**, in consideration of the mutual covenants and promises of the Parties and other good and valuable consideration, the sufficiency and receipt of which is hereby acknowledged, the Parties agree to be legally bound under the terms and conditions herein, inclusive of the schedule(s) named below and made part hereof.

**Schedule 1 Gift Card Sales**
**Schedule 2 Transaction Services**

1. **Definitions**. The following capitalized terms have the meanings set forth below:

    a. "Activate(d)" means a Gift Card that is enabled for and capable of being used for purchases by a Cardholder. "Activation" means the completed process through which a Gift Card is Activated, and "Activation Data" means the data necessary to Activate a Gift Card.

    b. "Affiliate" means, with respect to a Party, any person, firm, corporation, partnership, limited liability partnership, limited liability company or other entity that now or in the future, directly controls, is controlled with or by or is under common control with a Party. For purposes of the foregoing, "control" will mean: (i) where applicable, ownership directly of fifty percent (50%) or more of the voting power to elect directors thereof; or otherwise (ii) the power to direct the management of such entity.

    c. "App" means the application software provided by Partner to consumers which can be downloaded for use on mobile phones, iPads and other smart devices.

    d. "Applicable Law" means all laws, rules, regulations, or ordinances applicable to a Party.

    e. "Application Programming Interface" or "API" means a set of programming instructions and standards intended to be used as an interface by software components to communicate with each other.



1    Digital DPMA v.29 (2/1/2018)          Blackhawk Network Confidential Information

1/27/2021

f.        "BHN Platform" means the systems and technology (excluding the Partner Platform) used, controlled or licensed by Blackhawk, including, without limitation: (i) the architecture, design, and method of operation of such systems and technology; (ii) the BHN APIs; (iii) other technology used by Blackhawk as part of BHN Program; and (iv) all methods, models, specifications, software, hardware, and other technology and information of any kind and in any form, and all Intellectual Property Rights relating to any of the foregoing.

g.        "BHN Program" means the marketing, distribution and/or other programs operated by Blackhawk or its Affiliates, related to Gift Cards.

h.        "BHN Retailer" means any person or entity that (i) participates (either directly or indirectly) in the BHN Program as an issuer or redeemer of Gift Cards or (ii) grants to an issuer or redeemer of Gift Cards the right to participate in the BHN Program (either directly or indirectly) or otherwise endorses such issuer or redeemer's participation in the BHN Program; and also will be deemed to include a BHN Retailer's Affiliates, directors, officers, employees, agents, contractors and representatives. For purposes of this Agreement, any Partner Retailer is not a BHN Retailer.

i.        "Cardholder" means a natural or legal person who is in possession of an Activated Gift Card.

j.        "Claim" means an action, allegation, cause of action, cease and desist letter, charge, citation, claim, demand, directive, lawsuit or other litigation or proceeding, or notice.

k.        "Damages" means an assessment, fine, bona fide settlements, costs, damages, expenses (including, without limitation, reasonable attorneys' and accountants' fees), judgments, liabilities, losses, or penalties, incurred in connection with a Claim.

l.        "eGift" means a virtual Gift Card with a code delivered electronically to a Cardholder by e-mail or which may be accessed by Cardholder via a link in an e-mail or via the App.

m.        "Gift Card(s)" means a branded stored value or branded prepaid physical or digital card, or other electronic or digital debit payment mechanism, electronic promise, number, or payment code, (including eGifts) which, when Activated, can be used to purchase or access services and merchandise.

n.        "Gift Card Terms and Conditions" means the terms and conditions applicable to a Gift Card which are to be made available to each purchaser of a Gift Card before sale and delivered by Partner to each Cardholder.

o.        "Intellectual Property Rights" means all intellectual property rights throughout the world, including copyrights, patents, mask works, trademarks, service marks, trade secrets, inventions (whether or not patentable), know how, authors' rights, rights of attribution, and other proprietary rights and all applications and rights to apply for registration or protection of such rights.

p.        "Launch Date" means the date upon which a Gift Card first becomes available for sale to Partner's customers on the Partner Platform pursuant to this Agreement.

q.        "Mark" has the meaning set forth in Section 8.

r.        "PCI" means PCI Security Standards Council, LLC.

2    Digital DPMA v.29 (2/1/2018)                    Blackhawk Network Confidential Information

s.    "Planned Outages" means any planned disruption to the operation of the BHN Platform for any planned maintenance, replacement, upgrade or any other reason.

t.    "Partner Retailer" means any issuer or redeemer of Gift Cards with which Partner has a direct relationship that authorizes Partner to distribute and/or sell such Partner Retailer's Gift Cards.

u.    "Transaction" means a round trip transaction initiated by Partner or by Blackhawk on Partner's or BHN Retailers' behalf, as part of the routing of a Gift Card via the Partner Platform.  This includes but is not limited to instances in which the Partner Platform calls the BHN APIs to request Gift Card Activation, debit authorization, and balance inquiry. The BHN Platform may route these requests to third party systems to fulfill the requests. Transactions include any response provided by Blackhawk's systems or third party systems which are delivered back to the Partner Platform.

v.    "Transaction Service(s)" means one or more of the services listed in Schedule 2 hereto.

2.    **API License**.

2.1    License. During the Term, Blackhawk grants Partner a non-exclusive, revocable, non-sublicensable, non-transferable license to access and use certain Blackhawk Application Programming Interfaces ("BHN APIs") as may be provided by Blackhawk, solely to support the activities related to this Agreement.

2.2    Restrictions. Partner is solely responsible for calling the BHN APIs in its environment in accordance with the specifications provided by Blackhawk. No rights or licenses are granted except as expressly set forth herein.  Partner will not (and will not allow any third party to) use BHN APIs in connection with any products, services, or materials that constitute, promote or are used primarily for the purpose of dealing in: spyware, adware, or other malicious programs or code, counterfeit goods, items subject to U.S. or Canadian embargo, unsolicited mass distribution of email ("spam"), multilevel marketing proposals, hate materials, hacking/surveillance/interception/descrambling equipment, libelous, defamatory, obscene, abusive or otherwise offensive content, stolen products or items used for theft, or other illegal purposes.  Except as expressly authorized under this Agreement, Partner may not (and will not allow any third party to) (i) copy, rent, lease, sell, transfer, assign, sublicense, disassemble, reverse engineer or decompile, modify, alter or otherwise attempt to copy, access or create any source code which is included in or derived from BHN APIs or the BHN Platform; (ii) interfere with or disrupt the integrity or performance of, or attempt to gain unauthorized access to, the BHN Platform or its related systems or networks; or (iii) otherwise use BHN APIs or BHN Platform on behalf of any third party.

2.3    Suspension Rights.  Blackhawk may suspend Partner's right and license to use the BHN Platform (or any portion of the BHN Platform, including suspension of Activations and provision of Gift Cards) for cause immediately upon written notice (email is sufficient notice) to Partner, if:  (i) Blackhawk determines that Partner's access to or use of the BHN Platform poses a security or service risk to Blackhawk; (ii) any payment due to Blackhawk is not paid within two (2) days of its due date; (iii) Blackhawk determines that Partner has failed to comply with Applicable Law or Gift Card Terms and Conditions; (iv) Partner is in material breach of its contractual obligations to Blackhawk or its Affiliates; (v) Blackhawk determines there is evidence of fraud with respect to Partner's access or systems; or (vi) Partner uses the BHN Platform

3    Digital DPMA v.29 (2/1/2018)    Blackhawk Network Confidential Information

other than as expressly permitted in this Agreement.  Further, Blackhawk may suspend Partner's right and license to use the BHN Platform for the sale of a particular BHN Retailer's Gift Cards at any time if such BHN Retailer withdraws its authorization for Partner's sale of its Gift Cards.  Blackhawk shall give Partner as much prior notice as is practicable in order to remediate the cause giving rise thereto.  Blackhawk shall lift any such suspension as promptly as practicable following the resolution of the cause giving rise to the right of suspension hereunder.

2.4    Ownership. Blackhawk owns and retains all right, title and interest in and to the BHN Platform (including, without limitation, the BHN APIs) and all improvements, derivatives and modifications thereto.  Blackhawk or any of its Affiliates reserves the right to modify, add to or replace the BHN APIs at any time.

2.5    Updates and Modifications. In the event that Blackhawk intends to modify, add to or replace the BHN APIs, Blackhawk will endeavor to provide Partner with sixty (60) calendar days' advanced written notice of such change; provided, that Blackhawk may provide shorter notice or no advance notice if such modifications, additions or replacements are necessary to comply with Applicable Law, or to address any security breaches, potential security breaches, or similar urgent concerns.  Partner will modify the Partner Platform to comply with the modified, revised, added or replaced BHN API by the effective date of such change. The Parties will provide reasonable assistance to each other to test, resolve any issues and ensure the interoperability of the Partner Platform and the BHN Platform.

3.    **Service Levels**.

3.1    Blackhawk's Service Levels Targets.

a.    Availability and Response.  Blackhawk will use commercially reasonable efforts to process and respond to each API call from the Partner Platform as follows:

(i)    Availability.  The BHN APIs will be available and responsive for 99.5% of requests made by Partner over a single calendar month, excluding downtime for Planned Outages.

(ii)    Response Rate.  The BHN APIs will respond in four (4) seconds or less for 99% of all requests over a single calendar month, excluding downtime for Planned Outages.  Partner and Blackhawk will work together to establish a network topology or peering points necessary to achieve this benchmark.

b.    Timing, Notice and Limitation Regarding Planned Outages.

(i)    Blackhawk will use commercially reasonable efforts to schedule all Planned Outages between 10:00 p.m. to 2:00 a.m. PST/PDT; and will use commercially reasonable efforts to manage Planned Outages in a manner that minimizes any material disruption to the routing of Transactions pursuant to this Agreement, and in a manner that does not disadvantage Partner-initiated Transactions compared to other transactions routed by Blackhawk; *provided, however*, that Partner acknowledges and accepts

4    Digital DPMA v.29 (2/1/2018)              Blackhawk Network Confidential Information

that Blackhawk will, from time to time have Planned Outages between 9:00 p.m. and 7:00 a.m. PST/PDT.

(ii)    Blackhawk will use commercially reasonable efforts to give Partner at least five (5) calendar days' prior written notice of any Planned Outages and will strive to give Partner at least seven (7) calendar days' prior written notice.

(iii)    Blackhawk will notify Partner as soon as reasonably practicable after it becomes aware of any other disruption or likely disruption to the operation of the BHN Platform, including notification of third party system downtime of which it becomes aware.

4.    **Account Management Services**.  During the Term, Blackhawk will provide certain agreed upon account management services to Partner that may include the following, as needed:

a.    Weekly calls with Partner to review business opportunities;

b.    Management of settlement issues, customer issues and other operational issues;

c.    Seek approval from BHN Retailers to participate in the Partner Platform; and

d.    Assist Partner with questions regarding new product terms, content, and branding.

5.    **Fees; Payments**.

5.1    Schedule Fees.  Each Party agrees to pay all applicable fees set forth in the Schedule(s) attached hereto in accordance with the payment terms set forth therein.

5.2    Payment Terms.    For purposes of invoicing under this Agreement, a week is the seven (7) calendar day period ending each Saturday at 11:59:59 p.m. (each, a "Sales Week").  All times referred to in this Agreement mean local time in Salt Lake City, Utah, U.S.A, Mountain Time.  If a reporting day, invoicing day or payment day is a national legal holiday, then the report, invoice or payment, as applicable, will be due on the next business day.  All amounts paid to Partner by Blackhawk will be remitted using ACH procedures to an account designated by Partner.  All amounts paid by Partner to Blackhawk will be remitted using ACH procedures to an account designated by Blackhawk.

5.3    Failure to Make Timely Payments.  Notwithstanding anything to the contrary, if Partner fails to make a payment due to Blackhawk and does not cure such failure within two (2) days of receipt of written notice of such failure from Blackhawk (email is satisfactory notice in this instance); Blackhawk may, upon written notice to Partner (email is satisfactory notice in this instance) make the following changes to the payments if it deems such actions necessary based on its investigation of the issue: (i) increase the frequency of Partner's payment for sales of all BHN Retailer Gift Cards under the Agreement; (ii) require Partner to prepay for all BHN Retailer Gift Cards under the Agreement; (iii) require Partner to establish and maintain an appropriate credit mechanism upon which Blackhawk may draw on in the event Partner fails to timely make payment due to Blackhawk under this Agreement; (iv) offset any amounts owed by Partner or its

Affiliates to Blackhawk under this Agreement or under any other agreement against any credits or payments owed to Partner by Blackhawk under this Agreement or any other agreement; and/or (v) establish a reasonable timeframe and amount of funds Blackhawk will retain in order to protect itself against estimated exposure based on, among other things, reasonable the risk for chargebacks, returns, anticipated processing costs, unshipped merchandise and/or unfulfilled services, and all additional liabilities anticipated under this Agreement. Blackhawk will, upon request, meet with Partner to discuss the payment failure giving rise its actions under this provision and potential alternative changes to payments.

6.     **Taxes**. With respect to the fees and payments contemplated in this Agreement, each Party shall be solely responsible to pay all taxes (and, any penalties, interest, and other additions thereto) that each Party is liable to pay under Applicable Law or under this Agreement, and to comply with Applicable Law in respect of collection and remittance to the applicable governmental authority of any taxes due from either Party or from consumers in respect of the Transactions contemplated hereunder. Unless otherwise specified herein, all amounts paid or payable under this Agreement are exclusive of applicable taxes. Upon request, either Party shall promptly provide the other with a certificate of tax residency. Both parties shall reasonably cooperate to reduce or minimize any taxes that may impact the Transactions and payments contemplated herein.

7.     **Customer Service.** Each Party will provide, at such Party's expense, a customer service contact for the other Party to assist in resolving end-user disputes or addressing questions or problems relating to Gift Cards. Partner will be responsible for all customer service issues that relate to the Partner Platform.

8.     **Use of Trademarks/Logos**.

8.1     Each Party agrees to submit to the other Party for its prior written approval all marketing, advertising, press releases, and any promotional materials referencing the other Party and/or the other Party's trademarks, service marks, trade names, designs and logos (hereinafter "Marks"), copyrights or other Intellectual Property Rights, before the use or distribution of such materials. For purposes of this Section, when the "other Party" is Blackhawk, the term "other Party" will be deemed to include Blackhawk's Affiliates and all BHN Retailers. Similarly, when the "other Party" is Partner, the term "other Party" will be deemed to include Partner's Affiliates. The Party whose approval is sought will provide written notice of acceptance or rejection within ten (10) business days of receipt of the material. Neither Party will use or distribute or allow to be used or distributed any such material unless and until it receives the other Party's written approval to do so. Approval will not be unreasonably withheld or delayed.

8.2     The Parties agree that: (i) the other Party's Marks, copyrights or other Intellectual Property Rights will remain the sole property of the other Party; and (ii) nothing in this Agreement will confer in the Party any title to, right of ownership, or interest in the other Party's Marks, copyrights or other intellectual property, except to the extent expressly provided for herein.

8.3     In addition to the foregoing, Partner hereby grants to Blackhawk, for the term of this Agreement, a non-exclusive, worldwide, royalty free license to use, host, display, reproduce, transmit, and digitally perform any advertisements submitted to Blackhawk by, for, or on behalf of Partner, including without limitation all content, trademarks, service marks, trade names and logos contained therein, solely for the purpose

of Blackhawk fulfilling its obligations under this Agreement.  Notwithstanding subsection 8.1, Blackhawk will be permitted to use Partner's Marks or replications of Partner's Marks for the limited and express purpose of presentations, non-consumer facing marketing material or customer lists without obtaining Partner's further consent.

9.      **Audit Rights**.  Blackhawk and BHN Retailers will have the right, during the Term and for one (1) year thereafter, to inspect and audit all Partner records relating to its performance hereunder to ensure compliance with this Agreement.  Any audit will be conducted not more than one (1) time per year, at mutually agreed upon times, upon reasonable prior written notice, and in a manner that minimizes any disruption of the audited Party's normal business activities; *provided however*, that in the event of an underpayment of more than five percent (5%), the foregoing limit of one (1) audit per year will be expanded to one (1) per calendar quarter and the reasonable costs of such additional audits will be borne by Partner. Any underpayment revealed by such an audit will be paid promptly after the completion of such audit.

10.      **Representations and Warranties/Disclaimers**.  In addition to those representations and warranties made elsewhere in the Agreement (including applicable Schedules), the following representations and warranties are made:

a.      Each Party has the right, power and authority to enter into this Agreement, to grant the rights granted herein, and to perform its obligations hereunder;

b.      Each Party will comply with Applicable Law;

c.      Partner is the sole owner, in sole control of the Partner Platform, and the sole owner or a licensee with right of sublicense of the Marks used by it in connection with performing its obligations or exercising its rights under this Agreement, and such items do not infringe the Intellectual Property Rights of any person or entity;

d.      As of the Effective Date, there are no actions, suits or proceedings pending, or to the knowledge of Partner, threatened against Partner, Partner's Affiliates, agents and/or subcontractors, alleging infringement, misappropriation or other violation of any Intellectual Property Rights related to the Partner Platform or Partner's business as contemplated by this Agreement; and

e.      Partner will:

(i)      Not create Internet "links" to, "frame" or "mirror" the BHN Platform on any other server or wireless or Internet-based device (except as required for cloud computing service providers to Partner);

(ii)      Be responsible for all activity occurring under Partner's end-customer accounts, including those related to data privacy, consumer protection and the transmission of technical or personal data;

(iii)      Notify Blackhawk promptly after becoming aware of any unauthorized use of any password or account, fraudulent activation, or any other known or suspected breach of security, and will provide Blackhawk with all relevant information and take any actions reasonably necessary to stop or remedy any such breach or to prevent such breach from happening again;

(iv)      Comply with PCI Security Standards; and

DocuSign Envelope ID: 6D6BC49B-D840-4764-88AA-E615C4820AE0

(v) Not market the Gift Card(s) other than as expressly authorized under this Agreement or in the Gift Card Terms and Conditions.

**EXCEPT AS OTHERWISE EXPRESSLY SET FORTH IN THIS AGREEMENT, NEITHER PARTY MAKES ANY REPRESENTATION OR WARRANTY, AND HEREBY EXPRESSLY DISCLAIMS ALL WARRANTIES, EXPRESS, IMPLIED, STATUTORY, OR OTHERWISE, RELATING TO OR ARISING OUT OF THIS AGREEMENT, INCLUDING WITHOUT LIMITATION, ANY WARRANTY OF NON-INFRINGEMENT, ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE AND IMPLIED WARRANTIES ARISING FROM COURSE OF DEALING OR COURSE OF PERFORMANCE.**

11. **Confidential Information**.

a. For purposes hereof, "Confidential Information" means the terms of this Agreement and all information or material which (i) gives a receiving Party or a third party some competitive business advantage or the opportunity of obtaining such advantage or the disclosure of which could be detrimental to the interests of the Party who owns the Confidential Information; or (ii) which is either (A) marked "Confidential," "Restricted," or "Proprietary Information" or other similar marking, (B) known by the Parties to be considered confidential and proprietary, whether or not marked as such, or (C) from all the relevant circumstances should reasonably be assumed to be confidential and proprietary, whether or not marked as such. For purposes of this Agreement, Blackhawk's Confidential Information will also be deemed to include, as between Blackhawk and Partner, the Confidential Information of each BHN Retailer to which it relates. Notwithstanding the foregoing, Confidential Information will not include information which: (i) is or becomes generally known to the public by any means other than a breach of the obligations of a receiving Party; (ii) was previously known to the receiving Party or rightly received by the receiving Party from a third party; or (iii) is independently developed by the receiving Party without reference to information received from the other Party.

b. Unless otherwise provided under this Section, each Party agrees to hold the other Party's Confidential Information in strict confidence in perpetuity. The Parties agree not to make each other's Confidential Information available to any person (other than to a Party's accountants, auditors, attorneys or contractors that are obligated to hold the Confidential Information in strict confidence) or to use each other's Confidential Information for any purpose other than the implementation of, and as specified in, this Agreement. Each Party agrees to take all reasonable steps to ensure that Confidential Information of either Party is not disclosed or distributed by its employees, accountants, auditors, attorneys, agents or contractors in violation of this Agreement. This Confidential Information Section supplements and does not supersede any existing non-disclosure or confidentiality agreements between the Parties.

c. In the event any Confidential Information is required to be disclosed by a receiving Party under the terms of a valid and effective subpoena or order issued by a court of competent jurisdiction, or by a demand or information request from an executive or administrative agency or other governmental authority, the receiving Party requested or required to disclose such Confidential Information will, unless prohibited by the terms of a subpoena, order, or demand, (i) promptly notify the disclosing Party of the terms and circumstances surrounding such demand or request, and (ii) consult with the disclosing Party on the advisability of making legal efforts to resist or narrow such demand or request. If disclosure of such Confidential Information is required and regardless of whether the receiving Party is prohibited from notifying the disclosing Party of a subpoena, order or demand, by the terms of same, the receiving Party will exercise its reasonable efforts to narrow the scope of disclosure and obtain an order or other reliable assurance that confidential treatment will be accorded to such Confidential Information.

d. Partner's Confidential Information will remain the sole and exclusive property of Partner, and Blackhawk's Confidential Information will remain the sole and exclusive property of Blackhawk or the applicable BHN Retailer, as the case may be.

e. Each Party acknowledges that its breach of the provisions in this Confidential Information section will cause irreparable damage and hereby agrees that the other Party will be entitled to seek injunctive relief under this Agreement, as well as such further relief as may be granted by a court of competent jurisdiction.

12. **Financial Information.**  In the event Partner does not provide publicly available audited financial statements audited by an auditor (a chartered accountant or a certified public accountant), it will provide Blackhawk annual unaudited financial statements within ninety (90) days after the close of every fiscal year unless and until the Partner has audited financial statements. Partner shall provide to Blackhawk Partner's audited annual financial statements when such financials becomes available. Such financial statements shall be prepared in accordance with generally accepted accounting principles.  The provision of financial information, as stated herein, shall be considered Partner Confidential Information and is a material obligation of this Agreement.

13. **Materially Adverse Change in Financial Condition**.  If Blackhawk determines that there has been a change (or effect) in the business, financial condition or operations of Partner which change or effect, individually or in the aggregate, is or could reasonably be expected to be materially adverse to such business, financial condition, operations of Partner and its ability to consummate its obligations under this Agreement, Blackhawk may, upon written notice to Partner (email is satisfactory notice in this instance), request adequate assurances from Partner regarding its financial condition and its ongoing ability to fulfill its obligations under the Agreement.  If Partner fails to provide Blackhawk with adequate assurances within five (5) business days, Blackhawk may, upon written notice to Partner (email is satisfactory notice in this instance), immediately: (i) suspend Partner's right to use the BHN Platform (or any portion of the BHN Platform, including suspension of Activations and provision of Gift Cards) and/or (ii) establish a reasonable timeframe and amount of funds Blackhawk will retain in order to protect itself against the risk of, among other things, existing, potential, or anticipated processing costs plus Blackhawk's estimated exposure based on reasonable criteria for chargebacks, returns, unshipped merchandise and/or unfulfilled services, and all additional liabilities anticipated under this Agreement. The provision of financial information, as stated herein, shall be considered a material obligation of this Agreement.

14. **Indemnification**.

14.1 Partner Indemnification.  Partner agrees to defend, indemnify and hold harmless Blackhawk and its Affiliates, officers, directors, agents, and employees from and against any and all third party Claims and Damages arising out of or related to (i) Partner's breach (or, as to defense obligations only, alleged breach) of this Agreement; (ii) Partner's gross negligence, willful misconduct or fraudulent acts or omissions; (iii) Partner's violation of any Applicable Law; (iv) the infringement of the rights of any person or entity related to the permitted use of Partner's Marks, Partner Platform,  or other systems owned or operated by or on behalf of Partner under this Agreement; and (v) Partner's infringement of the rights (including, without limitation, the Intellectual Property Rights, proprietary rights, rights to privacy and rights to publicity) of any person or entity.

14.2 Blackhawk Indemnification.  Blackhawk agrees to defend, indemnify and hold harmless Partner and its officers, directors, agents and employees from and against any and all third party Claims and Damages arising out of or related to

9    Digital DPMA v.29 (2/1/2018)          Blackhawk Network Confidential Information

(i) Blackhawk's breach (or, as to defense obligations only, alleged breach) of this Agreement; (ii) Blackhawk's gross negligence, willful misconduct or fraudulent acts or omissions; (iii) Blackhawk's violation of any Applicable Law; (iv) a claim that the Blackhawk services herein infringe the Intellectual Property Rights of any person or entity; and (v) Blackhawk's infringement of the rights (including, without limitation, the Intellectual Property Rights, proprietary rights, rights to privacy and rights to publicity) of any person or entity.

14.3    Indemnification Procedure.  The Party seeking indemnification, as the indemnitee, will provide the other Party, as the indemnitor, prompt written notice of any third party Claim for which indemnity is sought.  If the indemnitor is so notified, the indemnitor will promptly hire experienced and competent counsel, and will have sole control of the defense and all negotiations for the compromise or settlement of such Claim, and will pay any Damages in respect of such Claim and reimburse the indemnitee for its reasonable expenses incurred in cooperation with and providing assistance to the indemnitor; *provided, however*, that the indemnitor may not settle any such Claim without the indemnitee's consent if the proposed settlement would be in the indemnitee's name or impose pecuniary or other liability or an admission of fault or guilt on the indemnitee or would require the indemnitee to be bound by an injunction of any kind.  Notwithstanding the foregoing, to the extent that such Claim is based on an assertion that the indemnitor's marketing materials used in the performance of its obligations hereunder, or the indemnitor's Marks, products, or other intellectual property infringe on any registered patent, copyright or Marks of any non-Party, or the rights to privacy or rights to publicity of any non-Party, the indemnitor will have the right, at its sole option and expense to procure for the indemnitee the right to continue using such marketing materials, to replace or modify them with non-infringing materials, or to withdraw them from use altogether. Consent to settlement will not be unreasonably withheld.

15.    **Limitations of Liability**.  THE FOLLOWING LIMITATIONS SHALL NOT APPLY TO ANY CLAIM THAT (A) IS SUBJECT TO INDEMNIFICATION ABOVE, (B) ARISES OUT OF A BREACH OF CONFIDENTIALITY, OR (C) ARISES OUT OF GROSS NEGLIGENCE, WILLFUL MISCONDUCT, OR FRAUD:  IN NO EVENT SHALL EITHER PARTY, OR ANY BHN RETAILER, OR THEIR AFFILIATES, BE LIABLE TO ANY PARTY TO THIS AGREEMENT, BHN RETAILER, OR ANY OF THE AFFILIATES OF ANY OF THEM, OR ANY THIRD PARTY, WHETHER IN CONTRACT, TORT, EQUITY OR OTHERWISE, FOR (1) ANY INDIRECT, INCIDENTAL, CONSEQUENTIAL, SPECIAL, PUNITIVE OR EXEMPLARY DAMAGES (EVEN IF SUCH DAMAGES ARE FORESEEABLE, AND WHETHER OR NOT A PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES) ARISING FROM OR RELATING TO THIS AGREEMENT; OR (2) ANY DIRECT DAMAGES, OTHER THAN THE PAYMENT OF GIFT CARD LOAD AMOUNTS DUE BY PARTNER TO BLACKHAWK HEREUNDER, ARISING FROM OR RELATING TO THIS AGREEMENT TO THE EXTENT THAT THE AGGREGATE AMOUNT OF SUCH DAMAGES EXCEEDS THE AGGREGATE AMOUNT ACTUALLY EARNED BY BLACKHAWK HEREUNDER AS COMMISSIONS OR FEES IN THE TWELVE (12) MONTHS BEFORE THE DATE SUCH CLAIM AROSE.

16.    **Term and Termination**.

16.1    Unless earlier terminated pursuant to the terms herein, this Agreement will commence on the Effective Date and shall continue until three (3) years after the Launch Date ("Initial Term") and will automatically renew for successive one (1) year periods (each, a "Renewal Term").  Either Party may terminate this Agreement

10    Digital DPMA v.29 (2/1/2018)                Blackhawk Network Confidential Information

at the end of the Initial Term or a Renewal Term by providing the other Party with written notice of its intent not to renew at least ninety (90) calendar days prior to the end of the Initial Term or a Renewal Term.  Collectively, the Initial Term and each Renewal Term will be referred to as the "Term".

16.2    Either Party may terminate this Agreement by giving to the other Party written notice of such termination upon the other Party's (i) material breach of any material term (subject to the other Party's right to cure within thirty (30) calendar days (or five (5) calendar days in the case of a payment breach) after receipt of such notice); (ii) becomes insolvent or admits its inability to pay its debts generally as they become due; (iii) becomes subject, voluntarily or involuntarily, to any proceeding under any domestic or foreign bankruptcy or insolvency law, which is not fully stayed within seven (7) business days or is not dismissed or vacated within forty five (45) business days after filing; (iv) is dissolved or liquidated or takes any corporate action for such purpose; (v) makes a general assignment for the benefit of creditors; or (vi) has a receiver, trustee, custodian, or similar agent appointed by order of any court of competent jurisdiction to take charge of or sell any material portion of its property or business. Further, in the event Partner ceases, for any reason, to carry forth its business as described in this Agreement, then Partner will provide: (i) Blackhawk immediate notice of such event; and (ii) its customers, within 24 hours of such event, notice of such event and a means by which customers can access their Gift Card Product if any customer information is stored or otherwise available to the customers in or through the Partner Platform. The right to suspend performance under this Agreement is not limited or impaired by this Section. Upon expiration or termination of this Agreement, the Parties will immediately remit full payment for amounts accrued and owing hereunder before the date of expiration or termination, without offset.  All provisions relating to indemnification, confidentiality and limitations of liability will survive the expiration or termination of this Agreement.

17.    **General**.

17.1    Notices.  All notices hereunder will be in writing, and will be given personally by facsimile, certified mail or by overnight courier to the address set forth below each Party's signature block.  Any Party may change its address for receiving notices or other communications by providing notice to the other as provided in this Section.

17.2    Publicity.  Neither Party will issue any press release or make any other public disclosure relating to this Agreement or the performance of any collaboration under this Agreement, without the prior written consent of the other Party.

17.3    Export Controls.  The Parties will comply with all export laws and restrictions and regulations of the Department of Commerce, the United States Department of Treasury Office of Foreign Assets Control, or other United States, Canadian, or foreign agency or authority.  Neither Party will export, or allow the export or re-export of the APIs or any other technology in violation of any such restrictions, laws or regulations.

17.4    Entire Agreement.  The body of this Agreement, the Schedule(s) attached hereto, and any written nondisclosure agreement previously executed by the Parties set forth the entire agreement and understanding between the Parties as to the subject matter hereof and supersede all prior discussions, agreements and understandings

of any kind and every nature between them.  Each Party confirms that it has not relied upon any statement, representation or understanding that is not an express term of this Agreement and will not have any remedy in respect of any statement, representation or understanding which is not an express term of this Agreement, unless made fraudulently.  This Agreement will not be changed, modified or amended except in writing and signed by both Parties.  In the event that there is a conflict or inconsistency between the terms, covenants or conditions of this Agreement and the Schedule(s) attached herein, the terms, covenants, and conditions of the body of this Agreement will control.

17.5    Assignment.  Neither Party may transfer or assign (by merger or operation of law or otherwise) this Agreement or its obligations under this Agreement, in whole or in part, without the prior written consent of the other Party (which consent will not be unreasonably withheld); *provided, however*, that either Party, upon not less than thirty (30) calendar days' prior written notice to the other Party, may assign this Agreement in whole (but not in part) to any Affiliate of such Party; and *provided further* that any assignment or transfer (even to an Affiliate) that is to a direct competitor of the other Party (or its Affiliates) may be rejected by the other Party at its sole discretion.  Any purported assignment in violation of this Section will be null and void.

17.6    Governing Law/Disputes.  Any claim, controversy, or dispute arising under or related to this Agreement will be governed by and construed in accordance with the laws of the State of California, without giving effect to the conflict of law principles thereof.  Any controversy or claim arising out of or in any way connected with this Agreement or the alleged breach hereof will be resolved by one arbitrator, in accordance with the Commercial Arbitration Rules of the American Arbitration Association ("AAA") then in effect in San Francisco, California and will be held in the San Francisco Bay Area.  Judgment upon the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof.  Costs of arbitration will be shared equally by both Parties.

17.7    Force Majeure.  Neither Party will be liable to the other Party for any delay or failure in performance, including compliance with Service Levels specified herein, (other than the payments due under this Agreement) arising out of a cause beyond its control and without its fault or negligence.  Such causes may include, but are not limited to fires, floods, earthquakes, strikes, unavailability of necessary utilities, blackouts, acts of God, acts of declared or undeclared war, acts of regulatory agencies, or national disasters.

17.8    Severability and Waiver.  If any provision of this Agreement (or any portion thereof) is determined to be invalid or unenforceable, the remaining provisions of this Agreement will not be affected thereby and will be binding upon the Parties and will be enforceable, as though said invalid or unenforceable provision (or portion thereof) were not contained in this Agreement.  The failure of either Party to insist upon strict performance of any provision in this Agreement will in no way constitute a waiver of its rights, at law or in equity, or a waiver of any other provisions of this Agreement or subsequent default by the other Party in the performance of or compliance with any of the terms and conditions in this Agreement.

17.9    Third Party Beneficiaries.  Except as expressly stated in this Agreement, no consumer, or any other third party is beneficiary to this Agreement.

12    Digital DPMA v.29 (2/1/2018)                    Blackhawk Network Confidential Information

17.10   Independent Contractor.   The Parties are independent contractors.   Nothing in this Agreement will be construed to create a joint venture, partnership, or an agency relationship between the Parties.  Neither Party has the authority, without the other Party's prior written approval, to bind or commit the other Party in any way.

17.11   Headings.  The headings of this Agreement are intended solely for convenience of reference and will be given no effect in the interpretation or construction of this Agreement.

17.12   Counterparts.  This Agreement may be executed in counterparts, which execution may be by facsimile, each of which will be an original, but all of which will constitute one, and the same, document.

IN WITNESS WHEREOF, the undersigned have effectively executed this Agreement as of the Effective Date.

**BLACKHAWK NETWORK, INC.**

By: _Brett Narlinger_
— 75CBCB95704A4B2...
Name: Brett Narlinger
Title: SVP- Global Commerce
Date: _1/27/2021_

**MOOCHO, INC.**

By: _Matthew Levenson_
— 96C681002588465...
Name: Matthew Levenson
Title: CEO
Date: _1/28/2021_

**BLACKHAWK NETWORK, INC.**
Attn: Talbott Roche
6220 Stoneridge Mall Road
Pleasanton, CA 94588
Fax: 925-226-9083
With a copy to: Legal Dept.
Attn: General Counsel
Fax: 925-226-9728

**MOOCHO, INC.**
Attn: Matthew Levenson
1815 Purdy Avenue
Miami Beach, FL 33139

**SCHEDULE 1**
**GIFT CARD SALES**

1.      **Overview**.  During the Term, Blackhawk will provide mutually approved Gift Cards of BHN Retailers through BHN APIs, enabling the Partner Platform to offer Gift Cards for sale to consumers located in the United States.  In addition, Blackhawk will transmit Activation Data for mutually approved Partner Retailers' Gift Cards.

2.      **Sale of Gift Cards**.

2.1      Partner agrees to offer for sale to consumers located solely in the United States, through the Partner Platform, the Gift Cards of certain BHN Retailers in accordance with this Agreement.

2.2      If Partner chooses to offer Gift Cards from certain BHN Retailers that require a separate agreement ("Agreement Acknowledgement") from this Agreement (which typically covers such items as trademark usage, confidentiality, and indemnification), then Partner will sign such Agreement Acknowledgement.  Further, if Partner chooses to offer for sale the Gift Cards of certain BHN Retailers that have separate terms and conditions, then Partner hereby agrees to abide by such terms and conditions.

2.3      No Gift Cards of BHN Retailers may be sub-distributed for sale by a third-party.  Partner covenants that: (i) only Partner, and not a third-party, will have the responsibility, ability and authority to (A) affect or modify the content and operation of the Partner Platform related to the display, marketing, promotion, sales, Gift Card Terms and Conditions and Gift Card Activation and (B) collect sums due for Gift Card sales to consumers for remittance to Blackhawk; and (ii) such sales will be conducted pursuant to the terms of this Agreement.

2.4      Title to the Gift Cards shall remain with the relevant BHN Retailer until a Gift Card has been Activated by the BHN Retailer and sold to a Cardholder.

2.5      Partner will use commercially reasonable efforts to use marketing channels, including but not limited to emails, to make customers aware of the Gift Cards available via the Partner Platform.

3.      **Activation Data Transmission Services**.  Blackhawk will provide an additional service to Partner that will transmit Activation Data for mutually approved Partner Retailers' Gift Cards.  Prior to any transmission of Activation Data for a Partner Retailer's Gift Card, Partner shall provide to Blackhawk Partner Retailer's approval to participate in Partner's gift card program.  For avoidance of doubt, Blackhawk will not provide any other services (e.g. settlement, provision of Marks, approval for participation in the Partner program, etc.) to Partner for any Partner Retailer.

4.      **Payment**.  Partner will remit payment to Blackhawk according to the below terms:

4.1      Partner Commissions.  For all BHN Retailer Gift Cards sold hereunder, Partner will earn the commissions ("Partner Commission") as set forth for each Gift Card on Exhibit A to Schedule 1 ("Commission Schedule") and as modified by the criteria set forth in the following table:

14    Digital DPMA v.28June2016                    Blackhawk Network Confidential Information



Partner acknowledges and agrees that the BHN Retailers and the Partner Commissions listed in the Commission Schedule may change from time to time due to changes in Blackhawk's underlying agreements with BHN Retailers and that Blackhawk is not obligated to offer all of the Gift Cards listed in the Commission Schedule. Blackhawk will advise Partner of such changes in writing (which may be done by email) as such changes occur.

     4.2  <u>Invoicing and Payment Terms</u>. All BHN Retailer Gift Cards sold hereunder will be invoiced and paid as follows:

    a.  <u>Daily Invoice</u>. Blackhawk will deliver to Partner a daily electronic invoice covering the sales of all BHN Retailer Gift Cards sold during the preceding calendar day (the "Daily Invoice"). Partner authorizes Blackhawk to draft payment for the Daily Invoice such that Blackhawk is paid on the calendar day following submission to Partner of each Daily Invoice. Partner will complete and submit the ACH form provided by Blackhawk and allow it to test the accuracy of the ACH information/process. Partner will maintain sufficient funds in its designated ACH account to pay all invoices when due.

    b.  <u>Credit Deposit</u>. Based on credit risk and volume-based reviews to be conducted by Blackhawk from time to time during the Term, Partner will be required to maintain a pre-established cash dollar amount "on account" equal to ▮▮▮▮▮▮▮▮▮▮▮▮▮ ("Minimum Balance") with Blackhawk to support projected sales activity ("Credit Account"). Blackhawk will review the sufficiency of the required Minimum Balance in the Credit Account on a quarterly basis, and has the right to adjust the amount of the Minimum Balance in response to changes in the estimated face value of projected quarterly sales volumes as established by Blackhawk. If Partner pays all amounts due to Blackhawk on time for one year, Blackhawk will review and determine in its sole discretion whether to eliminate the requirement for a Minimum Balance so long as Partner provides its most current financial statements for Blackhawk's consideration. Blackhawk will not eliminate the Minimum Balance requirement without reviewing Partner's most current financial statements. Within ten (10) business days after the termination or expiration of this Agreement and payment of all sums due to Blackhawk, the balance of the Credit Account, if any, will be returned to Partner. In the event Partner's designated ACH account has insufficient funds to pay any invoice, in addition to any other rights and remedies Blackhawk may have, it will notify Partner of such non-payment, and Partner will have twenty-four (24) hours following receipt of such notification to cure such non-payment. If Partner fails to cure such non-payment, then Blackhawk may immediately deduct

15  Digital DPMA v.29 (2/1/2018)    Blackhawk Network Confidential Information

from the Credit Account balance the amount required to pay the invoice and any fees and charges resulting from the failed ACH draft, and use said amount to pay such sums, and Partner will, within forty eight (48) hours after request, replenish the Credit Account to the Minimum Balance required hereunder. If the Credit Account has insufficient funds to pay the amounts due and owing, then Blackhawk will be entitled to suspend Activations of Gift Cards and any feeds to Partner via its APIs.

        c.      Reports.

           (i)     Daily Reports. Blackhawk will transmit a daily sales report to Partner setting forth the Partner Commission.

           (ii)    Reconciliation Reports. Partner will deliver weekly to Blackhawk a payment reconciliation report (the "Reconciliation Report") setting forth any discrepancies between Partner's records and the previous week's Daily Invoices.

    4.3    Record Database/Billing Dispute Resolution.

    a.    The Daily Invoice will be based on the sales of applicable BHN Retailer Gift Cards as reflected in Blackhawk's database of sales transactions during the previous calendar day (the "Record Database").

    b.    Partner will pay Blackhawk on all Daily Invoices based on the Record Database without withholding or offsetting discrepancies or disputed sums. Adjustments will be made after discrepancies or disputed sums (each, a "Billing Dispute") are mutually resolved by the Parties. If such resolution is not achieved within thirty (30) calendar days following the Reconciliation Report, the Billing Dispute will be referred to an appropriate senior account manager for each Party, who will attempt to resolve the Billing Dispute in good faith within two (2) weeks following such referral. If the senior account managers are unable to resolve the Billing Dispute within such period, they will refer the Billing Dispute to a senior officer who will attempt to resolve the Billing Dispute in good faith within two (2) weeks following such referral.

    4.4    Activation Data Transmission Fee. Blackhawk shall charge to Partner a monthly fee for each Partner Retailer Gift Card that utilizes the Activation Data Transmissions Services (the "Data Transmission Fee") based on the criteria set forth in the below table:



5.    **Refunds**.  Partner acknowledges and agrees that each BHN Retailer has the sole authority for all refunds or credits relating to, and offered in connection with, its Gift Cards once Activation occurs. If Partner issues any refund or credit, or cancels any transaction relating to a Gift Card, then, except as may be required by Applicable Law, Partner acknowledges and agrees that it does so at its sole cost and expense and that Partner is fully liable for the full and timely payment to Blackhawk of the sale value of the Gift Card less the applicable Partner Commission.

6.    **Representations and Warranties**.  Partner represents and warrants the following:

(i)    Partner will transmit Activation Data to Blackhawk only with respect to Gift Cards that have been purchased by a consumer and such Activation Data will be accurate;

(ii)    Partner will comply with the Blackhawk Practices stated below in Section 7;

(iii)    Partner will not sell, offer for sale or otherwise use the BHN Retailer Gift Cards except in accordance with the terms and conditions presented by BHN Retailer or Blackhawk;

(iv)    Partner will only sell Gift Cards to persons for delivery to recipients that are located in the United States; and

(v)    Partner has and will maintain in place policies and procedures reasonably adapted to prevent the sale of more than $10,000 in "prepaid access," as such term is defined in Section 1010.100(ff)(7)(ii) of FinCEN's Final Rule (Definitions and Other Regulations Relating to Prepaid Access, 76 FR 45403 (July 29, 2011)), to one person during any single calendar day.

7.    **Blackhawk Practices**.  The Parties agree that the Blackhawk Practices below are each deemed to be commercially reasonable and acceptable measures for storing, distributing and activating BHN Retailer Gift Cards.

7.1    Display.  Gift Cards (including the terms and conditions associated with each Gift Card) offered by Partner will be displayed by Partner on the Partner Platform in a conspicuous manner.  Partner will be responsible for accessing via the BHN APIs, the most current Gift Card terms and conditions at least every seven (7) calendar days and updating the terms and conditions associated with each Gift Card as displayed on the Partner Platform in a timely manner.

7.2    Promotion.  Except to the extent the Parties already have materials preapproved in writing or via email, Partner will not, and will ensure that the Partner Platform will not create, provide or use any disclosures (such as each Gift Card's terms and conditions), promotional materials or advertising relating to the Gift Cards unless such disclosures or materials are expressly approved in advance in writing (or by email) by Blackhawk.

17    Digital DPMA v.29 (2/1/2018)                    Blackhawk Network Confidential Information

   7.3  <u>General Operations</u>.  Partner is solely responsible for creating, maintaining and hosting the Partner Platform and for procuring and maintaining any and all software, hardware, communication line and other items necessary to receive and fulfill orders and deliver Gift Cards to customers.

   7.4  <u>Sale and Activation of un-Activated Gift Cards</u>.  Partner will be responsible for validating that all payments for Gift Cards are fully and validly tendered before sending any payment information to Blackhawk.  Partner will thereafter send all order information to Blackhawk.

   7.5  <u>Purchase Receipt or Packing List</u>.  Partner will provide to its purchasers of Gift Cards a purchase receipt or packing list (as applicable) that lists each Gift Card sold.

   7.6  <u>Order Processing</u>.

  a.  Partner will be the merchant of record, responsible for processing the payment of all Gift Card orders, returns, cancellations and other customer service relating to the foregoing on the Partner Platform, and for sending Gift Cards order information promptly to Blackhawk.

  b.  After receipt of the Gift Card order, Partner will use Blackhawk's APIs to retrieve Gift Card information.

   7.7  <u>Fraud and Risk Management</u>.  Partner will, either directly or through a third party, establish policies and maintain systems and processes designed to detect and minimize payment or Gift Card fraud and credit loss; such policies, systems and processes are to be commensurate with industry standards and will be PCI compliant.

   7.8  <u>Inappropriate Content</u>.  Partner will not offer to include, or include on the Partner Platform, any entity that promotes, sells, advertises or has embedded into or displayed on the Partner Platform, inappropriate or unlawful content.

   7.9  <u>Use of Retailer Designs</u>.  Partner will use the Marks and artwork owned or licensed by participating BHN Retailers solely to display the Gift Cards on the Partner Platform and to fulfill its obligations under this Agreement and only in the most current form provided or made available by Blackhawk or the BHN Retailer, as the case may be.  Partner will access via the BHN APIs, the most current BHN Retailer Marks and artwork at least every seven (7) calendar days and timely update its use of such Marks and artwork on the Partner Platform. Subject to the foregoing, Blackhawk will be responsible for acquiring from each BHN Retailer a limited license for Partner to use such Marks and artwork as necessary for Partner to perform its obligations under this Agreement.  Such license will be revocable by each BHN Retailer upon written or email notice from such BHN Retailer or Blackhawk.  Upon receipt of such notice, Partner will have a reasonable amount of time (not to exceed three (3) business days, unless Blackhawk advises Partner of a shorter time, in each instance, that is contractually required by a particular BHN Retailer) to cease use of the applicable Marks and artwork on the Partner Platform and any other location where such licensed materials may have been used.

   7.10  <u>Customer Service</u>.  Partner will provide customer service relating to (i) its service (ii) the online sale process; and (iii) Gift Card purchases on the Partner Platform.  In addition, each Party will provide, at such Party's expense, a customer service

contact for the other Party to help resolve customer disputes or address customer questions or problems relating to Gift Cards.

7.11    <u>eGift Cards</u>.  Upon completion of sale to a consumer, Blackhawk or its designee will deliver a unique URL to Partner for each eGift and Partner will email the unique URL to each end customer, so that when clicked by the Gift Card recipient, an HTML page is loaded which contains all the requisite data necessary for the end customer to complete redemption transactions.

8.    **Risk of Loss**.  Promptly after a Party has actual knowledge of any loss, theft or damage of Gift Cards, unauthorized issuance or attempted issuance of Gift Cards, or any unauthorized or fraudulently Activated Gift Cards or attempts to fraudulently Activate Gift Cards or to Activate Gift Cards without authorization, it shall notify the other Party thereof, along with any related pertinent information.  In connection with receipt of such notice, the Parties will promptly cooperate to investigate the foregoing and to mitigate any loss, liability, cost or expense therefrom, such as by using commercially reasonable efforts to de-Activate the related Gift Cards as to any unused balance on the affected Gift Cards.  The Parties agree that as between Partner and Blackhawk, the liability for loss, liability, cost or expense, including damage or destruction, ("Losses") with respect to the Gift Cards is as follows:

(a) any Losses arising from a third party's unauthorized access to the Partner Platform or its systems or Partner's third party provider's systems or any Losses arising from inaccurate Gift Card data or Activation Data transmission to the Blackhawk Platform from Partner (whether as a result of third party fraud, Partner's negligence, unauthorized access to Partner's or its third party-provider's computer systems or otherwise) will be the sole responsibility of Partner, except to the extent resulting from Blackhawk's fraud, willful misconduct or negligence; and

(b) any Losses arising from a third party's unauthorized access to the Blackhawk Platform or its third party provider's systems or any Losses arising from inaccurate Gift Card data or Activation Data transmission to the Partner Platform from Blackhawk (whether as a result of third party fraud, Blackhawk's negligence, unauthorized access to Blackhawk's or its third party-provider's computer systems or otherwise) will be the sole responsibility of Blackhawk, except to the extent resulting from Partner's, a BHN Retailer's or a third party-provider's respective fraud, willful misconduct or negligence.

9.    **Funds Held In Trust**. Partner represents and warrants that: (i) all monies received by Partner or its Affiliates for the Activation of BHN Retailer Gift Cards ("Gift Card Sales Proceeds"), except for the Partner Commission, are held in trust by Partner for the benefit of the applicable Gift Card issuers until paid to Blackhawk; (ii) it has no right, title or interest (including any equitable interest) in or to any Gift Card Sales Proceeds, except for the Partner Commission; (iii) it has an obligation to, and shall, remit to Blackhawk the full face value of the Activated BHN Retailer Gift Cards, less the Partner Commission; and (iv) it has not and will not pledge, grant any interest in or to or otherwise encumber such funds to be remitted to Blackhawk in favor of any third party; and (v) it will not object or take any contrary position hereto.

10.    **Bankruptcy Motion**.  In the event Partner commences bankruptcy proceedings under Title 11 of United States Code, Partner shall, on the same date as any other motions are first filed in the bankruptcy case, but no later than the second day following said bankruptcy filing, file a motion with the bankruptcy Court ("Motion of Debtor") asking for authorization to release to Blackhawk any funds received or held pre-petition by Partner arising from Partner's pre-petition sale of BHN Retailer Gift Cards hereunder. The Motion of Debtor shall reference this Agreement and expressly acknowledge that funds arising from pre-petition BHN Retailer Gift Card sales do not belong to Partner and either were or are (as of the date of the filing of the Motion of Debtor) held solely in trust by Partner for the benefit of BHN

19    Digital DPMA v.29 (2/1/2018)                Blackhawk Network Confidential Information

Retailer Gift Card issuers who are contractually bound to Cardholders upon Gift Card Activation. The Motion of Debtor shall further acknowledge that Partner is entitled only to commissions earned on the face value of BHN Retailer Gift Cards sold or to a portion of a Gift Card issuance fee set forth in the Agreement, and that Partner has at all times been obligated to remit to Blackhawk the full face value of the BHN Retailer Gift Cards sold, less such commission or fee. Partner acknowledges and agrees that there is no equitable remedy at law for breach of the obligations under this section; therefore, Partner agrees that Blackhawk may, upon Partner's breach of this section, immediately seek enforcement by means of specific performance, which may include but is not limited to filing a motion seeking turnover of Card sales funds held by Partner, without any requirement to post a bond or other security, and further that Partner will not object to that motion or assert in any manner that such funds are not trust funds or take any contrary position thereto.

11.     **BHN Retailer as Third-Party Beneficiary**. Each BHN Retailer as well as Blackhawk's and BHN Retailer's Affiliates are third-party beneficiaries to this Schedule 1 to the Agreement. In addition, Partner agrees to defend, indemnify and hold harmless BHN Retailers and their respective Affiliates, officers, directors, agents, and employees from and against any and all third party Claims and Damages arising out of or related to (i) Partner's breach (or, as to defense obligations only, alleged breach) of this Agreement; (ii) any act or omission of Partner's third-party service providers; (iii) Partner's gross negligence, willful misconduct or fraudulent acts or omissions; (iv) Partner's infringement of the rights (including, without limitation, the Intellectual Property Rights, proprietary rights, rights to privacy and rights to publicity) of any person or entity; (v) Partner's or Partner's third-party service provider's violation of any Applicable Law; and (vi) the infringement of the rights of any person or entity related to the permitted use of the Partner's Marks or systems owned or operated by or on behalf of Partner under this Agreement.

12.     **Nature of the Partnership between the Parties**.

12.1     During the Term, Partner will not (a) enter into any agreement with any BHN Retailer or other third party (unless such party is a Partner Retailer), other than through Blackhawk, for the sale or distribution of any Gift Cards; and/or (b) establish a hyperlink on any website or a third-party's technology platform controlled or operated by Partner that is directed to any third-party website that offers for sale or promotes gift cards and/or related products as its primary business. To ensure consistency and quality, Partner agrees that Blackhawk is the sole interface between BHN Retailers and Partner for the sale or distribution of Gift Cards.

**EXHIBIT A TO SCHEDULE 1**

**COMMISSION SCHEDULE**

[*SEE FOLLOWING PAGES*]

    Blackhawk Network Confidential Information

DocuSign Envelope ID: 6D6BC49B-D840-4764-88AA-5615C4820AF0

2

Blackhawk Network Confidential

DocuSign Envelope ID: 6D6BC49B-D840-4764-88AA-5615C4820AE0

5

Blackhawk Network Confidential

6

Blackhawk Network Confidential

DocuSign Envelope ID: 6D6BC49B-D840-4764-88AA-E615C4820AE0

DocuSign Envelope ID: 6D6BC49B-D840-4764-88AA-5615C4820AF0

Blackhawk Network Confidential

DocuSign Envelope ID: 6D6BC49B-D840-4764-88AA-E615C4820AE0

Blackhawk Network Confidential

DocuSign Envelope ID: 6D6BC49B-D840-4764-88AA-5615C4820AF0

17

Blackhawk Network Confidential

DocuSign Envelope ID: 6D6BC49B-D840-4764-88AA-E615C4820AE0

18 Blackhawk Network Confidential

DocuSign Envelope ID: 6D6BC49B-D840-4764-88AA-E615C4820AE0



## SCHEDULE 2
## TRANSACTION SERVICES

1.      **Overview**.  During the Term, Blackhawk will provide certain agreed upon Transaction Services (related to API calls) to Partner for purposes of adding, managing and redeeming BHN Retailer Gift Cards within the Partner Platform.

2.      **Fees and Payment for Transaction Services**.  Partner will pay to Blackhawk for the Transaction Services according to Exhibit A to Schedule 2 ("Transaction Services (API Calls) and Fees") on a monthly basis.  Blackhawk will issue a monthly invoice and Partner will pay Blackhawk within fifteen (15) calendar days of invoice issuance.  Neither Party has the right to net against, withhold from or offset against payments due under this Schedule 2.

3.      **Fraud**.  Partner and its employees will strictly adhere to any reasonable Blackhawk fraud policies and procedures as may change from time to time upon written or email notification from Blackhawk.  Such policies may include, without limitation, requiring a Gift Card PIN prior to providing a balance inquiry transaction.

4.      **Representations and Warranties**.  The following representations and warranties are made:

        a.      Each Party will perform its obligations herein in a professional manner in accordance with accepted industry standards; and

        b.      Each Party's personnel will have the requisite skill and experience required to deliver or fulfill its obligations under this Agreement.

5.      **Nature of the Partnership under Schedule 2**.  During the Term, Partner will not enter into any agreement with any third party provider of services to the Partner Platform similar to the services Partner receives from Blackhawk for the BHN Retailer Gift Cards in this Schedule 2.

**EXHIBIT A TO SCHEDULE 2**

**TRANSACTION SERVICES (API CALLS) AND FEES**





    Blackhawk Network Confidential Information

EXECUTION COPY

# FIRST AMENDMENT TO
# DISTRIBUTION PARTNER MASTER AGREEMENT

This First Amendment to Distribution Partner Master Agreement (this "*First Amendment*") is effective September 29, 2022 (the "*First Amendment  Effective Date*"), by and between Blackhawk Network, Inc., an Arizona corporation ("*Blackhawk*") and Moocho, Inc., a Delaware corporation ("*Partner*").

WHEREAS, Blackhawk and Partner are parties to that certain Distribution Partner Master Agreement, effective January 27, 2021; (the "*Agreement*"); and

WHEREAS, Blackhawk and Partner each desires to amend the Agreement as set forth below.

NOW THEREFORE, in consideration of these premises, and the covenants and mutual promises hereinafter set forth, the parties hereto agree as follows.

1.   All capitalized terms used but not defined in this First Amendment shall have the meanings set forth in the Agreement.

2.   The following definition of "Business Day" is hereby added to Section 1 of the Agreement in appropriate alphabetical order:

"Business Day" means every day Monday through Friday other than U.S. federal holidays.

3.   Section 4.2 a. of <u>Schedule 1</u> of the Agreement is hereby deleted in its entirety and replaced with the following:

"a.   <u>Invoice.</u>   Blackhawk will deliver to Partner a daily electronic invoice covering the sales of all BHN Retailer Gift Cards sold during the preceding calendar day (the "Daily Invoice"). Partner authorizes Blackhawk to draft payment for the Daily Invoice such that Blackhawk is paid on the tenth (10th) Business Day following submission to Partner of each Daily Invoice.  Partner will complete and submit the ACH form provided by Blackhawk and allow it to test the accuracy of the ACH information/process. Partner will maintain sufficient funds in its designated ACH account to pay all invoices when due."

4.   Except as explicitly set forth in this First Amendment all terms and provisions contained in the Agreement shall remain unchanged and in full force and effect.

IN WITNESS WHEREOF, the Parties, by and through their respective duly authorized representatives, have executed this First Amendment as of the First Amendment Effective Date.

**MOOCHO, INC.**

By:_____Matthew Levenson_____
          96C681002588465..

Printed Name: ___Matthew Levenson___

Title:____CEO_____

**BLACKHAWK NETWORK, INC.**

By:_____Brett Narlinger_____
          75CBCB95704A4B2..

Printed Name:___Brett Narlinger_____

Title:___Head of Global Commerce_____

TC

10/3/2022

DocuSign Envelope ID: 3FB5E85E-1E90-4F46-9AAF-AC60F62DACFF

EXECUTION COPY

## SECOND AMENDMENT TO
## DISTRIBUTION PARTNER MASTER AGREEMENT

This Second Amendment to Distribution Partner Master Agreement (this "*Second Amendment*") is effective January 26, 2023 (the "*Second Amendment Effective Date*"), by and between Blackhawk Network, Inc., an Arizona corporation ("*Blackhawk*") and Moocho, Inc., a Delaware corporation ("*Partner*").

WHEREAS, Blackhawk and Partner are parties to that certain Distribution Partner Master Agreement, effective January 27, 2021, as amended by that certain First Amendment To Distribution Partner Master Agreement, effective September 29, 2022 (collectively, the "*Agreement*"); and

WHEREAS, Blackhawk and Partner each desires to amend the Agreement as set forth below.

NOW THEREFORE, in consideration of these premises, and the covenants and mutual promises hereinafter set forth, the parties hereto agree as follows.

1.  All capitalized terms used but not defined in this Second Amendment shall have the meanings set forth in the Agreement.

2.  Notwithstanding anything in Section 4 of Schedule 1 to the contrary, as of January 1, 2023 Blackhawk and Partner agree to change the Partner Commission for all Gift Cards issued by ███████████████████ ██████████████████████████████████████████████████████████████████████████████████████ ██████████████████████████████████████

3.  Except as explicitly set forth in this Second Amendment all terms and provisions contained in the Agreement shall remain unchanged and in full force and effect.

IN WITNESS WHEREOF, the Parties, by and through their respective duly authorized representatives, have executed this Second Amendment as of the Second Amendment Effective Date.

| MOOCHO, INC. | BLACKHAWK NETWORK, INC. |
|---|---|
| By: *Matthew Levenson* | By: *Steve Dekker* |
| Printed Name: Matthew Levenson | Printed Name: Steve Dekker |
| Title: CEO | Title: Region Head |

*TC*

1/26/2023

– 1 –

Docusign Envelope ID: 8D0A2AAA-B35E-4555-BF59-7CEBF7BD4098

## THIRD AMENDMENT TO
## DISTRIBUTION PARTNER MASTER AGREEMENT

This Third Amendment to Distribution Partner Master Agreement (this "**Third Amendment**") is effective December 17, 2024 (the "**Third Amendment Effective Date**"), by and between Blackhawk Network, Inc., an Arizona corporation ("**Blackhawk**") and Moocho, Inc., a Delaware corporation ("**Partner**").

WHEREAS, Blackhawk and Partner are parties to that certain Distribution Partner Master Agreement, effective January 27, 2021, as amended by that certain First Amendment To Distribution Partner Master Agreement, effective September 29, 2022; and that certain Second Amendment To Distribution Partner Master Agreement, effective January 26, 2023 (collectively, the "**Agreement**"); and

WHEREAS, Blackhawk and Partner each desires to amend the Agreement as set forth below.

NOW THEREFORE, in consideration of these premises, and the covenants and mutual promises hereinafter set forth, the parties hereto agree as follows.

1.  All capitalized terms used but not defined in this Third Amendment shall have the meanings set forth in the Agreement.

2.  The Parties acknowledge that, pursuant to that certain Notice of Change of Minimum Credit Account Balance sent to Partner from Blackhawk, dated November 13, 2024, the Minimum Balance provided for in Section 4.2.b. of Schedule 1 of the Agreement is ▮▮▮▮▮▮▮▮▮▮▮▮.

3.  The following definition is hereby added to Section 1 of the Agreement in appropriate alphabetical order:

    "New Minimum Balance Date" means the date on which the Credit Account provided for in Section 4.2.b. of Schedule 1 contains a cash dollar amount greater than or equal to ▮▮▮▮▮▮▮▮▮▮▮▮."

4.  Section 16.1 of Agreement is hereby deleted in its entirety and replaced with the following:

    "16.1   Unless earlier terminated pursuant to the terms herein, this Agreement will commence on the Third Amendment Effective Date and shall continue until July 31, 2026 (the "Initial Term") and will automatically renew for successive one (1) year periods (each, a "Renewal Term"). Either Party may terminate this Agreement at the end of the Initial Term or a Renewal Term by providing the other Party with written notice of its intent not to renew at least ninety (90) days prior to the endo of the Initial Term or Renewal Term. Collectively, the Initial Term and each Renewal Term will be referred to as the "Term"."

5.  Section 4.1 of Schedule 1 is hereby deleted in its entirety and replaced with the following:

    "4.1    Partner Commissions.

    Notwithstanding anything in the Agreement or the Commission Schedule to the contrary, as of the Third Amendment Effective Date and through the period prior to the New Minimum Balance Date, for all BHN Retailer Cards sold hereunder, ▮▮▮▮▮▮▮▮▮▮▮▮

    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

*TC*

12/17/2024

– 1 –

██████████████████████████████████

6.    Section 4.2(b) of Schedule 1 is hereby deleted in its entirety and replaced with t1he following:

"b.    Credit Deposit. Based on credit risk and volume-based reviews to be conducted by Blackhawk from time to time during the Term, Partner will be required to maintain a pre-established cash dollar amount "on account" equal to █████████████████████ ("Minimum Balance") with Blackhawk to support projected sales activity ("Credit Account"). Blackhawk may review the sufficiency of the required Minimum Balance in the Credit Account on a quarterly basis, and the Minimum Balance shall be subject to adjustments as follows:

1.    Quarterly Review of Security Deposit:

Beginning with the first quarter of 2025 (January 1, 2025 – March 31, 2025) and continuing quarterly thereafter, the Minimum Credit Account Balance may be reviewed by Blackhawk and, if necessary, recalculated at the end of each calendar quarter. The recalculation will adjust the deposit proportionally to reflect any increase or decrease in Partner's total Gift Card sales relative to the sales volume used to establish the ██████ deposit for the fourth quarter of 2024.

2.    Adjustments Based on Sales Volume:

(A) Increase in Sales Volume: If Partner's Gift Card sales increase in proportion to the sales volume for the fourth quarter of 2024, the Minimum Credit Account Balance may, upon notice from Blackhawk to Partner, be increased proportionally to reflect the growth. Partner agrees to fund such increase within sixty (60) calendar days of receiving notice of the adjusted amount from Blackhawk.

(B) Decrease in Sales Volume: If Partner's Gift Card sales decrease in proportion to the sales volume for the fourth quarter of 2024, the Minimum Credit Account Balance may, upon notice from Blackhawk to Partner, be reduced proportionally, and Blackhawk will refund the excess deposit amount to Partner within sixty (60) calendar days of the recalculation.

3.    Notice and Disputes. In the event of an increase in the Minimum Balance in accordance with the above, Blackhawk agrees to meet with Partner to discuss the details giving rise to such adjustment. . Partner retains the right to dispute any adjustments based on inaccuracies, and the Parties agree to work in good faith to resolve such disputes promptly.

4.    Ongoing Calculation Framework. The framework established herein for calculating and adjusting the Minimum Credit Account Balance will apply for the duration of the amended Term and any Renewal Terms, unless otherwise agreed to in writing by both Parties.

5.    Remedies for Non-payment. In the event Partner's designated ACH account has insufficient funds to pay any invoice, in addition to any other rights and remedies Blackhawk may have, it will notify Partner of such non-payment, and Partner will have two (2) business days following receipt of such notification to cure such non-payment.  If Partner fails to cure such non-payment, then Blackhawk may immediately deduct from the Credit Account balance the amount required to pay the invoice and any fees and charges resulting from the failed ACH draft, and use said amount to pay such sums, and Partner will, within two (2) business days after request, replenish the Credit Account to the Minimum Balance required hereunder. If the Credit Account has insufficient funds

– 2 –

to pay the amounts due and owing, then Blackhawk will be entitled to suspend Activations of Gift Cards and any feeds to Partner via its APIs."

7.      Beginning on the New Minimum Balance Date, the following will hereby be added as a new Section 12.2 of Schedule 1 of the Agreement:

"12.2    Notwithstanding Section 12.1, above, in the event Partner receives a bona-fide offer for the sale or distribution of a Gift Card by a third party during the Term which, when considered on the whole and with due consideration of all economic terms contained herein, is more competitive than the terms offered by Blackhawk, Partner will: (a) notify Blackhawk in writing of such offer, providing sufficient detail of the product or service and the terms on which the offer is being made (a "ROFN Notice"), and (b) provide Blackhawk with a minimum of forty-five (45) days to enter into negotiations with the provider of such product or service on terms equal to or better than those identified in the ROFN Notice. If Blackhawk declines or is unable to engage the provider within the designated timeframe, then Partner may otherwise obtain such product or service independently of Blackhawk; *provided, however*, that in no event will Partner be allowed to move any Gift Card volume to a third-party in accordance with this Section 12.2 if such movement would result in the reduction the total dollar volume of Gift Cards sold hereunder by an amount equal to fifteen percent (15%) or more in the previous twelve (12) months."

8.      Except as explicitly set forth in this Third Amendment all terms and provisions contained in the Agreement shall remain unchanged and in full force and effect.

*[Signatures on following page]*

IN WITNESS WHEREOF, the Parties, by and through their respective duly authorized representatives, have executed this Third Amendment as of the Third Amendment Effective Date.

**MOOCHO, INC.**

By:_____

Printed Name: _____
Matt

Title:_____
CEO

**BLACKHAWK NETWORK, INC.**

By:_____

Printed Name:_____
Steve Dekker

Title:_____
Region Head

– 4 –

# FOURTH AMENDMENT TO
# DISTRIBUTION PARTNER MASTER AGREEMENT

This Fourth Amendment to Distribution Partner Master Agreement (this "***Fourth Amendment***") is effective April 25, 2025 (the "***Fourth Amendment  Effective Date***"), by and between Blackhawk Network, Inc., an Arizona corporation ("***Blackhawk***") and Moocho, Inc., a Delaware corporation ("***Partner***").

WHEREAS, Blackhawk and Partner are parties to that certain Distribution Partner Master Agreement, effective January 27, 2021, as amended by that certain First Amendment To Distribution Partner Master Agreement, effective September 29, 2022; that certain Second Amendment To Distribution Partner Master Agreement, effective January 26, 2023; and that certain Third Amendment To Distribution Partner Master Agreement, effective December 17, 2024 (collectively, the "***Agreement***"); and

WHEREAS, the Parties are also parties to that certain Secured Promissory Note effective as of the Fourth Amendment Effective Date (the "***Loan Agreement***")

WHEREAS, Blackhawk and Partner each desires to amend the Agreement as set forth below.

NOW THEREFORE, in consideration of these premises, and the covenants and mutual promises hereinafter set forth, the parties hereto agree as follows.

1.  All capitalized terms used but not defined in this Fourth Amendment shall have the meanings set forth in the Agreement.

2.  The definition of New Minimum Balance Date is hereby deleted in its entirety and replaced with the following:

    "New Minimum Balance Date" means the date on which the Credit Account provided for in Section 4.2.b. of Schedule 1 contains a cash dollar amount greater than or equal to ███████████████████ ████████████. Such date will be confirmed by Blackhawk in writing following such time."

3.  The following is hereby added to the end of Section 2.3:

    "Blackhawk may suspend all performance hereunder (including suspension of Activations and provision of Gift Cards) immediately and without notice to Partner upon an Event of Default (as defined in the Loan Agreement) or any breach of this Agreement. In addition, if during a single calendar day the face value of Gift Cards sold hereunder exceeds Two Million Five Hundred Thousand Dollars ($2,500,000) (the "***Daily Volume Cap***"), Blackhawk may immediately and without notice to Partner suspend all further Activations for the remainder of that calendar day. Once the Loan amount (as defined in the Load Agreement) is below Thirty Million Dollars ($30,000,000), Blackhawk may increase the Daily Volume Cap to Five Million Dollars ($5,000,000) pending any corresponding adjustment to the Minimum Balance as Blackhawk determines in its sole discretion.  Blackhawk may also reduce the Daily Volume Cap to a lower value (including to $0) if Blackhawk determines at its sole discretion that Partner has credit risk for any reason."

4.  Section 5.3 of the Agreement is hereby deleted in its entirety and replaced with the following:

    "5.3    Failure to Make Timely Payments. If Partner fails to make any payment under the Loan Agreement or this Agreement when due, Blackhawk may, effective immiedately and in its sole discretion, make the following changes to the payments if it deems such actions necessary based on its investigation of the issue: (i) increase the frequency of Partner's payment for sales of all Gift Card hereunder; (ii) require Partner to prepay for all Gift Cards hereunder; (iii) increase the Minimum Balance in the Credit Account; and/or (iv) offset any amounts owed by Partner or its Affiliates to Blackhawk under this Agreement or under any other agreement against any credits or payments owed to Partner by Blackhawk under this Agreement.

– 1 –

5.	Section 9 of the Agreement is hereby deleted in its entirety and replaced with the following:

"9.	Audit Rights. Blackhawk and BHN Retailers will have the right, during the Term and for one (1) year thereafter, to inspect and audit all Partner records relating to its performance hereunder to ensure compliance with this Agreement. Any audit will be conducted at such times and at such frequency as Blackhawk shall determine; provided however, that in the event of an underpayment of more than five percent (5%), the reasonable costs of any such audits will be borne by Partner. Any underpayment revealed by such an audit will be paid promptly after the completion of such audit."

6.	The following is hereby added to the end of Section 12:

"As of the Fourth Amendment Effective Date, Partner agrees to meet with Blackhawk monthly to provide all financial performance metrics requested by Blackhawk to ensure Partner's ongoing ability to meet its obligations under the Loan Agreement and this Agreement."

7.	Section 15 of the Agreement is hereby deleted in its entirety and replaced with the following:

"15	**Limitations of Liability**.  IN NO EVENT WILL BLACKHAWK, OR ITS AFFILIATES, BE LIABLE TO ANY PARTY TO THIS AGREEMENT OR ITS AFFILIATES, OR ANY THIRD PARTY, WHETHER IN CONTRACT, TORT, EQUITY OR OTHERWISE, FOR (A) ANY INDIRECT, INCIDENTAL, CONSEQUENTIAL, SPECIAL, PUNITIVE OR EXEMPLARY DAMAGES (EVEN IF SUCH DAMAGES ARE FORESEEABLE, AND WHETHER OR NOT A PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES) ARISING FROM OR RELATING TO THIS AGREEMENT OR THE LOAN AGREEMENT; OR (B) ANY DIRECT DAMAGES ARISING FROM OR RELATING TO THIS AGREEMENT OR THE LOAN AGREEMENT TO THE EXTENT THAT THE AGGREGATE AMOUNT OF SUCH DAMAGES EXCEEDS FIFTY THOUSAND DOLLARS ($50,000).

8.	Section 16.1 of the Agreement is hereby deleted in its entirety and replaced with the following:

"16.1	Unless earlier terminated pursuant to the terms herein, this Agreement will commence on the Effective Date and continue until the later of (a) July 31, 2026, or (b) the date on which Partner has paid the Loan in full (the "***Term***"). Blackhawk may terminate this Agreement for any reason or no reason on five (5) Business Days' notice to Partner."

9.	Section 17.5 of the Agreement is hereby deleted in its entirety and replaced with the following:

"17.5 Assignment. Partner shall not transfer or assign (by merger or operation of law or otherwise) this Agreement or its obligations under this Agreement, in whole or in part, without the prior written consent of Blackhawk (which consent will not be unreasonably withheld); provided that any assignment or transfer (even to an Affiliate of Partner) that is to a direct competitor of Blackhawk (or its Affiliates) may be rejected by Blackhawk at its sole discretion. Any purported assignment in violation of this Section will be null and void.  Blackhawk may transfer or assign (by merger or operation of law or otherwise and for any reason) this Agreement at its sole discretion without the consent of Partner."

10.	A new Section 17.13 is hereby added to the Agreement as follows:

"17.13 Partner Release. Partner, on behalf of itself, its parents, subsidiaries, and Affiliates, and their respective past and current officers, directors, principals, partners, managers, members, shareholders, employees, agents, representatives, successors and assigns, hereby fully and completely releases and forever discharges Blackhawk, its parents, subsidiaries, and Affiliates, and their respective past and current officers, directors, principals, partners, managers, members, shareholders, employees, agents, representatives, successors and assigns ("***Blackhawk Parties***"), from any and all Claims of every kind, nature and

– 2 –

description whatsoever, whether known or unknown, at law or in equity, it may now have or has ever had against Blackhawk Parties in connection with this Agreement and the BHN Program (the "***Release***"). Partner agrees to reaffirm the Release on an ongoing basis during the Term as a condition precedent of Blackhawk approving each Activation request from Partner."

11.  A new Section 2.6 is hereby added to Schedule 1 as follows:

"2.6    Partner may not offer any marketing promotion or campaign in which customers receive a discount (or equivalent value) that is greater than seventy-five percent (75%) of the Partner Commission without Blackhawk's prior written approval."

12.  Section 4.1 of Schedule 1 is hereby deleted in its entirety and replaced with the following:

"4.1    Partner Commissions.

On the Fourth Amendment Effective Date, Blackhawk will draw down on the Credit Account such amounts (together with the Loan amount) required to make Partner current on its outstanding trade payable amounts owed to Blackhawk. Notwithstanding anything in the Agreement to the contrary, as of the Fourth Amendment Effective Date, and through the period prior to the New Minimum Balance Date, for all BHN Retailer Gift Cards sold hereunder, Blackhawk will retain one hundred percent (100%) of the distribution commission, which will be included in the Daily Invoice and drafted by Blackhawk in accordance with Section 4.2.a of Schedule 1, below, fifty percent (50%) of which will be put toward achieving the new Minimum Balance amount.

Beginning on the New Minimum Balance Date, for all BHN Retailer Gift Cards sold hereunder, Partner will earn fifty percent (50%) of the distribution commission ("***Partner Commission***") as set forth for each Gift Card on the Commission Schedule, and Blackhawk agrees to put thirty-five percent (35%) of the distribution commission into the Credit Account. Once the amount in the Credit Account is more than or equal to the outstanding Loan amount, Blackhawk may, at its election, choose to use funds from the Credit Account as full and final payment of the Loan; *provided, however*, that in the event Partner misses any payment under the Loan Agreement, all amounts in the Credit Account that exceed the Minimum Balance will be swept by Blackhawk and will not be used for the repayment of any Loan amounts. Following the New Minimum Balance Date, Blackhawk will promptly issue a Commission Schedule listing the new Partner Commission amounts to Partner. Partner acknowledges and agrees that the BHN Retailers and the Partner Commissions listed in the Commission Schedule may change from time to time due to changes in Blackhawk's underlying agreements with BHN Retailers and that Blackhawk is not obligated to offer all of the Gift Cards listed in the Commission Schedule. Blackhawk will advise Partner of such changes in writing (which may be done by email) as such changes occur."

13.  Section 4.2(a) of Schedule 1 is hereby deleted in its entirety and replaced with the following:

"a.    Daily Invoicing. Beginning April 21, 2025, Blackhawk will deliver to Partner a daily electronic invoice covering the sales of all BHN Retailer Gift Cards sold during the preceding calendar day (the "***Daily Invoice***"). Partner authorizes Blackhawk to draft payment for the Daily Invoice such that Blackhawk is paid on the business day following submission to Partner of each Daily Invoice. Partner will complete and submit any ACH form provided by Blackhawk and allow it to test the accuracy of the ACH information/process, including through the Restricted Account (as defined below). Partner will maintain sufficient funds in the account to pay all invoices when due.

Partner reaffirms Section 9 of Schedule 1, below, and Partner agrees to hold all funds received from the sale of BHN Retailer Gift Cards hereunder in a restricted account for the sole benefit of Blackhawk approved by Blackhawk (the "***Restricted Account***"). Partner agrees to execute all customary documentation, including a

– 3 –

deposit account control agreement, or similar agreement, as may be required to effectuate the Restricted Account.

In addition to Blackhawk's other rights and remedies hereunder, if Partner fails to make any payment when due under this Agreement, Partner will pay interest on any outstanding amounts at the maximum rate allowable by Applicable Law as determined by Blackhawk in its sole discretion. Any interest amounts owed may be offset from funds in the Credit Account by Blackhawk at its discretion."

14.    Section 4.2(b) of Schedule 1 is hereby deleted in its entirety and replaced with the following:

"b.    Credit Deposit. Based on credit risk and volume-based reviews to be conducted by Blackhawk from time to time to during the Term, Partner will maintain a pre-established cash dollar amount "on account" with Blackhawk to support projected sales activity (the "**Credit Account**"). As of the Fourth Amendment Effective Date, the minimum balance required to be maintained by Partner in the Credit Account is ███ ██████████████████████████████████. Blackhawk has the right to adjust and the right to determine the process of adjustment to the Minimum Balance at any time in its sole discretion. In the event the Restricted Account has insufficient funds to pay any invoice, Blackhawk may immediately deduct from the Credit Account balance the amount required to pay the invoice (along with any fees and charges resulting from the failed ACH draft), and Partner will replenish the Credit Account to the Minimum Balance within two (2) Business Days. If the Credit Account has insufficient funds to pay any amounts due, Blackhawk may suspend its performance hereunder. The obligation to maintain the Credit Account and the Minimum Balance under this Section 4.2(b) will survive any termination of the Agreement and will remain in effect until all principal and interest owed by Partner under the Loan Agreement has been paid in full."

15.    Beginning on the New Minimum Balance Date, the following will hereby be added as a new Section 12.3 of Schedule 1 of the Agreement:

"12.3    Notwithstanding anything in the foregoing, Partner may enter into an agreement with a third party that offers for sale or distributes gift cards and/or related products; *provided*, *however*, that any such agreement with a third-party must contain an obligation for all funds received from the sale of Gift Cards thereunder to be held in the Restricted Account until all principal and interest owed under the Loan Agreement has been paid in full. Any agreement signed in violation of this Section 12.3 will be null and void *ab initio*."

16.    Except as explicitly set forth in this Fourth Amendment all terms and provisions contained in the Agreement shall remain unchanged and in full force and effect.

IN WITNESS WHEREOF, the Parties, by and through their respective duly authorized representatives, have executed this Fourth Amendment as of the Fourth Amendment Effective Date.

**MOOCHO, INC.**

By: _Matt Levenson_

Printed Name: _Matt Levenson_

Title: _CEO_

**BLACKHAWK NETWORK, INC.**

By: _Brett Narlinger_

Printed Name: _Brett Narlinger_

Title: _head of global commerce_

– 5 –

# Exhibit B

Florida Documentary Stamp Tax
Required by Law in the Amount of $ 2450
Has Been Paid or Will Be Paid Directly to
The Department of Revenue.
Certificate of Registration No. 340082025-58-001

## SECURED PROMISSORY NOTE

$65,000,000                                                         April 25, 2025

FOR VALUE RECEIVED, and subject to the terms and conditions set forth herein, Moocho, Inc., a Delaware corporation (the "**Maker**"), hereby unconditionally promises to pay to the order of Blackhawk Network, Inc. or its assigns (the "**Noteholder,**" and together with Maker, the "**Parties**"), the principal amount of $65,000,000, or such lesser amount outstanding on the date hereof, together with all accrued interest thereon as provided in this Promissory Note (the "**Note**").

1.    Definitions; Interpretation.

    1.1    Capitalized terms used herein shall have the meanings set forth in this Section 1.

        "**Accreted Value**" has the meaning set forth in Section 4.2.

        "**Anti-Corruption Laws**" means all laws, rules, and regulations of any jurisdiction applicable to Maker from time to time concerning or relating to bribery or corruption, including the United States Foreign Corrupt Practices Act of 1977 (15 U.S.C. §§ 78dd-1 to 78qq).

        "**Anti-Terrorism Laws**" means all laws, rules, and regulations of any jurisdiction related to money laundering or financing terrorism including the USA PATRIOT Act, the Currency and Foreign Transactions Reporting Act (also known as the "**Bank Secrecy Act,**" 31 U.S.C. §§ 5311 to 5330 and 12 U.S.C. §§ 1818(s), 1820(b) and 1951 to 1959), the Trading With the Enemy Act (50 U.S.C. §§ 4301 to 4341) and Executive Order 13224 (effective September 24, 2001).

        "**Applicable Rate**" means an interest rate per annum equal to 8% for the first twelve (12) months after the date of this Note (subject to Section 4.2 below) and 10% thereafter.

        "**Beneficial Ownership Regulation**" means 31 C.F.R. § 1010.230.

        "**Business Day**" means a day other than a Saturday, Sunday, or other day on which commercial banks in Orlando, Florida are authorized or required by law to close.

        "**Change of Control**" means (i) the sale, transfer or assignment, in one transaction or a series of related transactions, of all or substantially all of the assets of Maker; (ii) the sale, transfer or assignment, in one transaction or a series of related transactions, of greater than fifty percent (50%) of the voting equity interests of Maker; or (ii) a merger or consolidation of Maker with or into any other entity if Maker is not the surviving entity, other than a merger or consolidation which results in more than fifty percent (50%) of the voting equity interests of the surviving, consolidated, or resulting

4923-1786-0151.8                              1

company being then beneficially owned, directly or indirectly, by the persons who were Maker's equityholders immediately prior to such transaction in substantially the same proportions as their ownership, immediately prior to such transaction.

"**Conversion Price**" shall mean (i) with respect to a Financing: 90% of the lowest price per share paid in cash by the other investors for Preferred Stock sold in the Financing, (ii) with respect to an initial public offering: 90% of the lowest price per share paid in cash by other investors for common stock sold in the offering, and (iii) if there is no Financing or initial public offering price in the twelve (12) month period immediately preceding the date of determination, a value equal to 90% of the price per share determined by a valuation firm selected by Noteholder (or at a price per share determined by Noteholder, if Maker does not provide all information requested by the valuation firm within fourteen (14) calendar days of Noteholder's request).

"**Debt**" of Maker, means all (a) indebtedness for borrowed money; (b) obligations for the deferred purchase price of property or services, except trade payables arising in the ordinary course of business; (c) obligations evidenced by notes, bonds, debentures, or other similar instruments; (d) obligations as lessee under capital leases; (e) obligations in respect of any interest rate swaps, currency exchange agreements, commodity swaps, caps, collar agreements, or similar arrangements entered into by Maker providing for protection against fluctuations in interest rates, currency exchange rates, or commodity prices, or the exchange of nominal interest obligations, either generally or under specific contingencies; (f) obligations under acceptance facilities and letters of credit; (g) guaranties, endorsements (other than for collection or deposit in the ordinary course of business), and other contingent obligations to purchase, to provide funds for payment, to supply funds to invest in any Person, or otherwise to assure a creditor against loss, in each case, in respect of indebtedness set out in clauses (a) through (f) of a Person other than Maker; (h) indebtedness set out in clauses (a) through (g) of any Person other than Maker secured by any lien on any asset of Maker, whether or not such indebtedness has been assumed by Maker, and (i) indebtedness of any partnership, unlimited liability company, or unincorporated joint venture in which Maker is a general partner, member, or a joint venturer, respectively (unless such Debt is expressly made non-recourse to Maker).

"**Default**" means any of the events specified in Section 9 which constitute an Event of Default or which, upon the giving of notice, the lapse of time, or both, pursuant to Section 9, would, unless cured or waived, become an Event of Default.

"**Default Rate**" means the Applicable Rate plus 5%.

"**Election Amount**" has the meaning set forth in Section 2.4.

"**Event of Default**" has the meaning set forth in Section 9.

"**Financing**" shall mean any transaction or series of related transactions pursuant to which Maker sells shares of its capital stock.

2

4923-1786-0151.8

"**GAAP**" means generally accepted accounting principles in the United States of America as in effect from time to time.

"**Governmental Authority**" means the government of any nation or any political subdivision thereof, whether at the national, state, territorial, provincial, municipal, or any other level, and any agency, authority, instrumentality, regulatory body, court, central bank, or other entity exercising executive, legislative, judicial, taxing, regulatory, or administrative powers or functions of, or pertaining to, government (including any supra-national bodies such as the European Union or the European Central Bank).

"**Law**" as to any Person, means the certificate of incorporation and by-laws or other organizational or governing documents of such Person, and any law (including common law), statute, ordinance, treaty, rule, regulation, order, decree, judgment, writ, injunction, settlement agreement, requirement or determination of an arbitrator or a court or other Governmental Authority, in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"**Lien**" means any mortgage, pledge, hypothecation, encumbrance, lien (statutory or other), charge, or other security interest.

"**Loan**" means $65,000,000. The Loan represents $65,000,000 of outstanding trade payables owed by Maker to Noteholder as of the date hereof and converted into the debt represented by this Note.

"**Maker**" has the meaning set forth in the introductory paragraph.

"**Maturity Date**" means the earlier of (a) April 25, 2028, (b) the date on which all amounts under this Note shall become due and payable after giving effect to any prepayments; and (c) the date on which all amounts under this Note shall become due and payable pursuant to Section 10.

"**Note**" has the meaning set forth in the introductory paragraph.

"**Noteholder**" has the meaning set forth in the introductory paragraph.

"**Note Preferred Stock**" shall mean a series of preferred stock of Maker which has identical rights, privileges, preferences, and restrictions as the Preferred Stock, other than with respect to (i) the per share liquidation preference, which will equal the Conversion Price, and (ii) the price-based antidilution protection and dividend rights, which will be based on the Conversion Price.

"**OFAC**" means the US Department of the Treasury's Office of Foreign Assets Control.

"**Parties**" has the meaning set forth in the introductory paragraph.

"**Permitted Debt**" means Debt (a) existing or arising under this Note and any refinancing thereof; (b) existing as of the date of this Note and any refinancing thereof, the

Docusign Envelope ID: AA568335-85DA-40AD-93B1-555798A4A81C

principal amount of any such refinancing not to exceed $15,000,000 (the "**Permitted Refinancing**"); (c) which may be deemed to exist with respect to swap contracts; (d) owed in respect of any netting services, overdrafts, and related liabilities arising from treasury, depository, and cash management services in connection with any automated clearinghouse transfers of funds; and (e) unsecured insurance premiums owing in the ordinary course of business.

"**Person**" means any individual, corporation, limited liability company, trust, joint venture, association, company, limited or general partnership, unincorporated organization, Governmental Authority, or other entity.

"**PIK Interest**" has the meaning set forth in Section 4.2.

"**Sanctioned Country**" means, at any time, a country or territory which is itself the subject or target of any comprehensive or country-wide Sanctions.

"**Sanctioned Person**" means, at any time, (a) any Person listed in any Sanctions-related list of designated Persons maintained by a Sanctions Authority; (b) any Person operating, organized, or resident in a Sanctioned Country, (c) any Person controlled or 50% owned by any such Person or Persons described in the foregoing clauses (a) or (b), or (d) any Person that is the subject or target of any Sanctions.

"**Sanctions**" mean all economic or financial sanctions or trade embargoes imposed, administered, or enforced from time to time by a Sanctions Authority.

"**Sanctions Authority**" means OFAC, the US Department of State, the United Nations Security Council, the European Union, or other relevant sanctions authority.

"**Security Agreement**" means the Security Agreement, dated as of the date hereof, by and between Maker and Noteholder.

"**Preferred Stock**" shall mean the shares of the series of preferred stock of Maker sold to the investors for cash at the initial closing of the Financing.

"**Subsidiary**" as to any Person, means any corporation, partnership, limited liability company, joint venture, trust, or estate of or in which more than 50% of (a) the issued and outstanding capital stock having ordinary voting power to elect a majority of the board of directors of such corporation (irrespective of whether at the time capital stock of any other class of such corporation may have voting power upon the happening of a contingency), (b) the interest in the capital or profits of such partnership, limited liability company, or joint venture or, (c) the beneficial interest in such trust or estate is at the time directly or indirectly owned or controlled through one or more intermediaries, or both, by such Person. Unless otherwise qualified, all references to a "Subsidiary" or to "Subsidiaries" in this Agreement shall refer to a Subsidiary or Subsidiaries of Maker.

4

4923-1786-0151.8

Docusign Envelope ID: AA568335-85DA-40AD-93B1-555798A4A81C

"**USA PATRIOT Act**" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Title III of Pub. L. 107-56, signed into law October 26, 2001).

1.2     Interpretation. For purposes of this Note (a) the words "include," "includes," and "including" shall be deemed to be followed by the words "without limitation"; (b) the word "or" is not exclusive; and (c) the words "herein," "hereof," "hereby," "hereto," and "hereunder" refer to this Note as a whole. The definitions given for any defined terms in this Note shall apply equally to both the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine, and neuter forms. Unless the context otherwise requires, references herein to: (x) Schedules, Exhibits, and Sections mean the Schedules, Exhibits, and Sections of this Note; (y) an agreement, instrument, or other document means such agreement, instrument, or other document as amended, supplemented, and modified from time to time to the extent permitted by the provisions thereof; and (z) a statute means such statute as amended from time to time and includes any successor legislation thereto and any regulations promulgated thereunder. This Note shall be construed without regard to any presumption or rule requiring construction or interpretation against the party drafting an instrument or causing any instrument to be drafted.

2.     Payment Dates; Optional Prepayments.

2.1     Payment Dates.   The principal amount of the Loan shall be payable in consecutive quarterly installments of $5,000,000 of principal beginning on December 31, 2025, and on the last day of each quarter thereafter, *provided* that all amounts outstanding under this Note, including all accrued and unpaid interest and other amounts payable under the Note, shall be due and payable on the Maturity Date, unless otherwise provided in Section 10.   Notwithstanding anything herein to the contrary, all amounts due hereunder, including all Accreted Value, all accrued and unpaid interest, and all fees and other charges, shall be due and payable in full within 5 Business Days of a written notice from the Noteholder demanding such payment (which the Noteholder may send any time on or after April 25, 2027 if Noteholder reasonably determines that there is a risk to repayment of the Note).

2.2     Optional Prepayments. Maker may prepay the Loan in whole or in part at any time or from time to time without penalty or premium by paying the principal amount to be prepaid together with accrued interest thereon to the date of prepayment. No prepaid amount may be reborrowed.   Any prepayments, including pursuant to Section 7.4 shall be applied against and reduce the last payment(s) due hereunder.

2.3     Mandatory Prepayments. Maker shall make mandatory prepayments of the Loan as provided in Section 7.4.

2.4     Conversion.

(a)     At the election of the Noteholder, the then-outstanding Accreted Value (or portion thereof selected by Noteholder), together with all accrued and unpaid

Docusign Envelope ID: AA568335-85DA-40AD-93B1-555798A4A81C

interest under this Note designated by the Noteholder in its election (the portion designated by the Noteholder, the "**Election Amount**"), shall convert into fully paid and nonassessable shares of Preferred Stock, prior to an initial public offering, and common stock of Maker, after an initial public offering, at a price per share equal to the Conversion Price, with such number of shares of Preferred Stock or common stock to be issued to be determined by dividing (i) the then-outstanding Accreted Value, together with all accrued and unpaid interest under this Note, by (ii) the Conversion Price (rounded down to the nearest whole share). The conversion right may be elected one or more times by the Noteholder.

(b) If Maker engages in a Financing or an initial public offering, Maker shall deliver written notice to the Noteholder at the address last shown on the records of Maker for the Noteholder or given by the Noteholder to Maker for the purpose of notice, notifying the Noteholder of the general terms of the Financing or initial public offering to be effected, specifying the Conversion Price, the Accreted Value that may be converted at the Noteholder's election, together with all accrued and unpaid interest, and the date on which such Financing or public offering is expected to occur.

(c) If the Noteholder elects to convert this Note pursuant to this Section 2.4 (in whole or in part), the Noteholder shall give written notice to Maker at Maker's principal corporate office, of the election to convert the same pursuant to this Section 2.4.

(d) If the Noteholder elects to convert this Note pursuant to this Section 2.4, the Noteholder hereby agrees to execute and deliver to Maker (upon such elective conversion of this Note) all customary transaction documents entered into by all other recipients of capital stock in any applicable Financing.

(e) Maker shall, as soon as practicable thereafter, issue and deliver to the Noteholder a certificate or certificates (or a notice of issuance of uncertificated shares, if applicable) for the number of shares to which the Noteholder shall be entitled upon such conversion, including a check payable to the Noteholder for any cash amounts payable as described in Section 2.4(f). Any conversion of this Note shall be deemed to have been made upon the satisfaction of all of the conditions set forth in this Section 2.4 and on and after such date the Persons entitled to receive the shares issuable upon such conversion shall be treated for all purposes as the record holder of such shares.

(f) No fractional shares shall be issued upon conversion of this Note. In lieu of Maker issuing any fractional shares to the Noteholder upon the conversion of this Note, Maker shall pay to the Noteholder an amount equal to the product obtained by multiplying the applicable Conversion Price by the fraction of a share not issued pursuant to the previous sentence. In addition, to the extent not converted into shares of capital stock, Maker shall pay to the Noteholder any interest accrued on the amount converted and on the amount to be paid by Maker pursuant to the previous sentence. Upon conversion of this Note as provided in this Section 2.4 (including the rounding down to the nearest whole share the shares of capital stock to be issued) and the

4923-1786-0151.8

payment of the amounts specified in this paragraph, this Note shall be cancelled and, whether or not the original of this Note has been delivered to Maker for cancellation, shall no longer be an obligation of Maker.

3.    Security Agreement. Maker's performance of its obligations hereunder is secured by a first priority security interest in the collateral specified in the Security Agreement.

4.    Interest.

4.1    Interest Rate. Except as otherwise provided herein and subject to Section 4.2 below, the outstanding principal amount of the Loan made hereunder shall bear interest at the Applicable Rate from the date first written above until the Loan is paid in full, whether at maturity, upon acceleration, by prepayment, or otherwise.

4.2    Interest Payment Dates. Interest shall be payable monthly in arrears to the Noteholder beginning on May 31, 2025, and on the last day of each month thereafter; provided, however, that in lieu of accepting monthly cash interest payments in accordance with the foregoing with respect to the twelve (12) full calendar months after the date of this Note (the "**Initial Period**"), the Noteholder may elect, by providing written notice to Maker at least five (5) Business Days before any such payment date, to forego cash interest payments for the remaining months of the Initial Period and in lieu thereof have the outstanding principal amount of the Note accrue interest at 10% per annum (together with any Interest accrued at the Default Rate to be treated as PIK Interest in accordance with Section 4.3, "**PIK Interest**"). PIK Interest shall be added to the principal of this Note on each remaining interest payment date during the Initial Period. Once added to the principal of this Note, the Applicable Rate shall apply, and interest thereafter shall accrue, also on the portion of the principal of this Note representing PIK Interest added to such principal. On any date of determination, the principal amount of this Note, together with accrued PIK Interest added to the principal of this Note in accordance with this Section 4.2 shall be referred to as the "**Accreted Value**." Interest on this Note shall accrue from the date hereof until payment of the Accreted Value in full. References in this Note to the "principal amount" or words of similar effect shall be deemed to refer to the "Accreted Value," as applicable.

4.3    Default Interest. If any amount payable hereunder is not paid when due (without regard to any applicable grace periods), whether at stated maturity, by acceleration, or otherwise, such overdue amount shall bear interest at the Default Rate from the date of such non-payment until such amount is paid in full.

4.4    Computation of Interest. All computations of interest shall be made on the basis of 365 or 366 days, as the case may be, and the actual number of days elapsed. Interest shall accrue on the Loan on the day on which the Loan is made, and shall not accrue on the Loan for the day on which it is paid.

4.5    Interest Rate Limitation. If at any time and for any reason whatsoever, the interest rate payable on the Loan shall exceed the maximum rate of interest permitted to be charged by the Noteholder to Maker under applicable Law, such interest rate shall be

7

Docusign Envelope ID: AA568335-85DA-40AD-93B1-555798A4A81C

reduced automatically to the maximum rate of interest permitted to be charged under applicable Law.

5.    <u>Payment Mechanics</u>.

5.1    <u>Manner of Payments</u>. All payments of interest and Accreted Value shall be made in lawful money of the United States of America no later than 12:00 PM on the date on which such payment is due by wire transfer of immediately available funds to the Noteholder's account at a bank specified by the Noteholder in writing to Maker from time to time.

5.2    <u>Application of Payments</u>. All payments made under this Note shall be applied *first* to the payment of any fees or charges outstanding hereunder, *second* to accrued interest. including for the avoidance of doubt, any PIK Interest that has accrued but has not yet been added to the principal of this Note in accordance with Section 4.2 (and therefore has not become part of the Accreted Value of this Note), and *third* to the payment of the Accreted Value outstanding under the Note.

5.3    <u>Business Day Convention</u>. Whenever any payment to be made hereunder shall be due on a day that is not a Business Day, such payment shall be made on the next succeeding Business Day and such extension will be taken into account in calculating the amount of interest payable under this Note.

5.4    <u>Rescission of Payments</u>. If at any time any payment made by Maker under this Note is rescinded or must otherwise be restored or returned upon the insolvency, bankruptcy, or reorganization of Maker or otherwise, Maker's obligation to make such payment shall be reinstated as though such payment had not been made.

6.    <u>Representations and Warranties</u>. Maker hereby represents and warrants to the Noteholder on the date hereof as follows:

6.1    <u>Existence; Power and Authority; Compliance with Laws</u>. Maker (a) is a corporation duly incorporated, validly existing, and in good standing under the laws of the state of its jurisdiction of organization, (b) has the requisite power and authority, and the legal right, to own, lease, and operate its properties and assets and to conduct its business as it is now being conducted, to execute and deliver this Note and the Security Agreement, and to perform its obligations hereunder and thereunder, and (c) is in compliance with all Laws. Maker does not have any direct or indirect Subsidiaries.

6.2    <u>Authorization; Execution and Delivery</u>. The execution and delivery of this Note and the Security Agreement by Maker and the performance of its obligations hereunder and thereunder have been duly authorized by all necessary corporate action in accordance with all applicable Laws. Maker has duly executed and delivered this Note and the Security Agreement.

6.3    <u>No Approvals</u>. No consent or authorization of, filing with, notice to, or other act by, or in respect of, any Governmental Authority or any other Person is required in order

8

4923-1786-0151.8

Docusign Envelope ID: AA568335-85DA-40AD-93B1-555798A4A81C

for Maker to execute, deliver, or perform any of its obligations under this Note or the Security Agreement.

6.4     No Violations. The execution and delivery of this Note and the Security Agreement and the consummation by Maker of the transactions contemplated hereby and thereby do not and will not (a) violate any Law applicable to Maker or by which any of its properties or assets may be bound; or (b) constitute a default under any material agreement or contract by which Maker may be bound, including, without limitation, any agreement or contract relating to Debt incurred by Maker.

6.5     Enforceability. Each of the Note and the Security Agreement is a valid, legal, and binding obligation of Maker, enforceable against Maker in accordance with its terms, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium, or similar laws affecting the enforcement of creditors' rights generally and by general equitable principles (whether enforcement is sought by proceedings in equity or at law).

6.6     No Litigation. No action, suit, litigation, investigation, or proceeding of, or before, any arbitrator or Governmental Authority is pending or, to the knowledge of Maker, threatened by or against Maker or any of its property or assets (a) with respect to the Note, the Security Agreement, or any of the transactions contemplated hereby or thereby or (b) that would reasonably be expected to materially adversely affect Maker's financial condition or the ability of Maker to perform its obligations under the Note or the Security Agreement.

6.7     Anti-Terrorism Laws. Maker is, and to the knowledge of Maker, its directors, officers, employees, and agents are, in compliance in all material respects with Anti-Terrorism Laws.

6.8     Anti-Corruption Laws and Sanctions. Maker is not, and to the knowledge of Maker, no director, officer, employee of Maker, is a Sanctioned Person. No use of proceeds of the Loan or other transaction contemplated by this Note will violate any Anti-Corruption Law or applicable Sanctions.

7.     Affirmative Covenants. Until all amounts outstanding under this Note have been paid in full, Maker shall:

7.1     Maintenance of Existence. (a) Preserve, renew, and maintain in full force and effect its corporate or organizational existence and (b) take all reasonable action to maintain all rights, privileges, and franchises necessary or desirable in the normal conduct of its business.

7.2     Compliance. Comply with all Laws applicable to it and its business and its obligations under its material contracts and agreements.

7.3     Payment Obligations. Pay, discharge, or otherwise satisfy at or before maturity or before they become delinquent, as the case may be, all its material obligations of whatever nature, except where the amount or validity thereof is currently being contested in

9

4923-1786-0151.8

good faith by appropriate proceedings, and reserves in conformity with GAAP with respect thereto have been provided on its books.

7.4    Financing and Change of Control Proceeds. If Maker, or any of its direct or indirect Subsidiaries, receives, directly or indirectly, equity or debt financing, other than a Permitted Refinancing, in excess of $10,000,000 in the aggregate (the "**Base Equity Amount**"), whether in one or more related or unrelated transactions, including from crowdfunding and receipt of funds pursuant to a convertible promissory note, SAFE, or any other instrument convertible into or exchangeable for equity securities, Maker shall, within two (2) Business Days after receiving such funds, pay fifty percent (50%) of all such funds in excess of the Base Equity Amount to the Noteholder as a prepayment of this Note, which prepayment shall be subject to subject to Section 5.2 above. Maker shall provide regular updates to the Noteholder with respect to any discussions or negotiations regarding potential equity or debt financing transactions.

7.5    Notice of Certain Events. As soon as possible and in any event within one (1) Business Day after it becomes aware that an Event of Default has occurred, notify the Noteholder in writing of the nature and extent of such Event of Default and the action, if any, it has taken or proposes to take with respect to such Event of Default. As soon as possible and in any event within one (1) Business Day, notify Noteholder in writing of (i) all amendments, modifications, restatements, renewals, refinancings, increases, and extensions of any indebtedness and copies of all communications received from or sent to any other lender regarding a "Default" or "Event of Default" under any loan agreement, (ii) the entry of any agreement with respect to a Change of Control, the acquisition of any assets or securities of any other Person other than in the ordinary course of business, (iii) any claim in writing by any third-party that Maker is in breach of any material contract, (iv) any lawsuit or other proceeding initiated against Maker by any third party that could reasonably result in a material liability of Maker, (v) any reduction in force by Maker, or (vi) the resignation or removal of two (2) or more directors of Maker within any six (6) month period.

7.6    Financial Statements; Account Statements. Beginning with the calendar quarter ending June 30, 2025, within thirty (30) days after the end of each calendar quarter, Maker shall provide the Noteholder with unaudited consolidated and consolidating financial statements of Maker and its Subsidiaries, including a balance sheet and statements of income and of stockholders' equity and cash flows the end of such fiscal quarter. Beginning with the fiscal year ending December 31, 2025, within five days after their completion, audited consolidated and consolidating financial statements of Maker and its Subsidiaries, including a balance sheet and statements of income and of stockholders' equity and cash flows the end of such fiscal year as well as any other statements, documents or certifications provided to any junior lender. Maker shall deliver daily account statements to Lender with respect to all bank accounts of Maker.

7.7    Third Party Gift Cards. If Maker enters into an agreement with a third party that offers for sale or distributes gift cards and/or related or similar products (including any type of physical or electronic prepaid or disbursement product), then (i) Maker shall notify the Noteholder of such agreement within five (5) Business Days, and (ii) whether or not Maker delivers such notice, the outstanding Accreted Value and any interest accrued thereon

Docusign Envelope ID: AA568335-85DA-40AD-93B1-555798A4A81C

shall become immediately due and payable on the date Maker enters into the agreement without any notice, declaration, or other act on the part of the Noteholder. Any such agreement with a third-party must contain an obligation for all funds received from the sale of Gift Cards thereunder to be held in an account controlled by Noteholder (on terms acceptable to Noteholder in its sole discretion) until all Accreted Value and interest owed under this Note has been paid in full. Any agreement signed in violation of this Section 7.7 will be null and void *ab initio*.

7.8 <u>Subsidiaries</u>. Each U.S. Subsidiary of Maker in existence on the date hereof shall execute a guaranty of the obligations under this Note, in the form attached hereto as Exhibit A (each, a "**Guaranty**"). If Maker forms or acquires any additional U.S. Subsidiary, or a majority of the voting equity of any other entity, Maker shall cause such entity, within five (5) Business Days to (i) execute and deliver to the Noteholder a Guaranty and (ii) execute a joinder to the Security Agreement, in a form acceptable to the Noteholder, granting the Noteholder a first priority security interest in the assets of such entity as described in Section 2 of the Security Agreement.

7.9 <u>Change of Control</u>. Maker shall pay in full all Accreted Value, interest and any other amounts due under this Note immediately upon a Change of Control.

7.10 <u>Distribution Partner Master Agreement</u>. Maker and Noteholder shall enter into an amendment to that certain Distribution Partner Master Agreement, effective January 27, 2021, by and between Maker and the Noteholder, as amended, acceptable to Noteholder in its sole discretion by April 30, 2025.

7.11 <u>Further Assurances</u>. Upon the request of the Noteholder, promptly execute and deliver such further instruments and do or cause to be done such further acts as may be necessary or advisable to carry out the intent and purposes of this Note and the Security Agreement.

7.12 <u>Information/Inspection Rights</u>. Maker shall permit the Noteholder, at the Noteholder's expense, to visit and inspect Maker's properties; examine its books of account and records; and discuss Maker's affairs, finances, and accounts with its officers, during normal business hours of Maker as may be reasonably requested by the Noteholder (including all funds flow and transaction records); provided, however, that Maker shall not be obligated pursuant to this Section 7.11 to provide access to any information that it reasonably and in good faith considers to be a trade secret or confidential information or the disclosure of which would adversely affect the attorney-client privilege between Maker and its counsel. Maker shall also meet with Noteholder monthly to provide all financial performance metrics requested by Noteholder to ensure Maker's ongoing ability to meet its obligations under the this Note and the Security Agreement.

8. <u>Negative Covenants</u>. Until all amounts outstanding under this Note have been paid in full, Maker shall not:

8.1 <u>Indebtedness</u>. Incur, create, or assume any Debt, other than Permitted Debt.

11

8.2     Liens. Incur, create, assume, or suffer to exist any Lien on any of its property or assets, whether now owned or hereafter acquired, except for (a) Liens for taxes not yet due or which are being contested in good faith by appropriate proceedings if adequate reserves with respect thereto are maintained on the books of Maker in conformity with GAAP; (b) non-consensual Liens arising by operation of law, arising in the ordinary course of business, and for amounts which are not overdue for a period of more than 1 Business Day or that are being contested in good faith by appropriate proceedings; and (c) Liens created pursuant to the Security Agreement.

8.3     Dividends. Maker shall not make, or cause to be made, any (i) any dividend or other distribution (whether in cash, securities or other property) with respect to any ownership interests of Maker or any of its Subsidiaries, other than periodic distributions to members made solely to fund the payment of federal or state income taxes, (ii) any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any such interests, or on account of any return of capital to Maker or any of its Subsidiaries' stockholders, members or partners (or the equivalent Person thereof), (iii) any distribution, advance or repayment of indebtedness to or for the account of a holder of membership interests of Maker or any of its Subsidiaries, (iv) other arrangements which have the purpose or effect of circumventing the restrictions set forth in this Section, including without limitation, any arrangements between Maker, any affiliate or related party, including, without limitation, any member, shareholder, Subsidiary, parent, or affiliate of any of the foregoing, which is in excess of the market rate for the goods or services provided.

8.4     Change of Control. Maker shall not consummate a Change of Control or enter into any agreement with respect to a Change of Control without the Noteholder's prior written consent.

8.5     Investments. Maker shall not acquire any securities or assets of any other Person (other than acquisitions of inventory or equipment in the ordinary course of business) or enter into any agreement with respect to any such acquisition without the Noteholder's prior written consent.

8.6     Affiliate Transactions. Maker shall not enter into any agreement or transaction with (other than employment agreements in the ordinary course of business), or make any payments to (other than salary, reasonably bonuses, and reasonable expense reimbursement paid to officers who are employees of Maker), any affiliate of Maker without the Noteholder's prior written consent.

9.     Events of Default. The occurrence and continuance of any of the following shall constitute an Event of Default hereunder:

9.1     Failure to Pay. Maker fails to pay (a) any Accreted Value when due or (b) interest or any other amount when due and such failure continues for three (3) days.

12

Docusign Envelope ID: AA568335-85DA-40AD-93B1-555798A4A81C

9.2     Breach of Representations and Warranties. Any representation or warranty made by Maker to the Noteholder herein or in the Security Agreement is incorrect in any material respect on the date as of which such representation or warranty was made.

9.3     Breach of Covenants. Maker fails to observe or perform (a) any covenant, condition, or agreement contained in Section 2.4(b), Section 7.4, or Section 8 or (b) any other covenant, obligation, condition, or agreement contained in this Note or the Security Agreement, other than those specified in clause (a) and Section 9.1, and such failure continues for 1 Business Day after written notice to Maker.

9.4     Cross-Defaults. Maker fails to pay when due any of its Debt (other than Debt arising under this Note), or any interest or premium thereon, when due and such failure continues after the applicable grace period, if any, specified in the agreement or instrument relating to such Debt.

9.5     Bankruptcy.

(a)     Maker commences any case, proceeding, or other action (i) under any existing or future Law relating to bankruptcy, insolvency, reorganization, or other relief of debtors, seeking to have an order for relief entered with respect to it, or seeking to adjudicate it as bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, winding-up, liquidation, dissolution, composition, or other relief with respect to it or its debts or (ii) seeking appointment of a receiver, trustee, custodian, conservator, or other similar official for it or for all or any substantial part of its assets, or Maker makes a general assignment for the benefit of its creditors;

(b)     There is commenced against Maker any case, proceeding, or other action of a nature referred to in Section 9.5(a) which (i) results in the entry of an order for relief or any such adjudication or appointment or (ii) remains undismissed, undischarged, or unbonded for a period of 1 Business Day;

(c)     There is commenced against Maker any case, proceeding, or other action seeking issuance of a warrant of attachment, execution, or similar process against all or any substantial part of its assets which results in the entry of an order for any such relief which has not been vacated, discharged, or stayed or bonded pending appeal within 1 Business Day from the entry thereof;

(d)     Maker takes any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the acts set forth in Section 9.5(a), Section 9.5(b), or Section 9.5(c) above; or

(e)     Maker is generally not, or shall be unable to, or admits in writing its inability to, pay its debts as they become due.

9.6     Judgments. One or more judgments or decrees shall be entered against Maker and all of such judgments or decrees shall not have been vacated, discharged, or stayed or bonded pending appeal within 1 Business Day from the entry thereof.

4923-1786-0151.8

Docusign Envelope ID: AA568335-85DA-40AD-93B1-555798A4A81C

10.    Remedies. Upon the occurrence of any Event of Default and at any time thereafter during the continuance of such Event of Default, the Noteholder may, at its option, by written notice to Maker (a) declare the entire Accreted Value, together with all accrued interest thereon and all other amounts payable under this Note, immediately due and payable; and (b) exercise any or all of its rights, powers or remedies under the Security Agreement or applicable Law; *provided, however*, that if an Event of Default described in Section 9.5 shall occur, the Accreted Value and all accrued interest on the Loan shall become immediately due and payable without any notice, declaration, or other act on the part of the Noteholder.

11.    Miscellaneous.

11.1    Notices.

(a)    All notices, requests, or other communications required or permitted to be delivered hereunder shall be made in writing and mailed by certified or registered mail, delivered by hand or overnight courier service, or sent by facsimile or and all notices and other communications expressly permitted to be given by telephone shall be made to the applicable phone number, in each case as follows:

(i)    If to the Noteholder: 6220 Stoneridge Mall Road, Pleasanton, CA 94588, Attention of: Legal Department.

(ii)    If to Maker, 1815 Purdy Avenue, Miami Beach, FL, 33139 Attention of: Matt Levenson, Email: coach@moocho.com.

(b)    Notices if (i) mailed by certified or registered mail or sent by hand or overnight courier service shall be deemed to have been given when received; and (ii) sent by email shall be deemed received upon the sender's receipt of an acknowledgment from the intended recipient (such as by the "return receipt requested" function, as available, return email, or other written acknowledgment).

11.2    Expenses. Maker shall (i) pay to the applicable Governmental Authority any documentary stamp taxes or other similar fees with respect to the Loan and this Note and (ii) reimburse the Noteholder on demand for all reasonable and documented out-of-pocket costs, expenses, and fees (including reasonable expenses and fees of its external counsel) incurred by the Noteholder in connection with the transactions contemplated hereby including the negotiation, documentation, and execution of this Note and the Security Agreement and the enforcement of the Noteholder's rights hereunder and thereunder.

11.3    Governing Law. This Note, the Security Agreement, and any claim, controversy, dispute, or cause of action (whether in contract or tort or otherwise) based upon, arising out of, or relating to this Note, the Security Agreement, and the transactions contemplated hereby and thereby shall be governed by the laws of the State of Florida.

11.4    Submission to Jurisdiction.

14

4923-1786-0151.8

Docusign Envelope ID: AA568335-85DA-40AD-93B1-555798A4A81C

(a)     Maker hereby irrevocably and unconditionally (i) agrees that any legal action, suit, or proceeding arising out of or relating to this Note or the Security Agreement shall be brought exclusively in the courts of the State of Florida in the Ninth Judicial Circuit in Orange County, Florida and (ii) submits to the exclusive jurisdiction of any such court in any such action, suit, or proceeding. Final judgment against Maker in any action, suit, or proceeding shall be conclusive and may be enforced in any other jurisdiction by suit on the judgment.

(b)     Nothing in this Section 11.4 shall affect the right of the Noteholder to (i) commence legal proceedings or otherwise sue Maker in any other court having jurisdiction over Maker or (ii) serve process upon Maker in any manner authorized by the laws of any such jurisdiction.

11.5    Venue. Maker irrevocably and unconditionally waives, to the fullest extent permitted by applicable law, any objection that it may now or hereafter have to the laying of venue of any action or proceeding arising out of or relating to this Note or the Security Agreement in any court referred to in Section 11.4 and the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

11.6    Waiver of Jury Trial. THE MAKER HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY RELATING TO THIS NOTE, THE SECURITY AGREEMENT, OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY, WHETHER BASED ON CONTRACT, TORT, OR ANY OTHER THEORY.

11.7    Integration. This Note and the Security Agreement constitute the entire contract between the Parties with respect to the subject matter hereof and supersede all previous agreements and understandings, oral or written, with respect thereto.

11.8    Successors and Assigns. This Note may be assigned or transferred by the Noteholder to any Person. Maker may not assign or transfer this Note or any of its rights hereunder without the prior written consent of the Noteholder. This Note shall inure to the benefit of, and be binding upon, the Parties and their permitted assigns.

11.9    Waiver of Notice. Maker hereby waives demand for payment, presentment for payment, protest, notice of payment, notice of dishonor, notice of nonpayment, notice of acceleration of maturity, and diligence in taking any action to collect sums owing hereunder.

11.10   USA PATRIOT Act. The Noteholder hereby notifies Maker that pursuant to the requirements of the USA PATRIOT Act and the Beneficial Ownership Regulation, it is required to obtain, verify, and record information that identifies Maker, which information includes the name and address of Maker and other information that will allow the Noteholder to identify Maker in accordance with the USA PATRIOT Act and the Beneficial Ownership Regulation, and Maker agrees to provide such information from time to time to the Noteholder.

15

4923-1786-0151.8

Docusign Envelope ID: AA568335-85DA-40AD-93B1-555798A4A81C

11.11 <u>Amendments and Waivers</u>. No term of this Note may be waived, modified, or amended except by an instrument in writing signed by both of the Parties. Any waiver of the terms hereof shall be effective only in the specific instance and for the specific purpose given.

11.12 <u>Headings</u>. The headings of the various Sections and subsections herein are for reference only and shall not define, modify, expand, or limit any of the terms or provisions hereof.

11.13 <u>No Waiver; Cumulative Remedies</u>. No failure to exercise, and no delay in exercising on the part of the Noteholder, of any right, remedy, power, or privilege hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power, or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power, or privilege. The rights, remedies, powers, and privileges herein provided are cumulative and not exclusive of any rights, remedies, powers, and privileges provided by law.

11.14 <u>Electronic Execution</u>. The words "execution," "signed," "signature," and words of similar import in the Note shall be deemed to include electronic or digital signatures or electronic records, each of which shall be of the same effect, validity, and enforceability as manually executed signatures or a paper-based record-keeping system, as the case may be, to the extent and as provided for under applicable law, including the Electronic Signatures in Global and National Commerce Act of 2000 (15 U.S.C. §§ 7001 to 7031), the Uniform Electronic Transactions Act (UETA), or any state law based on the UETA.

11.15 <u>Severability</u>. If any term or provision of this Note or the Security Agreement is invalid, illegal, or unenforceable in any jurisdiction, such invalidity, illegality, or unenforceability shall not affect any other term or provision of this Note or the Security Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction. Upon such determination that any term or other provision is invalid, illegal, or unenforceable, the Parties shall negotiate in good faith to modify this Note so as to affect the original intent of the parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

[SIGNATURE PAGE FOLLOWS]

16

4923-1786-0151.8

Docusign Envelope ID: AA568335-85DA-40AD-93B1-555798A4A81C

IN WITNESS WHEREOF, Maker has executed this Note as of the date first written above.

MOOCHO, INC.

By:_____
Name:_____
Matt Levenson
Title:_____
CEO

*[Signature Page to Secured Promissory Note]*

Docusign Envelope ID: AA568335-85DA-40AD-93B1-555798A4A81C

# EXHIBIT A

## GUARANTY

This GUARANTY (this "**Guaranty**"), dated as of [DATE], is made by [NAME OF GUARANTOR], [a/an] [[STATE OF ORGANIZATION] [ENTITY TYPE] ("**Guarantor**"), in favor and for the benefit of [Blackhawk Network, Inc. ("**Beneficiary**").

Reference is made to the Secured Promissory Note, dated as of April 25, 2025 (the "**Note**"), by Moocho, Inc., a Delaware corporation ("**Obligor**"), and Beneficiary. In consideration of the substantial direct and indirect benefits derived by Guarantor from the transactions under the Note, and in order to induce Beneficiary to extend the Loan to Obligor, Guarantor, the subsidiary of Obligor hereby agrees as follows:

1.    Guaranty. Guarantor absolutely, unconditionally and irrevocably guarantees, as primary obligor and not merely as surety, the full and punctual payment and performance of all present and future obligations, liabilities, covenants and agreements required to be observed and performed or paid or reimbursed by Obligor under or relating to the Note, plus all costs, expenses and fees (including the reasonable fees and expenses of Beneficiary's counsel) in any way relating to the enforcement or protection of Beneficiary's rights hereunder (collectively, the "**Obligations**").

2.    Guaranty Absolute and Unconditional. Guarantor agrees that its Obligations under this Guaranty are irrevocable, continuing, absolute and unconditional and shall not be discharged or impaired or otherwise affected by, and Guarantor hereby irrevocably waives any defenses to enforcement it may have (now or in the future) by reason of:

(a)    Any illegality, invalidity or unenforceability of any Obligation or the Note or any related agreement or instrument, or any law, regulation, decree or order of any jurisdiction or any other event affecting any term of the Obligations.

(b)    Any change in the time, place or manner of payment or performance of, or in any other term of the Obligations, or any rescission, waiver, release, assignment, amendment or other modification of the Note.

(c)    Any taking, exchange, substitution, release, impairment, amendment, waiver, modification or non-perfection of any collateral or any other guaranty for the Obligations, or any manner of sale, disposition or application of proceeds of any collateral or other assets to all or part of the Obligations.

(d)    Any default, failure or delay, willful or otherwise, in the performance of the Obligations.

(e)    Any change, restructuring or termination of the corporate structure, ownership or existence of Guarantor or Obligor or any insolvency, bankruptcy, reorganization or other similar proceeding affecting Obligor or its assets or any resulting restructuring, release or discharge of any Obligations.

4923-1786-0151.8

18

(f)     Any failure of Beneficiary to disclose to Guarantor any information relating to the business, condition (financial or otherwise), operations, performance, properties or prospects of Obligor now or hereafter known to Beneficiary, Guarantor waiving any duty of Beneficiary to disclose such information.

(g)     The failure of any other guarantor or third party to execute or deliver this Guaranty or any other guaranty or agreement, or the release or reduction of liability of Guarantor or any other guarantor or surety with respect to the Obligations.

(h)     The failure of Beneficiary to assert any claim or demand or to exercise or enforce any right or remedy under the provisions of any Note or otherwise.

(i)     The existence of any claim, set-off, counterclaim, recoupment or other rights that Guarantor or Obligor may have against Beneficiary (other than a defense of payment or performance).

(j)     Any other circumstance (including, without limitation, any statute of limitations), act, omission or manner of administering the Note or any existence of or reliance on any representation by Beneficiary that might vary the risk of Guarantor or otherwise operate as a defense available to, or a legal or equitable discharge of, Guarantor.

3.     <u>Certain Waivers; Acknowledgments</u>. Guarantor further acknowledges and agrees as follows:

(a)     Guarantor hereby unconditionally and irrevocably waives any right to revoke this Guaranty and acknowledges that this Guaranty is continuing in nature and applies to all presently existing and future Obligations, until the complete, irrevocable and indefeasible payment and satisfaction in full of the Obligations.

(b)     This Guaranty is a guaranty of payment and performance and not of collection. Beneficiary shall not be obligated to enforce or exhaust its remedies against Obligor or under the Note before proceeding to enforce this Guaranty.

(c)     This Guaranty is a direct guaranty and independent of the obligations of Obligor under the Note. Beneficiary may resort to Guarantor for payment and performance of the Obligations whether or not Beneficiary shall have resorted to any collateral therefor or shall have proceeded against Obligor or any other guarantors with respect to the Obligations. Beneficiary may, at Beneficiary's option, proceed against Guarantor and Obligor, jointly and severally, or against Guarantor only without having obtained a judgment against Obligor.

(d)     Guarantor hereby unconditionally and irrevocably waives promptness, diligence, notice of acceptance, presentment, demand for performance, notice of non-performance, default, acceleration, protest or dishonor and any other notice with respect to any of the Obligations and this Guaranty and any requirement that Beneficiary protect, secure, perfect or insure any lien or any property subject thereto.

19

4923-1786-0151.8

(e)    Guarantor agrees that its guaranty hereunder shall continue to be effective or be reinstated, as the case may be, if at any time all or part of any payment of any Obligation is voided, rescinded or recovered or must otherwise be returned by Beneficiary upon the insolvency, bankruptcy or reorganization of Obligor.

4.    Subrogation. Guarantor waives and shall not exercise any rights that it may acquire by way of subrogation, contribution, reimbursement or indemnification for payments made under this Guaranty until all Obligations shall have been indefeasibly paid and discharged in full.

5.    Representations and Warranties. To induce Beneficiary to enter into the Note, Guarantor represents and warrants that: (a) Guarantor is a duly organized and validly existing [ENTITY TYPE] in good standing under the laws of the jurisdiction of its organization; (b) this Guaranty constitutes Guarantor's valid and legally binding agreement in accordance with its terms; (c) the execution, delivery and performance of this Guaranty have been duly authorized by all necessary action and will not violate any order, judgment or decree to which Guarantor or any of its assets may be subject; and (d) Guarantor is currently solvent and will not be rendered insolvent by providing this Guaranty.

6.    Notices. All notices, requests, consents, demands and other communications hereunder (each, a "**Notice**") shall be in writing and delivered to the parties at the addresses set forth herein or to such other address as may be designated by the receiving party in a Notice given in accordance with this section. All Notices shall be delivered by personal delivery, nationally recognized overnight courier, email, or certified or registered mail (return receipt requested, postage prepaid). Except as otherwise provided in this Guaranty, a Notice is effective only (a) with written confirmation of delivery or transmission; (b) upon receipt of the receiving party; and (c) if the party giving the Notice has complied with the requirements of this section.

7.    Assignment. This Guaranty shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns; provided, however, that Guarantor may not, without the prior written consent of Beneficiary, assign any of its rights, powers or obligations hereunder. Beneficiary may assign this Guaranty and its rights hereunder without the consent of Guarantor. Any attempted assignment in violation of this section shall be null and void.

8.    Governing Law; Service of Process. THIS GUARANTY SHALL BE GOVERNED BY AND CONSTRUED UNDER THE LAWS OF THE STATE OF FLORIDA, WITHOUT REFERENCE TO ANY CHOICE OF LAW DOCTRINE. EACH PARTY IRREVOCABLY CONSENTS TO SERVICE OF PROCESS IN THE MANNER PROVIDED FOR NOTICES IN SECTION 6 HEREOF AND AGREES THAT NOTHING HEREIN SHALL AFFECT THE RIGHT OF ANY PARTY HERETO TO SERVE PROCESS IN ANY MANNER PERMITTED BY APPLICABLE LAW.

9.    Waiver of Jury Trial. EACH PARTY HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHTS TO TRIAL BY JURY WITH RESPECT TO ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS GUARANTY OR ANY OF THE OBLIGATIONS HEREUNDER.

4923-1786-0151.8

Docusign Envelope ID: AA568335-83DA-40AD-93B1-555798A4A81C

10.     Cumulative Rights. Each right, remedy and power hereby granted to Beneficiary or allowed it by applicable law or other agreement shall be cumulative and not exclusive of any other, and may be exercised by Beneficiary at any time or from time to time.

11.     Severability. If any provision of this Guaranty is to any extent determined by final decision of a court of competent jurisdiction to be unenforceable, the remainder of this Guaranty shall not be affected thereby, and each provision of this Guaranty shall be valid and enforceable to the fullest extent permitted by law.

12.     Entire Agreement; Amendments; Headings; Effectiveness. This Guaranty constitutes the sole and entire agreement of Guarantor and Beneficiary with respect to the subject matter hereof and supersedes all previous agreements or understandings, oral or written, with respect to such subject matter. No amendment or waiver of any provision of this Guaranty shall be valid and binding unless it is in writing and signed, in the case of an amendment, by both parties, or in the case of a waiver, by the party against which the waiver is to be effective. Section headings are for convenience of reference only and shall not define, modify, expand or limit any of the terms of this Guaranty. Delivery of this Guaranty by facsimile or in electronic (i.e., pdf or tif) format shall be effective as delivery of a manually executed original of this Guaranty.

[SIGNATURE PAGE FOLLOWS]

21

4923-1786-0151.8

Docusign Envelope ID: AA568335-85DA-40AD-93B1-555798A4A81C

IN WITNESS WHEREOF, Guarantor has executed this Guaranty as of the day and year first above written.

GUARANTOR:

[NAME OF GUARANTOR]

By: _____

Name:

Title:

[SWORN TO BEFORE ME THIS [DATE]

_____

Notary Public]

# Exhibit C

## SECURITY AGREEMENT

This SECURITY AGREEMENT, dated as of April 25, 2025 (as amended, supplemented or otherwise modified from time to time in accordance with the provisions hereof, this "**Agreement**"), made by and among MOOCHO, INC., a Delaware corporation (the "**Borrower**") and the guarantors listed on the signature pages hereto (the "**Original Guarantors**") or from time to time party hereto by execution of a joinder agreement (the "**Additional Guarantors**", and together with the Original Guarantors, the "**Guarantors**"), as grantors, pledgors, assignors and debtors (the Borrower, together with the Guarantors, in such capacities and together with any successors in such capacities, the "**Grantors**", and each, a "**Grantor**"), in favor of BLACKHAWK NETWORK, INC., an Arizona corporation (the "**Secured Party**").

**WHEREAS**, on the date hereof, the Secured Party has made a loan to the Grantor in an aggregate unpaid principal amount of $65,000,000 (the "**Loans**"), evidenced by that certain Secured Promissory Note of even date herewith (as amended, supplemented or otherwise modified from time to time, the "**Note**") made by the Grantor and payable to the order of the Secured Party. Capitalized terms used but not otherwise defined herein shall have the meanings assigned to such terms in the Note;

**WHEREAS**, each Guarantor is party to that certain Guaranty pursuant to which they have guaranteed the obligations of the Borrower under the Note;

**WHEREAS**, the Borrower and each Guarantor will receive substantial direct and indirect benefits from the execution, delivery and performance of the obligations under the Note and this Agreement and each is, therefore, willing to enter into this Agreement;

**WHEREAS**, this Agreement is given by the Grantors in favor of the Secured Party to secure the payment and performance of all of the Secured Obligations; and

**WHEREAS**, it is a condition to the obligations of the Lender to make the Loans under the Note that the Grantor execute and deliver this Agreement.

**NOW, THEREFORE**, in consideration of the mutual covenants, terms and conditions set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.    Definitions.

(a)    Unless otherwise specified herein, all references to Sections and Schedules herein are to Sections and Schedules of this Agreement.

(b)    Unless otherwise defined herein, terms used herein that are defined in the UCC shall have the meanings assigned to them in the UCC. However, if a term is defined in Article 9 of the UCC differently than in another Article of the UCC, the term has the meaning specified in Article 9.

(c)    For purposes of this Agreement, the following terms shall have the following meanings:

"**Collateral**" has the meaning set forth in Section 2.

"**Event of Default**" has the meaning set forth in the Note.

"**First Priority**" means, with respect to any lien and security interest purported to be created in any Collateral pursuant to this Agreement, such lien and security interest is the most senior lien to which such Collateral is subject (subject only to liens for Permitted Debt under the Note).

"**Proceeds**" means "proceeds" as such term is defined in section 9-102 of the UCC and, in any event, shall include, without limitation, all dividends or other income from the Collateral, collections thereon or distributions with respect thereto.

"**Secured Obligations**" has the meaning set forth in Section 3.

"**UCC**" means the Uniform Commercial Code as in effect from time to time in the State of Florida or, when the laws of any other state govern the method or manner of the perfection or enforcement of any security interest in any of the Collateral, the Uniform Commercial Code as in effect from time to time in such state.

2.      Grant of Security Interest. The Grantor hereby pledges and grants to the Secured Party, and hereby creates a continuing First Priority lien and security interest in favor of the Secured Party in and to all of its right, title and interest in and to the following, wherever located, whether now existing or hereafter from time to time arising or acquired (collectively, the "**Collateral**"):

(a)      all fixtures and personal property of every kind and nature including all accounts (including health-care-insurance receivables), goods (including inventory and equipment), documents (including, if applicable, electronic documents), instruments, promissory notes, chattel paper (whether tangible or electronic), letters of credit, letter-of-credit rights (whether or not the letter of credit is evidenced by a writing), securities and all other investment property, commercial tort claims described on Schedule 1 hereof as supplemented by any written notification given by the Grantor to the Secured Party pursuant to Section 4(e), general intangibles (including all payment intangibles), money, deposit accounts, and any other contract rights or rights to the payment of money; and

(b)      all Proceeds and products of each of the foregoing, all books and records relating to the foregoing, all supporting obligations related thereto, and all accessions of and to, substitutions and replacements for, and rents, profits and products of, each of the foregoing, and any and all Proceeds of any insurance, indemnity, warranty or guaranty payable to the Grantor from time to time with respect to any of the foregoing.

3.      Secured Obligations. The Collateral secures the due and prompt payment and performance of:

(a)      the obligations of the Grantor from time to time arising under the Note, this Agreement or otherwise with respect to the due and prompt payment of (i) the principal of and premium, if any, and interest on the Loans (including interest accruing during the pendency of any bankruptcy, insolvency, receivership or other similar proceeding, regardless of whether allowed or allowable in such proceeding), when and as due, whether at maturity, by acceleration, upon one or more dates set for prepayment or otherwise and (ii) all other monetary obligations, including fees, costs, attorneys' fees and disbursements, reimbursement obligations, contract causes of action, expenses and indemnities, whether primary, secondary, direct or indirect, absolute or contingent, due or to become due, now existing or hereafter arising, fixed or otherwise (including monetary obligations incurred

2

during the pendency of any bankruptcy, insolvency, receivership or other similar proceeding, regardless of whether allowed or allowable in such proceeding), of the Grantor under or in respect of the Note and this Agreement; and

(b) all other covenants, duties, debts, obligations and liabilities of any kind of the Grantor under or in respect of the Note, this Agreement or any other document made, delivered or given in connection with any of the foregoing, in each case whether evidenced by a note or other writing, whether allowed in any bankruptcy, insolvency, receivership or other similar proceeding, whether arising from an extension of credit, issuance of a letter of credit, acceptance, loan, guaranty, indemnification or otherwise, and whether primary, secondary, direct or indirect, absolute or contingent, due or to become due, now existing or hereafter arising, fixed or otherwise (all such obligations, covenants, duties, debts, liabilities, sums and expenses set forth in Section 3 being herein collectively called the "**Secured Obligations**").

4.      Perfection of Security Interest and Further Assurances.

(a) The Grantor shall, from time to time, as may be required by the Secured Party with respect to all Collateral, immediately take all actions as may be requested by the Secured Party to perfect the security interest of the Secured Party in the Collateral, including, without limitation, with respect to all Collateral over which control may be obtained within the meaning of sections 8-106, 9-104, 9-105, 9-106 and 9-107 of the UCC, section 201 of the federal Electronic Signatures in Global and National Commerce Act and, as the case may be, section 16 of the Uniform Electronic Transactions Act, as applicable, the Grantor shall immediately take all actions as may be requested from time to time by the Secured Party so that control of such Collateral is obtained and at all times held by the Secured Party. All of the foregoing shall be at the sole cost and expense of the Grantor.

(b) The Grantor hereby irrevocably authorizes the Secured Party at any time and from time to time to file in any relevant jurisdiction any financing statements and amendments thereto that contain the information required by Article 9 of the UCC of each applicable jurisdiction for the filing of any financing statement or amendment relating to the Collateral, including any financing or continuation statements or other documents for the purpose of perfecting, confirming, continuing, enforcing or protecting the security interest granted by the Grantor hereunder, without the signature of the Grantor where permitted by law, including the filing of a financing statement describing the Collateral as all assets now owned or hereafter acquired by the Grantor, or words of similar effect. The Grantor agrees to provide all information required by the Secured Party pursuant to this Section promptly to the Secured Party upon request.

(c) The Grantor hereby further authorizes the Secured Party to file with the United States Patent and Trademark Office and the United States Copyright Office (and any successor office and any similar office in any state of the United States or in any other country) this Agreement and other documents for the purpose of perfecting, confirming, continuing, enforcing or protecting the security interest granted by the Grantor hereunder, without the signature of the Grantor where permitted by law.

(d) If the Grantor shall at any time hold or acquire any certificated securities, promissory notes, tangible chattel paper, negotiable documents or warehouse receipts relating to the Collateral, the Grantor shall immediately endorse, assign and deliver

3

4930-4819-3079.3

the same to the Secured Party, accompanied by such instruments of transfer or assignment duly executed in blank as the Secured Party may from time to time specify.

(e)  If the Grantor shall at any time hold or acquire a commercial tort claim, the Grantor shall (i) immediately notify the Secured Party in a writing signed by the Grantor of the particulars thereof and grant to the Secured Party in such writing a security interest therein and in the proceeds thereof, all upon the terms of this Agreement, with such writing to be in form and substance satisfactory to the Secured Party and (ii) deliver to the Secured Party an updated Schedule 1.

(f)  The Grantor shall cause each Subsidiary of the Grantor which, from time to time, after the date hereof shall be required to pledge any assets to the Secured Party pursuant to the provisions of this Agreement, to execute and deliver to the Secured Party a Joinder Agreement within thirty (30) days of the date on which it was acquired or created and, upon such execution and delivery, such Subsidiary shall constitute a "Grantor" for all purposes hereunder with the same force and effect as if originally named as Grantor herein. Upon the execution and delivery by any Subsidiary of a Joinder Agreement, the supplemental schedules attached to such Joinder Agreement shall be incorporated into and become part of and supplement the Schedules to this Agreement and each reference to such Schedules shall mean and be a reference to such Schedules as supplemented pursuant to each Joinder Agreement and from time to time. The execution and delivery of such Joinder Agreement shall not require the consent of any Grantor hereunder. The rights and obligations of each Grantor hereunder shall remain in full force and effect notwithstanding the addition of any new Grantor as a party to this Agreement.

(g)  The Grantor shall cause all Persons, other than the U.S. Small Business Administration, who hold security interests in any assets of the Grantor to subordinate all amounts owed to such Persons and all such security interests granted to such Persons to the Note and the Secured Party's rights under the Note and this Agreement.

(h)  Within thirty (30) days after the date hereof, all depository accounts of the Grantor shall be subject to a deposit account control agreement in favor of the Secured Party in a form acceptable to the Secured Party.  Within thirty (30) days of the date hereof, the Grantor shall notify each of its customers in writing and otherwise use its commercially reasonable efforts to ensure that each customer remits all payments owed to the Grantor directly to the account(s) subject to such deposit account control agreement and the Grantor shall not maintain or have any operating account, deposit account, investment account, securities account or similar account at any bank, depositary source, financial intermediary or other financial institution, other than the account(s) subject to such deposit account control agreement.

(i)  The Grantor agrees that at any time and from time to time, at the expense of the Grantor, the Grantor will promptly execute and deliver all further instruments and documents, obtain such agreements from third parties, and take all further action, that may be necessary or desirable, or that the Secured Party may reasonably request, in order to create and/or maintain the validity, perfection or priority of and protect any security interest granted or purported to be granted hereby or to enable the Secured Party to exercise and enforce its rights and remedies hereunder or under any other agreement with respect to any Collateral.

4

4930-4819-3079.3

5. <u>Representations and Warranties</u>. The Grantor represents and warrants as follows:

(a) The Grantor's exact legal name is that indicated in the preamble of this Agreement and on the signature page hereof, (ii) the Grantor is a corporation duly incorporated, validly existing, and in good standing under the laws of the State of Delaware, and (iii) the Grantor's place of business (or, if more than one, its chief executive office) and its mailing address is set forth on the signature page hereof.

(b) Schedule 2 is a true, correct, and complete list of (i) all the Grantor's United States patents, patent licenses, trademarks, and trademark licenses registered with the United States Patent and Trademark Office and all other patents, patent licenses, trademarks, and trademark licenses, including the name of the registered owner and the registration number of each patent, patent license, trademark, and trademark license, owned by the Grantor; and (ii) all the Grantor's United States copyrights and copyright licenses and all other copyrights and copyright licenses, including the name of the registered owner and the registration number of each material registered copyright or copyright license owned by the Grantor.

(c) Schedule 3 is a true, correct, and complete list of all real property owned or leased by the Grantor.

(d) The Collateral consisting of securities, if any, have been duly authorized and validly issued, and are fully paid and non-assessable and subject to no options to purchase or similar rights. The Grantor holds no commercial tort claims except as indicated on Schedule 1. None of the Collateral constitutes, or is the proceeds of, (i) farm products, (ii) as-extracted collateral, (iii) manufactured homes, (iv) health-care-insurance receivables, (v) timber to be cut, (vi) aircraft, aircraft engines, satellites, ships or railroad rolling stock. None of the account debtors or other persons obligated on any of the Collateral is a governmental authority covered by the Federal Assignment of Claims Act or like federal, state or local statute or rule in respect of such Collateral.

(e) At the time the Collateral becomes subject to the lien and security interest created by this Agreement, the Grantor will be the sole, direct, legal and beneficial owner thereof, free and clear of any lien, security interest, encumbrance, claim, option or right of others except for the security interest created by this Agreement and other liens permitted by the Note.

(f) The pledge of the Collateral pursuant to this Agreement creates a valid and perfected First Priority security interest in the Collateral, securing the payment and performance when due of the Secured Obligations.

(g) It has full power, authority and legal right to borrow the Loans and pledge the Collateral pursuant to this Agreement.

(h) Each of this Agreement and the Note has been duly authorized, executed and delivered by the Grantor and constitutes a legal, valid and binding obligation of the Grantor enforceable in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting creditors' rights generally and subject to equitable principles (regardless of whether enforcement is sought in equity or at law).

5

4930-4819-3079.3

(i)       No authorization, approval, or other action by, and no notice to or filing with, any governmental authority or regulatory body is required for the borrowing of the Loans and the pledge by the Grantor of the Collateral pursuant to this Agreement or for the execution and delivery of the Note and this Agreement by the Grantor or the performance by the Grantor of its obligations thereunder.

(j)       The execution and delivery of the Note and this Agreement by the Grantor and the performance by the Grantor of its obligations thereunder, will not violate any provision of any applicable law or regulation or any order, judgment, writ, award or decree of any court, arbitrator or governmental authority, domestic or foreign, applicable to the Grantor or any of its property, or the organizational or governing documents of the Grantor or any agreement or instrument to which the Grantor is party or by which it or its property is bound.

(k)       The Grantor has taken all action required on its part for control (as defined in sections 8-106, 9-104, 9-105, 9-106 and 9-107 of the UCC, section 201 of the federal Electronic Signatures in Global and National Commerce Act and, as the case may be, section 16 of the Uniform Electronic Transactions Act, as applicable) to have been obtained by the Secured Party over all Collateral with respect to which such control may be obtained pursuant to the UCC. No person other than the Secured Party has control or possession of all or any part of the Collateral.

6.      <u>Voting, Distributions and Receivables</u>.

(a)       The Secured Party agrees that unless an Event of Default shall have occurred and be continuing, the Grantor may, to the extent the Grantor has such right as a holder of the Collateral consisting of securities, other equity interests or indebtedness owed by any obligor, vote and give consents, ratifications and waivers with respect thereto, except to the extent that, in the Secured Party's reasonable judgment, any such vote, consent, ratification or waiver would detract from the value thereof as Collateral or which would be inconsistent with or result in any violation of any provision of the Note or this Agreement, and from time to time, upon request from the Grantor, the Secured Party shall deliver to the Grantor suitable proxies so that the Grantor may cast such votes, consents, ratifications and waivers.

(b)       The Secured Party agrees that the Grantor may, unless an Event of Default shall have occurred and be continuing, receive and retain all dividends and other distributions with respect to the Collateral consisting of securities, other Equity Interests or indebtedness owed by any obligor.

**(c)**       If any Event of Default shall have occurred and be continuing, the Secured Party may, or at the request and option of the Secured Party the Grantor shall, notify account debtors and other persons obligated on any of the Collateral of the security interest of the Secured Party in any account, chattel paper, general intangible, instrument or other Collateral and that payment thereof is to be made directly to the Secured Party.

7.      <u>Covenants</u>. The Grantor covenants as follows:

(a)       The Grantor will not, without providing at least 30 days' prior written notice to the Secured Party, change its legal name, identity, type of organization, jurisdiction of organization, corporate structure, location of its chief executive office or its principal place of business or its organizational identification number. The Grantor will, prior to any change

6

described in the preceding sentence, take all actions reasonably requested by the Secured Party to maintain the perfection and priority of the Secured Party's security interest in the Collateral.

(b)    The Collateral, to the extent not delivered to the Secured Party pursuant to Section 4, will be kept at those locations listed on Schedule 3 and the Grantor will not remove the Collateral from such locations without providing at least thirty (30) days' prior written notice to the Secured Party. The Grantor will, prior to any change described in the preceding sentence, take all actions reasonably required by the Secured Party to maintain the perfection and priority of the Secured Party's security interest in the Collateral.

(c)    The Grantor shall, at its own cost and expense, defend title to the Collateral and the First Priority lien and security interest of the Secured Party therein against the claim of any person claiming against or through the Grantor and shall maintain and preserve such perfected First Priority security interest for so long as this Agreement shall remain in effect.

(d)    The Grantor will not sell, offer to sell, dispose of, convey, assign or otherwise transfer, grant any option with respect to, restrict, or grant, create, permit or suffer to exist any mortgage, pledge, lien, security interest, option, right of first offer, encumbrance or other restriction or limitation of any nature whatsoever on, any of the Collateral or any interest therein.

(e)    The Grantor will keep the Collateral in good order and repair and will not use the same in violation of law or any policy of insurance thereon. The Grantor will permit the Secured Party, or its designee, to inspect the Collateral at any reasonable time, wherever located.

(f)    The Grantor will pay promptly when due all taxes, assessments, governmental charges, and levies upon the Collateral or incurred in connection with the use or operation of the Collateral or incurred in connection with this Agreement.

8.    Secured Party Appointed Attorney-in-Fact. The Grantor hereby appoints the Secured Party the Grantor's attorney-in-fact, with full authority in the place and stead of the Grantor and in the name of the Grantor or otherwise, from time to time during the continuance of an Event of Default in the Secured Party's discretion to take any action and to execute any instrument which the Secured Party may deem necessary or advisable to accomplish the purposes of this Agreement (but the Secured Party shall not be obligated to and shall have no liability to the Grantor or any third party for failure to do so or take action). This appointment, being coupled with an interest, shall be irrevocable. The Grantor hereby ratifies all that said attorneys shall lawfully do or cause to be done by virtue hereof.

9.    Secured Party May Perform. If the Grantor fails to perform any obligation contained in this Agreement, the Secured Party may itself perform, or cause performance of, such obligation, and the expenses of the Secured Party incurred in connection therewith shall be payable by the Grantor; provided that the Secured Party shall not be required to perform or discharge any obligation of the Grantor.

10.    Reasonable Care. The Secured Party shall have no duty with respect to the care and preservation of the Collateral beyond the exercise of reasonable care. The Secured Party shall be deemed to have exercised reasonable care in the custody and preservation of

4930-4819-3079.3

the Collateral in its possession if the Collateral is accorded treatment substantially equal to that which the Secured Party accords its own property, it being understood that the Secured Party shall not have any responsibility for (a) ascertaining or taking action with respect to any claims, the nature or sufficiency of any payment or performance by any party under or pursuant to any agreement relating to the Collateral or other matters relative to any Collateral, whether or not the Secured Party has or is deemed to have knowledge of such matters, or (b) taking any necessary steps to preserve rights against any parties with respect to any Collateral. Nothing set forth in this Agreement, nor the exercise by the Secured Party of any of the rights and remedies hereunder, shall relieve the Grantor from the performance of any obligation on the Grantor's part to be performed or observed in respect of any of the Collateral.

11.    Remedies Upon Default.

(a)    If any Event of Default shall have occurred and be continuing, the Secured Party, without any other notice to or demand upon the Grantor, may assert all rights and remedies of a secured party under the UCC or other applicable law, including, without limitation, the right to take possession of, hold, collect, sell, lease, deliver, grant options to purchase or otherwise retain, liquidate or dispose of all or any portion of the Collateral. If notice prior to disposition of the Collateral or any portion thereof is necessary under applicable law, written notice mailed to the Grantor at its notice address as provided in Section 15 hereof ten (10) days prior to the date of such disposition shall constitute reasonable notice, but notice given in any other reasonable manner shall be sufficient. So long as the sale of the Collateral is made in a commercially reasonable manner, the Secured Party may sell such Collateral on such terms and to such purchaser(s) as the Secured Party in its absolute discretion may choose, without assuming any credit risk and without any obligation to advertise or give notice of any kind other than that necessary under applicable law. Without precluding any other methods of sale, the sale of the Collateral or any portion thereof shall have been made in a commercially reasonable manner if conducted in conformity with reasonable commercial practices of creditors disposing of similar property. At any sale of the Collateral, if permitted by applicable law, the Secured Party may be the purchaser, licensee, assignee or recipient of the Collateral or any part thereof and shall be entitled, for the purpose of bidding and making settlement or payment of the purchase price for all or any portion of the Collateral sold, assigned or licensed at such sale, to use and apply any of the Secured Obligations as a credit on account of the purchase price of the Collateral or any part thereof payable at such sale. To the extent permitted by applicable law, the Grantor waives all claims, damages and demands it may acquire against the Secured Party arising out of the exercise by it of any rights hereunder. The Grantor hereby waives and releases to the fullest extent permitted by law any right or equity of redemption with respect to the Collateral, whether before or after sale hereunder, and all rights, if any, of marshalling the Collateral and any other security for the Secured Obligations or otherwise. At any such sale, unless prohibited by applicable law, the Secured Party or any custodian may bid for and purchase all or any part of the Collateral so sold free from any such right or equity of redemption. Neither the Secured Party nor any custodian shall be liable for failure to collect or realize upon any or all of the Collateral or for any delay in so doing, nor shall it be under any obligation to take any action whatsoever with regard thereto. The Grantor agrees that it would not be commercially unreasonable for the Secured Party to dispose of the Collateral or any portion thereof by utilizing internet sites that provide for the auction of assets of the type included in the Collateral or that have the reasonable capability of doing so, or that match

8

4930-4819-3079.3

buyers and sellers of assets. The Secured Party shall not be obligated to clean-up or otherwise prepare the Collateral for sale.

(b)    If any Event of Default shall have occurred and be continuing, all rights of the Grantor to (i) exercise the voting and other consensual rights it would otherwise be entitled to exercise pursuant to Section 6(a) and (ii) receive the dividends and other distributions which it would otherwise be entitled to receive and retain pursuant to Section 6(b), shall immediately cease, and all such rights shall thereupon become vested in the Secured Party, which shall have the sole right to exercise such voting and other consensual rights and receive and hold such dividends and other distributions as Collateral.

(c)    If any Event of Default shall have occurred and be continuing, any cash held by the Secured Party as Collateral and all cash Proceeds received by the Secured Party in respect of any sale of, collection from, or other realization upon all or any part of the Collateral shall be applied in whole or in part by the Secured Party to the payment of expenses incurred by the Secured Party in connection with the foregoing or incidental to the care or safekeeping of any of the Collateral or in any way relating to the Collateral or the rights of the Secured Party hereunder, including reasonable attorneys' fees, and the balance of such proceeds shall be applied or set off against all or any part of the Secured Obligations in such order as the Secured Party shall elect. Any surplus of such cash or cash Proceeds held by the Secured Party and remaining after payment in full of all the Secured Obligations shall be paid over to the Grantor or to whomsoever may be lawfully entitled to receive such surplus. The Grantor shall remain liable for any deficiency if such cash and the cash Proceeds of any sale or other realization of the Collateral are insufficient to pay the Secured Obligations and the fees and other charges of any attorneys employed by the Secured Party to collect such deficiency.

(d)    If the Secured Party shall determine to exercise its rights to sell all or any of the Collateral pursuant to this Section, the Grantor agrees that, upon request of the Secured Party, the Grantor will, at its own expense, do or cause to be done all such acts and things as may be necessary to make such sale of the Collateral or any part thereof valid and binding and in compliance with applicable law.

12.    No Waiver and Cumulative Remedies. The Secured Party shall not by any act (except by a written instrument pursuant to Section 14), delay, indulgence, omission or otherwise be deemed to have waived any right or remedy hereunder or to have acquiesced in any Default or Event of Default. All rights and remedies herein provided are cumulative and are not exclusive of any rights or remedies provided by law.

13.    SECURITY INTEREST ABSOLUTE. The Grantor hereby waives demand, notice, protest, notice of acceptance of this Agreement, notice of loans made, credit extended, Collateral received or delivered or other action taken in reliance hereon and all other demands and notices of any description. All rights of the Secured Party and liens and security interests hereunder, and all Secured Obligations of the Grantor hereunder, shall be absolute and unconditional irrespective of:

(a)    any illegality or lack of validity or enforceability of any Secured Obligation or any related agreement or instrument;

(b)    any change in the time, place or manner of payment of, or in any other term of, the Secured Obligations, or any rescission, waiver, amendment or other modification

9

4930-4819-3079.3

of the Note, this Agreement or any other agreement, including any increase in the Secured Obligations resulting from any extension of additional credit or otherwise;

(c)    any taking, exchange, substitution, release, impairment or non-perfection of any Collateral or any other collateral, or any taking, release, impairment, amendment, waiver or other modification of any guaranty, for all or any of the Secured Obligations;

(d)    any manner of sale, disposition or application of proceeds of any Collateral or any other collateral or other assets to all or part of the Secured Obligations;

(e)    any default, failure or delay, willful or otherwise, in the performance of the Secured Obligations;

(f)    any defense, set-off or counterclaim (other than a defense of payment or performance) that may at any time be available to, or be asserted by, the Grantor against the Secured Party; or

(g)    any other circumstance (including, without limitation, any statute of limitations) or manner of administering the Loans or any existence of or reliance on any representation by the Secured Party that might vary the risk of the Grantor or otherwise operate as a defense available to, or a legal or equitable discharge of, the Grantor or any other grantor, guarantor or surety.

14.    Amendments. None of the terms or provisions of this Agreement may be amended, modified, supplemented, terminated or waived, and no consent to any departure by the Grantor therefrom shall be effective unless the same shall be in writing and signed by the Secured Party and the Grantor, and then such amendment, modification, supplement, waiver or consent shall be effective only in the specific instance and for the specific purpose for which made or given.

15.    Addresses For Notices. All notices and other communications provided for in this Agreement shall be in writing and shall be given in the manner and become effective as set forth in the Note, and addressed to the respective parties at their addresses as specified on the signature pages hereof or as to either party at such other address as shall be designated by such party in a written notice to each other party.

16.    Continuing Security Interest; Further Actions. This Agreement shall create a continuing First Priority lien and security interest in the Collateral and shall (a) subject to Section 17, remain in full force and effect until payment and performance in full of the Secured Obligations, (b) be binding upon the Grantor, its successors and assigns, and (c) inure to the benefit of the Secured Party and its successors, transferees and assigns; provided that the Grantor may not assign or otherwise transfer any of its rights or obligations under this Agreement without the prior written consent of the Secured Party.  Without limiting the generality of the foregoing clause (c), any assignee of the Secured Party's interest in any agreement or document which includes all or any of the Secured Obligations shall, upon assignment in accordance with Section 11.8 of the Note, become vested with all the benefits granted to the Secured Party herein with respect to such Secured Obligations.

17.    Termination; Release. On the date on which all Secured Obligations have been paid and performed in full, the Secured Party will, at the request and sole expense of the

10

4930-4819-3079.3

Grantor, (a) duly assign, transfer and deliver to or at the direction of the Grantor (without recourse and without any representation or warranty) such of the Collateral as may then remain in the possession of the Secured Party, together with any monies at the time held by the Secured Party hereunder, and (b) execute and deliver to the Grantor a proper instrument or instruments acknowledging the satisfaction and termination of this Agreement.

18.    GOVERNING LAW. This Agreement and the Note and any claim, controversy, dispute or cause of action (whether in contract or tort or otherwise) based upon, arising out of or relating to this Agreement or the Note (except, as to the Note, as expressly set forth therein) and the transactions contemplated hereby and thereby shall be governed by, and construed in accordance with, the laws of the State of Florida. The other provisions of Sections 11.3, 11.4, 11.5, and 11.6 of the Note are incorporated herein, mutatis mutandis, as if a part hereof.

19.    Benefit of Agreement.  The terms and provisions of this Security Agreement shall be binding upon and inure to the benefit of the Grantors, the Secured Party and their respective successors and assigns (including all Persons who become bound as a Grantor under this Security Agreement), except that no Grantor shall have the right to assign its rights or delegate its obligations under this Security Agreement or any interest herein without the prior written consent of the Secured Party.  Without limiting the generality of the foregoing, the Secured Party may assign or otherwise transfer all or any portion of its rights and obligations under this Security Agreement to any other Person which is an assignee of the Secured Party under the Note, and such other Person shall thereupon become vested with all the benefits in respect hereof granted to the Secured Party herein.

20.    Counterparts. This Agreement and any amendments, waivers, consents or supplements hereto may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all taken together shall constitute a single contract. Delivery of an executed counterpart of a signature page to this Agreement by facsimile or in electronic (i.e., "pdf" or "tif") format shall be effective as delivery of a manually executed counterpart of this Agreement. This Agreement and the Note constitute the entire contract among the parties with respect to the subject matter hereof and supersede all previous agreements and understandings, oral or written, with respect thereto.

[SIGNATURE PAGE FOLLOWS]

11

4930-4819-3079.3

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

BORROWER:

MOOCHO, INC.

By: _____ Matt Levenson _____

Name: Matt Levenson

Title: CEO

Address for Notices:

1815 Purdy Avenue
Miami Beach, FL, 33139
Attention: Matt Levenson
Email: coach@moocho.com

SECURED PARTY:

BLACKHAWK NETWORK, INC.

By: _____

Name: David McLaughlin

Title: Chief Financial Officer

Address for Notices:

6220 Stoneridge Mall Road
Pleasanton, CA 94588
Attention: Legal Department

*[Signature Page to Security Agreement]*

## SCHEDULE 1

## COMMERCIAL TORT CLAIMS

None.

4930-4819-3079.3

## SCHEDULE 2

## INTELLECTUAL PROPERTY

None.

4930-4819-3079.3

# SCHEDULE 3

## REAL PROPERTY

1815 Purdy Avenue, Miami Beach, FL 33139

4930-4819-3079.3

## EXHIBIT A

## JOINDER AGREEMENT

This **JOINDER AGREEMENT** ("**Joinder Agreement**"), dated as of [DATE] is made by [JOINING GRANTOR], a [STATE OF ORGANIZATION] [ENTITY TYPE] (the "**Joining Grantor**"), and delivered to Blackhawk Network, Inc. ("**Lender**") under that certain Security Agreement (as amended, amended and restated, supplemented or otherwise modified from time to time, the "**Security Agreement**"; capitalized terms used but not otherwise defined herein shall have the meanings assigned to such terms in the Security Agreement), dated as of April 25, 2025, made by and among Moocho, Inc., a Delaware corporation (the "**Borrower**"), and the Grantors party thereto, in favor of the Lender.

**WHEREAS**, the Joining Grantor is a Subsidiary of the Borrower and required by the terms of the Note to become a Guarantor (as defined in the Note) and be joined as a party to the Security Agreement as a Grantor; and

**WHEREAS**, this Joinder Agreement supplements the Security Agreement and is delivered by the Joining Grantor pursuant to Section 7.8 of the Note and Section 4(f) of the Security Agreement; and

**WHEREAS**, the Joining Grantor will materially benefit directly and indirectly from the Loan made available to the Borrower by the Lender under the Note; and

**NOW THEREFORE**, the Joining Grantor hereby agrees as follows:

1.	**Joinder.** The Joining Grantor hereby irrevocably, absolutely and unconditionally becomes a party to the Security Agreement as a Grantor and agrees to be bound by all the terms, conditions, covenants, obligations, liabilities and undertakings of each Grantor or to which each Grantor is subject thereunder, all with the same force and effect as if the Joining Grantor were a signatory to the Security Agreement. Without limiting the generality of the foregoing, the Joining Grantor hereby pledges and grants to the Lender, as collateral security for the payment and performance in full of all the Secured Obligations, a First Priority security interest in and to all of its right, title and interest in, to and under the Collateral owned by it, wherever located, and whether now existing or hereafter arising or acquired from time to time and expressly assumes all obligations and liabilities of a Grantor thereunder.

2.	**Affirmations.** The Joining Grantor hereby makes each of the representations and warranties and agrees to each of the covenants applicable to the Grantors contained in the Security Agreement. The Joining Grantor also represents and warrants to the Lender that (a) it has the corporate or limited liability company, as applicable, power and authority, and the legal right, to make, deliver and perform this Joinder Agreement and has taken all necessary corporate or limited liability company, as applicable, action to authorize the execution, delivery and performance of this Joinder Agreement, (b) no consent or authorization of, filing with, notice to or other act by or in respect of, any Governmental Authority or any other Person that has not been obtained, made or completed is required in connection with the execution, delivery and performance, validity or enforceability of this Joinder Agreement, (c) this Joinder Agreement has been duly executed and delivered on behalf of the Joining Grantor and (d) this Joinder Agreement constitutes a legal, valid and binding obligation of the Joining Grantor enforceable against such Joining Grantor in accordance with its terms, subject to the effects of bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium and other similar laws relating to or affecting creditors' rights generally, general

equitable principles (whether considered in a proceeding in equity or at law) and an implied covenant of good faith and fair dealing.

3.      **Supplemental Schedules.** Attached to this Joinder Agreement are duly completed schedules (the "**Supplemental Schedules**") supplementing the respective Schedules to the Security Agreement. The Joining Grantor represents and warrants that the information contained on each of the Supplemental Schedules with respect to such Joining Grantor and its properties is true, complete and accurate as of the date hereof. Such Supplemental Schedules shall be deemed to be part of the Security Agreement.

4.      **Severability.** The provisions of this Joinder Agreement are independent of and separable from each other. If any provision hereof shall for any reason be held invalid or unenforceable, such invalidity or unenforceability shall not affect the validity or enforceability of any other provision hereof, but this Joinder Agreement shall be construed as if such invalid or unenforceable provision had never been contained herein.

5.      **Counterparts.** This Joinder Agreement may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. Delivery of an executed counterpart of a signature page to this Joinder Agreement by facsimile or in electronic (i.e., "pdf" or "tif") format shall be effective as delivery of a manually executed counterpart of this Joinder Agreement.

6.      **Delivery.** The Joining Grantor hereby irrevocably waives notice of acceptance of this Joinder Agreement and acknowledges that the Secured Obligations are incurred and maintained, in reliance on this Joinder Agreement and the Joining Grantor's joinder as a party to the Security Agreement as herein provided.

7.      **Governing Law; Venue; Waiver of Jury Trial.** This Joinder Agreement and any claim, controversy, dispute or cause of action (whether in contract or tort or otherwise) based upon, arising out of or relating to this Joinder Agreement and the transactions contemplated hereby and thereby shall be governed by and construed in accordance with the laws of the State of Florida. The provisions of Section 18 of the Security Agreement are hereby incorporated by reference as if fully set forth herein.

[SIGNATURE PAGE FOLLOWS]

17

IN WITNESS WHEREOF, the parties hereto have caused this Joinder Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

[NAME OF JOINING GRANTOR]

By:_____

Name:_____

Title:_____

Address for Notices:

_____

_____

_____

AGREED TO AND ACCEPTED:

BLACKHAWK NETWORK, INC.

By: _____

Name:_____

Title:_____

Address for Notices:

6220 Stoneridge Mall Road
Pleasanton, CA 94588
Attention: Legal Department

# Exhibit D

# FOURTH AMENDMENT TO
# DISTRIBUTION PARTNER MASTER AGREEMENT

This Fourth Amendment to Distribution Partner Master Agreement (this "***Fourth Amendment***") is effective April 25, 2025 (the "***Fourth Amendment  Effective Date***"), by and between Blackhawk Network, Inc., an Arizona corporation ("***Blackhawk***") and Moocho, Inc., a Delaware corporation ("***Partner***").

WHEREAS, Blackhawk and Partner are parties to that certain Distribution Partner Master Agreement, effective January 27, 2021, as amended by that certain First Amendment To Distribution Partner Master Agreement, effective September 29, 2022; that certain Second Amendment To Distribution Partner Master Agreement, effective January 26, 2023; and that certain Third Amendment To Distribution Partner Master Agreement, effective December 17, 2024 (collectively, the "***Agreement***"); and

WHEREAS, the Parties are also parties to that certain Secured Promissory Note effective as of the Fourth Amendment Effective Date (the "***Loan Agreement***")

WHEREAS, Blackhawk and Partner each desires to amend the Agreement as set forth below.

NOW THEREFORE, in consideration of these premises, and the covenants and mutual promises hereinafter set forth, the parties hereto agree as follows.

1.      All capitalized terms used but not defined in this Fourth Amendment shall have the meanings set forth in the Agreement.

2.      The definition of New Minimum Balance Date is hereby deleted in its entirety and replaced with the following:

"New Minimum Balance Date" means the date on which the Credit Account provided for in Section 4.2.b. of Schedule 1 contains a cash dollar amount greater than or equal to ███████████████████████ ████████████. Such date will be confirmed by Blackhawk in writing following such time."

3.      The following is hereby added to the end of Section 2.3:

"Blackhawk may suspend all performance hereunder (including suspension of Activations and provision of Gift Cards) immediately and without notice to Partner upon an Event of Default (as defined in the Loan Agreement) or any breach of this Agreement. In addition, if during a single calendar day the face value of Gift Cards sold hereunder exceeds Two Million Five Hundred Thousand Dollars ($2,500,000) (the "***Daily Volume Cap***"), Blackhawk may immediately and without notice to Partner suspend all further Activations for the remainder of that calendar day. Once the Loan amount (as defined in the Load Agreement) is below Thirty Million Dollars ($30,000,000), Blackhawk may increase the Daily Volume Cap to Five Million Dollars ($5,000,000) pending any corresponding adjustment to the Minimum Balance as Blackhawk determines in its sole discretion.  Blackhawk may also reduce the Daily Volume Cap to a lower value (including to $0) if Blackhawk determines at its sole discretion that Partner has credit risk for any reason."

4.      Section 5.3 of the Agreement is hereby deleted in its entirety and replaced with the following:

"5.3     <u>Failure to Make Timely Payments</u>. If Partner fails to make any payment under the Loan Agreement or this Agreement when due, Blackhawk may, effective immiedately and in its sole discretion, make the following changes to the payments if it deems such actions necessary based on its investigation of the issue: (i) increase the frequency of Partner's payment for sales of all Gift Card hereunder; (ii) require Partner to prepay for all Gift Cards hereunder; (iii) increase the Minimum Balance in the Credit Account; and/or (iv) offset any amounts owed by Partner or its Affiliates to Blackhawk under this Agreement or under any other agreement against any credits or payments owed to Partner by Blackhawk under this Agreement.

– 1 –

5.      Section 9 of the Agreement is hereby deleted in its entirety and replaced with the following:

"9.     <u>Audit Rights</u>. Blackhawk and BHN Retailers will have the right, during the Term and for one (1) year thereafter, to inspect and audit all Partner records relating to its performance hereunder to ensure compliance with this Agreement. Any audit will be conducted at such times and at such frequency as Blackhawk shall determine; provided however, that in the event of an underpayment of more than five percent (5%), the reasonable costs of any such audits will be borne by Partner. Any underpayment revealed by such an audit will be paid promptly after the completion of such audit."

6.      The following is hereby added to the end of Section 12:

"As of the Fourth Amendment Effective Date, Partner agrees to meet with Blackhawk monthly to provide all financial performance metrics requested by Blackhawk to ensure Partner's ongoing ability to meet its obligations under the Loan Agreement and this Agreement."

7.      Section 15 of the Agreement is hereby deleted in its entirety and replaced with the following:

"15     **Limitations of Liability**.  IN NO EVENT WILL BLACKHAWK, OR ITS AFFILIATES, BE LIABLE TO ANY PARTY TO THIS AGREEMENT OR ITS AFFILIATES, OR ANY THIRD PARTY, WHETHER IN CONTRACT, TORT, EQUITY OR OTHERWISE, FOR (A) ANY INDIRECT, INCIDENTAL, CONSEQUENTIAL, SPECIAL, PUNITIVE OR EXEMPLARY DAMAGES (EVEN IF SUCH DAMAGES ARE FORESEEABLE, AND WHETHER OR NOT A PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES) ARISING FROM OR RELATING TO THIS AGREEMENT OR THE LOAN AGREEMENT; OR (B) ANY DIRECT DAMAGES ARISING FROM OR RELATING TO THIS AGREEMENT OR THE LOAN AGREEMENT TO THE EXTENT THAT THE AGGREGATE AMOUNT OF SUCH DAMAGES EXCEEDS FIFTY THOUSAND DOLLARS ($50,000).

8.      Section 16.1 of the Agreement is hereby deleted in its entirety and replaced with the following:

"16.1   Unless earlier terminated pursuant to the terms herein, this Agreement will commence on the Effective Date and continue until the later of (a) July 31, 2026, or (b) the date on which Partner has paid the Loan in full (the "**Term**"). Blackhawk may terminate this Agreement for any reason or no reason on five (5) Business Days' notice to Partner."

9.      Section 17.5 of the Agreement is hereby deleted in its entirety and replaced with the following:

"17.5 <u>Assignment</u>. Partner shall not transfer or assign (by merger or operation of law or otherwise) this Agreement or its obligations under this Agreement, in whole or in part, without the prior written consent of Blackhawk (which consent will not be unreasonably withheld); provided that any assignment or transfer (even to an Affiliate of Partner) that is to a direct competitor of Blackhawk (or its Affiliates) may be rejected by Blackhawk at its sole discretion. Any purported assignment in violation of this Section will be null and void.  Blackhawk may transfer or assign (by merger or operation of law or otherwise and for any reason) this Agreement at its sole discretion without the consent of Partner."

10.    A new Section 17.13 is hereby added to the Agreement as follows:

"17.13 <u>Partner Release</u>. Partner, on behalf of itself, its parents, subsidiaries, and Affiliates, and their respective past and current officers, directors, principals, partners, managers, members, shareholders, employees, agents, representatives, successors and assigns, hereby fully and completely releases and forever discharges Blackhawk, its parents, subsidiaries, and Affiliates, and their respective past and current officers, directors, principals, partners, managers, members, shareholders, employees, agents, representatives, successors and assigns ("**Blackhawk Parties**"), from any and all Claims of every kind, nature and

description whatsoever, whether known or unknown, at law or in equity, it may now have or has ever had against Blackhawk Parties in connection with this Agreement and the BHN Program (the "*Release*"). Partner agrees to reaffirm the Release on an ongoing basis during the Term as a condition precedent of Blackhawk approving each Activation request from Partner."

11. A new Section 2.6 is hereby added to Schedule 1 as follows:

"2.6     Partner may not offer any marketing promotion or campaign in which customers receive a discount (or equivalent value) that is greater than seventy-five percent (75%) of the Partner Commission without Blackhawk's prior written approval."

12. Section 4.1 of Schedule 1 is hereby deleted in its entirety and replaced with the following:

"4.1     Partner Commissions.

On the Fourth Amendment Effective Date, Blackhawk will draw down on the Credit Account such amounts (together with the Loan amount) required to make Partner current on its outstanding trade payable amounts owed to Blackhawk. Notwithstanding anything in the Agreement to the contrary, as of the Fourth Amendment Effective Date, and through the period prior to the New Minimum Balance Date, for all BHN Retailer Gift Cards sold hereunder, Blackhawk will retain one hundred percent (100%) of the distribution commission, which will be included in the Daily Invoice and drafted by Blackhawk in accordance with Section 4.2.a of Schedule 1, below, fifty percent (50%) of which will be put toward achieving the new Minimum Balance amount.

Beginning on the New Minimum Balance Date, for all BHN Retailer Gift Cards sold hereunder, Partner will earn fifty percent (50%) of the distribution commission ("*Partner Commission*") as set forth for each Gift Card on the Commission Schedule, and Blackhawk agrees to put thirty-five percent (35%) of the distribution commission into the Credit Account. Once the amount in the Credit Account is more than or equal to the outstanding Loan amount, Blackhawk may, at its election, choose to use funds from the Credit Account as full and final payment of the Loan; *provided, however*, that in the event Partner misses any payment under the Loan Agreement, all amounts in the Credit Account that exceed the Minimum Balance will be swept by Blackhawk and will not be used for the repayment of any Loan amounts. Following the New Minimum Balance Date, Blackhawk will promptly issue a Commission Schedule listing the new Partner Commission amounts to Partner. Partner acknowledges and agrees that the BHN Retailers and the Partner Commissions listed in the Commission Schedule may change from time to time due to changes in Blackhawk's underlying agreements with BHN Retailers and that Blackhawk is not obligated to offer all of the Gift Cards listed in the Commission Schedule. Blackhawk will advise Partner of such changes in writing (which may be done by email) as such changes occur."

13. Section 4.2(a) of Schedule 1 is hereby deleted in its entirety and replaced with the following:

"a.     Daily Invoicing. Beginning April 21, 2025, Blackhawk will deliver to Partner a daily electronic invoice covering the sales of all BHN Retailer Gift Cards sold during the preceding calendar day (the "*Daily Invoice*"). Partner authorizes Blackhawk to draft payment for the Daily Invoice such that Blackhawk is paid on the business day following submission to Partner of each Daily Invoice. Partner will complete and submit any ACH form provided by Blackhawk and allow it to test the accuracy of the ACH information/process, including through the Restricted Account (as defined below). Partner will maintain sufficient funds in the account to pay all invoices when due.

Partner reaffirms Section 9 of Schedule 1, below, and Partner agrees to hold all funds received from the sale of BHN Retailer Gift Cards hereunder in a restricted account for the sole benefit of Blackhawk approved by Blackhawk (the "*Restricted Account*"). Partner agrees to execute all customary documentation, including a

– 3 –

deposit account control agreement, or similar agreement, as may be required to effectuate the Restricted Account.

In addition to Blackhawk's other rights and remedies hereunder, if Partner fails to make any payment when due under this Agreement, Partner will pay interest on any outstanding amounts at the maximum rate allowable by Applicable Law as determined by Blackhawk in its sole discretion. Any interest amounts owed may be offset from funds in the Credit Account by Blackhawk at its discretion."

14.    Section 4.2(b) of Schedule 1 is hereby deleted in its entirety and replaced with the following:

"b.    Credit Deposit. Based on credit risk and volume-based reviews to be conducted by Blackhawk from time to time to during the Term, Partner will maintain a pre-established cash dollar amount "on account" with Blackhawk to support projected sales activity (the "**Credit Account**"). As of the Fourth Amendment Effective Date, the minimum balance required to be maintained by Partner in the Credit Account is ███████ ███████████████████████████████████████. Blackhawk has the right to adjust and the right to determine the process of adjustment to the Minimum Balance at any time in its sole discretion. In the event the Restricted Account has insufficient funds to pay any invoice, Blackhawk may immediately deduct from the Credit Account balance the amount required to pay the invoice (along with any fees and charges resulting from the failed ACH draft), and Partner will replenish the Credit Account to the Minimum Balance within two (2) Business Days. If the Credit Account has insufficient funds to pay any amounts due, Blackhawk may suspend its performance hereunder. The obligation to maintain the Credit Account and the Minimum Balance under this Section 4.2(b) will survive any termination of the Agreement and will remain in effect until all principal and interest owed by Partner under the Loan Agreement has been paid in full."

15.    Beginning on the New Minimum Balance Date, the following will hereby be added as a new Section 12.3 of Schedule 1 of the Agreement:

"12.3    Notwithstanding anything in the foregoing, Partner may enter into an agreement with a third party that offers for sale or distributes gift cards and/or related products; *provided*, *however*, that any such agreement with a third-party must contain an obligation for all funds received from the sale of Gift Cards thereunder to be held in the Restricted Account until all principal and interest owed under the Loan Agreement has been paid in full. Any agreement signed in violation of this Section 12.3 will be null and void *ab initio*."

16.    Except as explicitly set forth in this Fourth Amendment all terms and provisions contained in the Agreement shall remain unchanged and in full force and effect.

IN WITNESS WHEREOF, the Parties, by and through their respective duly authorized representatives, have executed this Fourth Amendment as of the Fourth Amendment Effective Date.

**MOOCHO, INC.**

By:_____ *Matt Levenson* _____
96C681002588465...
Printed Name: _____
   Matt Levenson

Title:_____
   CEO

**BLACKHAWK NETWORK, INC.**

By:_____ *Brett Narlinger* _____
A5FE2F25AE8B43F...
Printed Name:_____
   Brett Narlinger

Title:_____
   head of global commerce

– 5 –

# Exhibit E

Docusign Envelope ID: 9B07E644-D447-4992-A2A5-0A8A498C53A0



September 4, 2025

Via Email & Overnight Courier

Moocho, Inc.
1815 Purdy Avenue
Miami Beach, FL 33139
Attention: Matt Levenson
Email: coach@moocho.com

Subject: Notice of Default under Secured Promissory Note dated April 25, 2025

Dear Mr. Levenson,

Blackhawk Network, Inc. (the "Noteholder") hereby provides formal notice to Moocho, Inc. (the "Maker") that an Event of Default has occurred under the Secured Promissory Note dated April 25, 2025 (the "Note").

As you are aware, in accordance with Section 4.2 of the Note, the Noteholder agreed to treat the interest installments due on May 31, 2025, June 30, 2025, and July 31, 2025, as "PIK Interest," as that term is defined in the Note. However, the Noteholder expressly advised the Maker on August 21, 2025 that the August 31, 2025 interest installment would not be treated as PIK Interest and was therefore due and payable in cash on that date.

To date, no payment has been received for the August 31, 2025 interest installment.

This constitutes an Event of Default under Section 9.1(b), which provides that failure to pay interest or any other amount when due, and such failure continuing for three (3) days, triggers default. Accordingly, the Maker had until September 3, 2025, to cure this breach. As of the date of this notice, the default remains uncured.

Furthermore, as required under Section 7.5 of the Note, the Maker has failed to provide any written notice regarding the nature and extent of the Event of Default, and to provide the required information identified in Section 7.5(i)-(vi).

To cure the default, the Noteholder hereby demands that the Maker immediately pay the missed August 31, 2025 interest installment in full, no later than September 11, 2025.

The Noteholder reserves all rights and remedies available under the Note, the Security Agreement dated April 25, 2025 ("Security Agreement"), and applicable law, including but not limited to:

- Charging default interest at the rate specified in Section 4.3 of the Note; and

- Declaring the full Accreted Value of the Note and all other amounts due to be immediately payable under Section 10 of the Note.

- Asserting all rights and remedies as a Secured Party under Section 11 of the Security Agreement

Docusign Envelope ID: 9B07E644-D447-4992-A2A5-0A8A498C53A0



Sincerely,

David McLaughlin
Chief Financial Officer

cc:  Micki Wainhouse, VP Legal Counsel

# Exhibit F

**From:** Matt Levenson <coach@moocho.com>
**Date:** Monday, 8 September 2025 at 13:03
**To:** Vikram Varma <Vikram.Varma2@bhn.com>
**Cc:** Micki Wainhouse <Micki.Wainhouse@bhn.com>
**Subject:** Notice of Material Adverse Change – Moocho, Inc.

**CAUTION:** This email originated from outside of the organization.
Do not click the links or open attachments unless you recognize the sender and know the content is safe.

September 8, 2025

Vikram Varma
General Counsel
Blackhawk Network
6220 Stoneridge Mall Rd.
Pleasanton, CA 94588

Micki Wainhouse
Interim General Counsel and VP, Legal
BHN
Westside, London Road
Hemel Hempstead, Hertfordshire, HP3 9TD
+44(0)7872 865796

Dear Vick and Micki,

Pursuant to Section 7.5 (Notice of Certain Events) of the Secured Promissory Note and Security Agreement dated April 25, 2025, by and between Moocho, Inc. and Blackhawk Network, Inc. (the "Note"), Moocho, Inc. (the "Maker") hereby provides written notice of a material adverse change in its financial condition and operations.

Despite ongoing efforts to secure additional financing and restructure our obligations, Moocho has not obtained new capital commitments. As a result, Moocho is now preparing to initiate an orderly wind down of its operations.

In connection with this process, the Company is seeking to liquidate its assets for the benefit of its creditors. As of the date of this notice, Moocho has approximately $15 million in senior secured debt obligations that take priority over the debt held by Blackhawk Network.

This notice is provided in compliance with the Maker's obligation to notify the Noteholder of an Event of Default and related developments under the Note. We will continue to update you in writing as required under Section 7.5.

Please contact me directly should you have any questions or require additional information.

Sincerely,

Matthew Levenson
Chief Executive Officer
Moocho, Inc .

# Exhibit G



September 16, 2025

Via Email & Overnight Courier

Moocho, Inc.
1815 Purdy Avenue
Miami Beach, FL 33139
Attention: Matt Levenson
Email: coach@moocho.com

Subject:      **Acceleration of Secured Promissory Note dated April 25, 2025 –
              Immediate Payment Due**

Dear Mr. Levenson,

Blackhawk Network, Inc. (the "Noteholder") acknowledges receipt of Moocho, Inc.'s (the "Maker") correspondence dated September 8, 2025, in which you provided notice of a material adverse change in the Maker's financial condition and operations, and indicated that the Maker is preparing to initiate an orderly wind-down of its business.

As previously communicated in our Notice of Default dated September 4, 2025, the Maker has failed to cure the payment default under the Secured Promissory Note dated April 25, 2025 (the "Note"), and the default remains uncured as of today.

Pursuant to Section 10 ("Remedies") of the Note, upon the occurrence and continuance of an Event of Default, the Noteholder may declare the entire Accreted Value, together with all accrued interest and other amounts payable under the Note, immediately due and payable. The Maker's notice of its intent to wind down operations and the uncured payment default constitute continuing Events of Default under the Note.

Accordingly, this letter serves as formal notice that the full Accreted Value of the Note, together with all accrued interest and any other amounts payable, is hereby declared immediately due and payable. As of August 31, 2025, the Accredited Value of the Note is $67,178,071.18. The Default Rate of 15% per annum applies to the Accredited Value, which is equivalent to $27,607.43 per day of interest ("Daily Default Interest"). *See* Note, Sections 4.3 ("Default Interest") & 4.4 ("Computation of Interest").

Please arrange for payment in full by September 18, 2025 of the Accredited Value and each day of Daily Default Interest since August 31, 2025, in accordance with the payment instructions set forth in the Note.

The Noteholder reserves all rights and remedies available under the Note, the Security Agreement, and applicable law.

Sincerely,

*James S McDonald*

James S. McDonald
VP Litigation, Chief IP Counsel

cc: Micki Wainhouse, Interim General Counsel

# Exhibit H

IN THE CIRCUIT COURT OF THE NINTH JUDICIAL CIRCUIT, IN AND FOR ORANGE COUNTY, FLORIDA

BLACKHAWK NETWORK, INC.,

        Plaintiff,

vs.

MOOCHO, INC.,

        Defendant,

CASE NO.:

_____/

## COMPLAINT FOR BREACH OF SECURED PROMISSORY NOTE, ENFORCEMENT OF SECURITY INTEREST, AND BREACH OF CONTRACT

Plaintiff, BLACKHAWK NETWORK, INC., hereby files suit against Defendant, MOOCHO, INC., and alleges as follows:

### PARTIES, JURISDICTION, AND VENUE

1.    This is an action for damages that exceeds $50,000.00, exclusive of interest, costs, and attorney's fees.

2.    The amount in controversy arises from Defendant's breach of a written Secured Promissory Note in the original principal amount of $65,000,000.00 (the "Note"). A true and correct copy of the Note is attached as Exhibit "A" and incorporated by reference.

3.    The parties also entered into a Security Agreement which further outlines the responsibilities of the parties and permits this action to enforce its terms. A true and correct copy of the Security Agreement referenced in the Note is attached as Exhibit "B" and incorporated by reference.

4.    Plaintiff Blackhawk Network, Inc. ("Blackhawk") is an Arizona corporation with its principal place of business in Pleasanton, California.

5.      Defendant Moocho, Inc. ("Moocho") is a Delaware corporation with its principal place of business in Miami Beach, Florida. In its 2025 annual report with the Florida Secretary of State, Moocho, Inc. reported its headquarters as 1815 Purdy Avenue, Miami Beach, Florida 33139.

6.      Jurisdiction and venue are proper in the Ninth Judicial Circuit in Orange County, Florida because Moocho agreed to such jurisdiction and venue. *See* Note, Section 11.4(a) ("Maker [Moocho] hereby irrevocably and unconditionally (i) agrees that any legal action, suit, or proceeding arising out of or relating to this Note or the Security Agreement shall be brought exclusively in the courts of the State of Florida in the Ninth Judicial Circuit in Orange County, Florida and (ii) submits to the exclusive jurisdiction of any such court in any such action, suit, or proceeding. Final judgment against Maker in any action, suit, or proceeding shall be conclusive and may be enforced in any other jurisdiction by suit on the judgment.").

**GENERAL ALLEGATIONS**

7.      On April 25, 2025, Moocho executed the Note in favor of Blackhawk in the principal amount of $65,000,000.00. *See* Exhibit A, Note.

8.      On April 25, 2025, Moocho also executed a Security Agreement with Blackhawk. *See* Exhibit B, Security Agreement.

9.      Moocho is designated as the "Maker" and Blackhawk is designated as the "Noteholder" in the Note. *See* Note at 1.

10.     Moocho is designated as the "Borrower" and Blackhawk is designated as the "Secured Party" in the Security Agreement. *See* Security Agreement at 1.

11.     The Note provides that interest shall be payable monthly beginning May 31, 2025. *See* Note, Section 4.2 ("Interest shall be payable monthly in arrears to the Noteholder beginning on May 31, 2025, and on the last day of each month thereafter.").

2

12.     During the first twelve months after the date of the Note, the Applicable Rate is 8% per annum.  The rate then increases to and remains 10% thereafter. *See* Note, Section 4.1 ("the outstanding principal amount of the Loan made hereunder shall bear interest at the Applicable Rate"); Note, Section 1.1 ("'Applicable Rate' means an interest rate per annum equal to 8% for the first twelve (12) months after the date of this Note (subject to Section 4.2 below) and 10% thereafter.").

13.     The Note permits Blackhawk, during the Initial Period of twelve months, to elect PIK Interest in lieu of cash interest payments upon timely written notice, with such PIK Interest added to the principal, and with Applicable Rate at 10% per annum. *See* Note, Section 4.2 ("in lieu of accepting monthly cash interest payments... the Noteholder may elect, by providing written notice to Maker at least five (5) Business Days before any such payment date, to forego cash interest payments for the remaining months of the Initial Period and in lieu thereof have the outstanding principal amount of the Note accrue interest at 10% per annum ('PIK Interest'). PIK Interest shall be added to the principal of this Note on each remaining interest payment date during the Initial Period").

14.     The Note states that the principal amount of the Note shall be referred to as the "Accreted Value" and shall include any accrued PIK Interest. *See* Note, Section 4.2 ("On any date of determination, the principal amount of this Note, together with accrued PIK Interest added to the principal of this Note in accordance with this Section 4.2 shall be referred to as the 'Accreted Value.' Interest on this Note shall accrue from the date hereof until payment of the Accreted Value in full.").

15.     The Note states that Moocho's performance is secured by a first priority security in the Security Agreement. *See* Note, Section 3 ("Maker's performance of its obligations hereunder

3

is secured by a first priority security interest in the collateral specified in the Security Agreement.").

16.     The Note states that failure to pay interest or any other amount when due, and such failure continuing for three (3) days, constitutes an Event of Default. *See* Note, Section 9.1 ("Maker fails to pay (a) any Accreted Value when due or (b) interest or any other amount when due and such failure continues for three (3) days.").

17.     The Note states that upon any such nonpayment, the overdue amount bears Default Interest from the date of non-payment until paid, which is calculated as the Applicable Rate plus 5%. *See* Note, Section 4.3 ("If any amount payable hereunder is not paid when due (without regard to any applicable grace periods) ... such overdue amount shall bear interest at the Default Rate from the date of such non-payment until such amount is paid in full."); Note, Section 1 ("'Default Rate' means the Applicable Rate plus 5%.").

18.     The Note states that upon an Event of Default, Blackhawk may accelerate all amounts due for immediate payment. *See* Note, Section 10 ("Upon the occurrence of any Event of Default and at any time thereafter during the continuance of such Event of Default, the Noteholder may, at its option, by written notice to Maker (a) declare the entire Accreted Value, together with all accrued interest thereon and all other amounts payable under this Note, immediately due and payable; and (b) exercise any or all of its rights, powers or remedies under the Security Agreement or applicable Law; *provided, however,* that if an Event of Default described in Section 9.5 shall occur, the Accreted Value and all accrued interest on the Loan shall become immediately due and payable without any notice, declaration, or other act on the part of the Noteholder.").

19.     The Note and the Security Agreement are governed by Florida law. *See* Note, Section 11.3 ("This Note, the Security Agreement, and any claim, controversy, dispute, or cause

4

of action (whether in contract or tort or otherwise) based upon, arising out of, or relating to this Note, the Security Agreement, and the transactions contemplated hereby and thereby shall be governed by the laws of the State of Florida."); Security Agreement, Section 18 ("This Agreement and the Note and any claim, controversy, dispute or cause of action (whether in contract or tort or otherwise) based upon, arising out of or relating to this Agreement or the Note (except, as to the Note, as expressly set forth therein) and the transactions contemplated hereby and thereby shall be governed by, and construed in accordance with, the laws of the State of Florida.").

20.    Consistent with Section 4.2 of the Note, Blackhawk elected to treat the interest installments due on May 31, June 30, and July 31, 2025, as PIK Interest, thereby adding such interest to principal on each such date.

21.    On August 21, 2025, Blackhawk advised Moocho that the August 31, 2025 interest installment would not be treated as PIK Interest and would be due and payable in cash on that date. The August 21, 2025 email is attached hereto as Exhibit "C" and incorporated by reference. *See* Exhibit C, Email dated Aug. 21, 2025.

22.    Moocho failed to pay the August 31, 2025 interest installment.

23.    Blackhawk served a written Notice of Default on September 4, 2025 identifying the missed payment and the expiration of the three-day cure period on September 3, 2025. A true and correct copy of the Notice of Default is attached hereto as Exhibit "D" and incorporated by reference. *See* Exhibit D, Notice of Default Letter dated Sept. 4, 2025.

24.    On September 8, 2025, Moocho sent Blackhawk an email providing "written notice of a material adverse change in its financial condition and operations," specifically that "Moocho is now preparing to initiate an orderly wind down of its operations," that Moocho "is seeking to liquidate its assets for the benefit of its creditors," and that Moocho has approximately "$15 million

5

in senior secured debit obligations that take priority over the debt held by Blackhawk Network." A true and correct copy of the September 8, 2025 letter is attached hereto as Exhibit "E" and incorporated by reference. *See* Exhibit E, Email dated Sept. 8, 2025.

25.     On September 16, 2025, Blackhawk served a written notice of Acceleration of Secured Promissory Note, which provided "formal notice that the full Accreted Value of the Note, together with all accrued interest and any other amounts payable, is hereby declared immediately due and payable. As of August 31, 2025, the Accredited Value of the Note is $67,178,071.18. The Default Rate of 15% per annum applies to the Accredited Value, which is equivalent to $27,607.43 per day of interest ('Daily Default Interest'). *See* Note, Sections 4.3 ('Default Interest') & 4.4 ('Computation of Interest')." A true and correct copy of the September 16, 2025 Acceleration of Secured Promissory Note is attached hereto as Exhibit "F" and incorporated by reference. *See* Exhibit F, Acceleration of Secured Promissory Note dated Sept. 16, 2025.

26.     At no time after receiving the Notice of Default nor after receiving the Acceleration of Secured Promissory Note did Moocho remit payment for any of the amounts due and owing under the Note or the Security Agreement.

27.     All conditions precedent to the bringing of this action have occurred or have been waived.

28.     Pursuant to the Note at Section 11.2, Moocho was required to pay all documentary stamp taxes on the Note. *See* Note, Section 11.2 ("Maker shall (i) pay to the applicable Governmental Authority any documentary stamp taxes or other similar fees with respect to the Loan and this Note and (ii) reimburse the Noteholder on demand for all reasonable and documented out-of-pocket costs ... incurred by the Noteholder in connection with the transactions contemplated hereby [...]."

6

29.     When Moocho failed to do so, Blackhawk remitted to the State of Florida all documentary stamp taxes required to enforce the Note, which totals $3,430. This consists of the $2450.00 fee that Moocho was required to pay pursuant to Florida Statutes § 201.08, and an additional penalty fee of $980.00 for late payment. Moocho has failed to reimburse Blackhawk for such costs.

30.     Blackhawk has retained counsel and is entitled to recover reasonable attorney's fees and costs of enforcement. *See* Note, Section 11.2 ("Maker shall... reimburse the Noteholder on demand for all reasonable and documented out-of-pocket costs, expenses, and fees (including reasonable expenses and fees of its external counsel) incurred by the Noteholder... including... the enforcement of the Noteholder's rights hereunder).

31.     Blackhawk has retained the law firm of Baker & Hostetler, LLP as counsel of record in this action, and has agreed to pay a reasonable fee for its services.

## COUNT I – ENFORCEMENT OF SECURED PROMISSORY NOTE

32.     Blackhawk reasserts paragraphs 1 through 32 above and incorporates them by reference as if fully set forth herein.

33.     On April 25, 2025, Moocho executed the Note, a binding promissory note, in the State of Florida. Moocho delivered the Note to Blackhawk.

34.     The Note is a legally binding agreement between the parties.

35.     Blackhawk is the owner and holder of the note.

36.     Blackhawk is entitled to enforce the Note pursuant to Florida law, including but to limited to Fla. Stat. § 673.3011.

37.     Moocho defaulted under the Note by failing to make required payments when due.

38.     Blackhawk has elected to accelerate payment of the balance of the Note, as permitted by the agreement between the parties.

7

39.    As a result of the default, the entire balance under the Note, together with interest, late fees, and attorney's fees, is now due and owing.

40.    Moocho owes Blackhawk the Accreted Value of the Note, which as of August 31, 2025 is $67,178,071.18. The Accreted Value consists of the original principal amount of the loan of $65,000,000; $512,876.71, which is the unpaid 8% per annum interest originally due May 31, 2025, which as of that date was added to the principal; $538,462.00, which is the unpaid 10% per annum interest originally due June 30, 2025, which as of that date was added to the principal; $560,983.97, which is the unpaid 10% per annum interest originally due July 31, 2025, which as of that date was added to the principal; and $565,748.49, which is the unpaid 10% per annum that Moocho failed to pay.

41.    Moocho owes interest at the Default Rate of 15% per annum on the Accreted Value, which when applied to the Accreted Value, is equivalent to $27,607.43 per day of interest ("Daily Default Interest").

42.    Moocho also owes Blackhawk $3,430.00 in unpaid documentary stamp taxes, and reasonable attorneys' fees and costs.

43.    Blackhawk is obligated to pay its attorneys a reasonable fee for their services.

WHEREFORE, Blackhawk demands judgment against Moocho for $67,178,071.18 owed on the Note, $2,450.00 in unpaid documentary stamp taxes, Daily Default Interest payments on the Note of $27,607.43 per day, pre-judgment interest, post-judgment interest, reasonable attorneys' fees and costs, and such further relief as this Court deems just and proper.

## COUNT II – ENFORCEMENT AND FORECLOSURE OF SECURITY INTEREST

44.    Blackhawk reasserts paragraphs 1 through 43 above and incorporates them by reference as if fully set forth herein.

8

45.     Moocho executed and delivered the Security Agreement to Blackhawk, granting Blackhawk a security interest in the collateral described in Exhibit "B."

46.     The Security Agreement is a legally binding agreement between the parties.

47.     Blackhawk's security interest is valid, perfected, and enforceable under Florida law, including but not limited to Article 9 of the Florida Uniform Commercial Code.

48.     Moocho defaulted under the Note and Security Agreement by failing to pay the sums due.

49.     Blackhawk is entitled to enforce its security interest, including foreclosure, possession, and/or sale of the collateral, and to apply the proceeds toward satisfaction of Moocho's obligations.

50.     Moocho owes Blackhawk the Accreted Value of the Note, which as of August 31, 2025 is $67,178,071.18. Moocho owes $27,607.43 per day of Daily Default Interest. Moocho also owes Blackhawk $3,430.00 in unpaid documentary stamp taxes, and reasonable attorneys' fees and costs.

51.     Blackhawk is obligated to pay its attorneys a reasonable fee for their services.

WHEREFORE, Blackhawk demands judgment in its favor and against Moocho, awarding: (a) Damages in the principal amount due, plus Daily Default interest, late charges, and other amounts provided under the Note; (b) Foreclosure and enforcement of Plaintiff's rights under the Security Agreement; (c) Attorney's fees and costs; (d) pre- and post-judgment interest; and (e) Such other relief as this Court deems just and proper.

## COUNT III – BREACH OF CONTRACT

52.     Blackhawk reasserts paragraphs 1 through 51 above and incorporates them by reference as if fully set forth herein.

9

53.   The Note, Security Agreement, and related loan documents constitute valid and binding contracts under Florida law.

54.   Blackhawk performed its obligations under the contracts.

55.   Moocho materially breached the contracts by failing to make the required payments when due and otherwise defaulting.

56.   Moocho's breaching of the contracts was the first material breach of the contracts.

57.   Blackhawk did not excuse Moocho's breach.

58.   Moocho owes Blackhawk the Accreted Value of the Note, which as of August 31, 2025 is $67,178,071.18. Moocho owes $27,607.43 per day of Daily Default Interest.  Moocho also owes Blackhawk $2450.00 in unpaid documentary stamp taxes, and reasonable attorneys' fees and costs.

59.   As a direct and proximate result of Moocho's actions, Blackhawk has suffered damages in the amount due under the contracts.

WHEREFORE, Blackhawk demands judgment against Moocho for $67,178,071.18 owed on the Note, $3,430.00 in unpaid documentary stamp taxes, Daily Default Interest payments on the Note of $27,607.43 per day, pre-judgment interest, post-judgment interest, reasonable attorneys' fees and costs, and such further relief as this Court deems just and proper.

Respectfully submitted this 19th day of September, 2025.

*s/ Michael S. Vitale*
Michael S. Vitale, Esq.
Florida Bar No. 17136
Primary: mvitale@bakerlaw.com
Secondary: ybayala@bakerlaw.com
     orlbakerdocket@bakerlaw.com
Jimmy D. Parrish, Esq.
Florida Bar No. 52640
Primary:  jparrish@bakerlaw.com
Secondary: cmartin@bakerlaw.com
BAKER & HOSTETLER LLP
200 South Orange Avenue, Suite 2300
Orlando, Florida 32802-0112
Telephone: 407-649-4000
Facsimile: 407-841-0168

*Attorneys for Plaintiff Blackhawk Network, Inc.*

11

# EXHIBIT "A"

Docusign Envelope ID: AA568335-85DA-40AD-93B1-555798A4A81C

Florida Documentary Stamp Tax
Required by Law in the Amount of $ 2450.
Has Been Paid or Will Be Paid Directly to
The Department of Revenue.
Certificate of Registration No. 340082025-58-001

## SECURED PROMISSORY NOTE

$65,000,000                                                                April 25, 2025

FOR VALUE RECEIVED, and subject to the terms and conditions set forth herein, Moocho, Inc., a Delaware corporation (the "**Maker**"), hereby unconditionally promises to pay to the order of Blackhawk Network, Inc. or its assigns (the "**Noteholder**," and together with Maker, the "**Parties**"), the principal amount of $65,000,000, or such lesser amount outstanding on the date hereof, together with all accrued interest thereon as provided in this Promissory Note (the "**Note**").

1.    Definitions; Interpretation.

    1.1    Capitalized terms used herein shall have the meanings set forth in this Section 1.

"**Accreted Value**" has the meaning set forth in Section 4.2.

"**Anti-Corruption Laws**" means all laws, rules, and regulations of any jurisdiction applicable to Maker from time to time concerning or relating to bribery or corruption, including the United States Foreign Corrupt Practices Act of 1977 (15 U.S.C. §§ 78dd-1 to 78qq).

"**Anti-Terrorism Laws**" means all laws, rules, and regulations of any jurisdiction related to money laundering or financing terrorism including the USA PATRIOT Act, the Currency and Foreign Transactions Reporting Act (also known as the "**Bank Secrecy Act**," 31 U.S.C. §§ 5311 to 5330 and 12 U.S.C. §§ 1818(s), 1820(b) and 1951 to 1959), the Trading With the Enemy Act (50 U.S.C. §§ 4301 to 4341) and Executive Order 13224 (effective September 24, 2001).

"**Applicable Rate**" means an interest rate per annum equal to 8% for the first twelve (12) months after the date of this Note (subject to Section 4.2 below) and 10% thereafter.

"**Beneficial Ownership Regulation**" means 31 C.F.R. § 1010.230.

"**Business Day**" means a day other than a Saturday, Sunday, or other day on which commercial banks in Orlando, Florida are authorized or required by law to close.

"**Change of Control**" means (i) the sale, transfer or assignment, in one transaction or a series of related transactions, of all or substantially all of the assets of Maker; (ii) the sale, transfer or assignment, in one transaction or a series of related transactions, of greater than fifty percent (50%) of the voting equity interests of Maker; or (ii) a merger or consolidation of Maker with or into any other entity if Maker is not the surviving entity, other than a merger or consolidation which results in more than fifty percent (50%) of the voting equity interests of the surviving, consolidated, or resulting

Docusign Envelope ID: AA568335-85DA-40AD-93B1-555798A4A81C

company being then beneficially owned, directly or indirectly, by the persons who were Maker's equityholders immediately prior to such transaction in substantially the same proportions as their ownership, immediately prior to such transaction.

"**Conversion Price**" shall mean (i) with respect to a Financing: 90% of the lowest price per share paid in cash by the other investors for Preferred Stock sold in the Financing, (ii) with respect to an initial public offering: 90% of the lowest price per share paid in cash by other investors for common stock sold in the offering, and (iii) if there is no Financing or initial public offering price in the twelve (12) month period immediately preceding the date of determination, a value equal to 90% of the price per share determined by a valuation firm selected by Noteholder (or at a price per share determined by Noteholder, if Maker does not provide all information requested by the valuation firm within fourteen (14) calendar days of Noteholder's request).

"**Debt**" of Maker, means all (a) indebtedness for borrowed money; (b) obligations for the deferred purchase price of property or services, except trade payables arising in the ordinary course of business; (c) obligations evidenced by notes, bonds, debentures, or other similar instruments; (d) obligations as lessee under capital leases; (e) obligations in respect of any interest rate swaps, currency exchange agreements, commodity swaps, caps, collar agreements, or similar arrangements entered into by Maker providing for protection against fluctuations in interest rates, currency exchange rates, or commodity prices, or the exchange of nominal interest obligations, either generally or under specific contingencies; (f) obligations under acceptance facilities and letters of credit; (g) guaranties, endorsements (other than for collection or deposit in the ordinary course of business), and other contingent obligations to purchase, to provide funds for payment, to supply funds to invest in any Person, or otherwise to assure a creditor against loss, in each case, in respect of indebtedness set out in clauses (a) through (f) of a Person other than Maker; (h) indebtedness set out in clauses (a) through (g) of any Person other than Maker secured by any lien on any asset of Maker, whether or not such indebtedness has been assumed by Maker, and (i) indebtedness of any partnership, unlimited liability company, or unincorporated joint venture in which Maker is a general partner, member, or a joint venturer, respectively (unless such Debt is expressly made non-recourse to Maker).

"**Default**" means any of the events specified in Section 9 which constitute an Event of Default or which, upon the giving of notice, the lapse of time, or both, pursuant to Section 9, would, unless cured or waived, become an Event of Default.

"**Default Rate**" means the Applicable Rate plus 5%.

"**Election Amount**" has the meaning set forth in Section 2.4.

"**Event of Default**" has the meaning set forth in Section 9.

"**Financing**" shall mean any transaction or series of related transactions pursuant to which Maker sells shares of its capital stock.

2

4923-1786-0151.8

Docusign Envelope ID: AA568335-85DA-40AD-93B1-555798A4A81C

"**GAAP**" means generally accepted accounting principles in the United States of America as in effect from time to time.

"**Governmental Authority**" means the government of any nation or any political subdivision thereof, whether at the national, state, territorial, provincial, municipal, or any other level, and any agency, authority, instrumentality, regulatory body, court, central bank, or other entity exercising executive, legislative, judicial, taxing, regulatory, or administrative powers or functions of, or pertaining to, government (including any supra-national bodies such as the European Union or the European Central Bank).

"**Law**" as to any Person, means the certificate of incorporation and by-laws or other organizational or governing documents of such Person, and any law (including common law), statute, ordinance, treaty, rule, regulation, order, decree, judgment, writ, injunction, settlement agreement, requirement or determination of an arbitrator or a court or other Governmental Authority, in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"**Lien**" means any mortgage, pledge, hypothecation, encumbrance, lien (statutory or other), charge, or other security interest.

"**Loan**" means $65,000,000. The Loan represents $65,000,000 of outstanding trade payables owed by Maker to Noteholder as of the date hereof and converted into the debt represented by this Note.

"**Maker**" has the meaning set forth in the introductory paragraph.

"**Maturity Date**" means the earlier of (a) April 25, 2028, (b) the date on which all amounts under this Note shall become due and payable after giving effect to any prepayments; and (c) the date on which all amounts under this Note shall become due and payable pursuant to Section 10.

"**Note**" has the meaning set forth in the introductory paragraph.

"**Noteholder**" has the meaning set forth in the introductory paragraph.

"**Note Preferred Stock**" shall mean a series of preferred stock of Maker which has identical rights, privileges, preferences, and restrictions as the Preferred Stock, other than with respect to (i) the per share liquidation preference, which will equal the Conversion Price, and (ii) the price-based antidilution protection and dividend rights, which will be based on the Conversion Price.

"**OFAC**" means the US Department of the Treasury's Office of Foreign Assets Control.

"**Parties**" has the meaning set forth in the introductory paragraph.

"**Permitted Debt**" means Debt (a) existing or arising under this Note and any refinancing thereof; (b) existing as of the date of this Note and any refinancing thereof, the

3

Docusign Envelope ID: AA568335-85DA-40AD-93B1-555798A4A81C

principal amount of any such refinancing not to exceed $15,000,000 (the "**Permitted Refinancing**"); (c) which may be deemed to exist with respect to swap contracts; (d) owed in respect of any netting services, overdrafts, and related liabilities arising from treasury, depository, and cash management services in connection with any automated clearinghouse transfers of funds; and (e) unsecured insurance premiums owing in the ordinary course of business.

"**Person**" means any individual, corporation, limited liability company, trust, joint venture, association, company, limited or general partnership, unincorporated organization, Governmental Authority, or other entity.

"**PIK Interest**" has the meaning set forth in Section 4.2.

"**Sanctioned Country**" means, at any time, a country or territory which is itself the subject or target of any comprehensive or country-wide Sanctions.

"**Sanctioned Person**" means, at any time, (a) any Person listed in any Sanctions-related list of designated Persons maintained by a Sanctions Authority; (b) any Person operating, organized, or resident in a Sanctioned Country, (c) any Person controlled or 50% owned by any such Person or Persons described in the foregoing clauses (a) or (b), or (d) any Person that is the subject or target of any Sanctions.

"**Sanctions**" mean all economic or financial sanctions or trade embargoes imposed, administered, or enforced from time to time by a Sanctions Authority.

"**Sanctions Authority**" means OFAC, the US Department of State, the United Nations Security Council, the European Union, or other relevant sanctions authority.

"**Security Agreement**" means the Security Agreement, dated as of the date hereof, by and between Maker and Noteholder.

"**Preferred Stock**" shall mean the shares of the series of preferred stock of Maker sold to the investors for cash at the initial closing of the Financing.

"**Subsidiary**" as to any Person, means any corporation, partnership, limited liability company, joint venture, trust, or estate of or in which more than 50% of (a) the issued and outstanding capital stock having ordinary voting power to elect a majority of the board of directors of such corporation (irrespective of whether at the time capital stock of any other class of such corporation may have voting power upon the happening of a contingency), (b) the interest in the capital or profits of such partnership, limited liability company, or joint venture or, (c) the beneficial interest in such trust or estate is at the time directly or indirectly owned or controlled through one or more intermediaries, or both, by such Person. Unless otherwise qualified, all references to a "Subsidiary" or to "Subsidiaries" in this Agreement shall refer to a Subsidiary or Subsidiaries of Maker.

4

4923-1786-0151.8

Docusign Envelope ID: AA568335-85DA-40AD-93B1-555798A4A81C

"**USA PATRIOT Act**" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Title III of Pub. L. 107-56, signed into law October 26, 2001).

1.2     Interpretation. For purposes of this Note (a) the words "include," "includes," and "including" shall be deemed to be followed by the words "without limitation"; (b) the word "or" is not exclusive; and (c) the words "herein," "hereof," "hereby," "hereto," and "hereunder" refer to this Note as a whole. The definitions given for any defined terms in this Note shall apply equally to both the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine, and neuter forms. Unless the context otherwise requires, references herein to: (x) Schedules, Exhibits, and Sections mean the Schedules, Exhibits, and Sections of this Note; (y) an agreement, instrument, or other document means such agreement, instrument, or other document as amended, supplemented, and modified from time to time to the extent permitted by the provisions thereof; and (z) a statute means such statute as amended from time to time and includes any successor legislation thereto and any regulations promulgated thereunder. This Note shall be construed without regard to any presumption or rule requiring construction or interpretation against the party drafting an instrument or causing any instrument to be drafted.

2.     Payment Dates; Optional Prepayments.

2.1     Payment Dates.  The principal amount of the Loan shall be payable in consecutive quarterly installments of $5,000,000 of principal beginning on December 31, 2025, and on the last day of each quarter thereafter, *provided* that all amounts outstanding under this Note, including all accrued and unpaid interest and other amounts payable under the Note, shall be due and payable on the Maturity Date, unless otherwise provided in Section 10.  Notwithstanding anything herein to the contrary, all amounts due hereunder, including all Accreted Value, all accrued and unpaid interest, and all fees and other charges, shall be due and payable in full within 5 Business Days of a written notice from the Noteholder demanding such payment (which the Noteholder may send any time on or after April 25, 2027 if Noteholder reasonably determines that there is a risk to repayment of the Note).

2.2     Optional Prepayments. Maker may prepay the Loan in whole or in part at any time or from time to time without penalty or premium by paying the principal amount to be prepaid together with accrued interest thereon to the date of prepayment. No prepaid amount may be reborrowed.  Any prepayments, including pursuant to Section 7.4 shall be applied against and reduce the last payment(s) due hereunder.

2.3     Mandatory Prepayments. Maker shall make mandatory prepayments of the Loan as provided in Section 7.4.

2.4     Conversion.

(a)     At the election of the Noteholder, the then-outstanding Accreted Value (or portion thereof selected by Noteholder), together with all accrued and unpaid

5

Docusign Envelope ID: AA568335-85DA-40AD-93B1-555798A4A81C

interest under this Note designated by the Noteholder in its election (the portion designated by the Noteholder, the "**Election Amount**"), shall convert into fully paid and nonassessable shares of Preferred Stock, prior to an initial public offering, and common stock of Maker, after an initial public offering, at a price per share equal to the Conversion Price, with such number of shares of Preferred Stock or common stock to be issued to be determined by dividing (i) the then-outstanding Accreted Value, together with all accrued and unpaid interest under this Note, by (ii) the Conversion Price (rounded down to the nearest whole share). The conversion right may be elected one or more times by the Noteholder.

(b)  If Maker engages in a Financing or an initial public offering, Maker shall deliver written notice to the Noteholder at the address last shown on the records of Maker for the Noteholder or given by the Noteholder to Maker for the purpose of notice, notifying the Noteholder of the general terms of the Financing or initial public offering to be effected, specifying the Conversion Price, the Accreted Value that may be converted at the Noteholder's election, together with all accrued and unpaid interest, and the date on which such Financing or public offering is expected to occur.

(c)  If the Noteholder elects to convert this Note pursuant to this Section 2.4 (in whole or in part), the Noteholder shall give written notice to Maker at Maker's principal corporate office, of the election to convert the same pursuant to this Section 2.4.

(d)  If the Noteholder elects to convert this Note pursuant to this Section 2.4, the Noteholder hereby agrees to execute and deliver to Maker (upon such elective conversion of this Note) all customary transaction documents entered into by all other recipients of capital stock in any applicable Financing.

(e)  Maker shall, as soon as practicable thereafter, issue and deliver to the Noteholder a certificate or certificates (or a notice of issuance of uncertificated shares, if applicable) for the number of shares to which the Noteholder shall be entitled upon such conversion, including a check payable to the Noteholder for any cash amounts payable as described in Section 2.4(f). Any conversion of this Note shall be deemed to have been made upon the satisfaction of all of the conditions set forth in this Section 2.4 and on and after such date the Persons entitled to receive the shares issuable upon such conversion shall be treated for all purposes as the record holder of such shares.

(f)  No fractional shares shall be issued upon conversion of this Note. In lieu of Maker issuing any fractional shares to the Noteholder upon the conversion of this Note, Maker shall pay to the Noteholder an amount equal to the product obtained by multiplying the applicable Conversion Price by the fraction of a share not issued pursuant to the previous sentence. In addition, to the extent not converted into shares of capital stock, Maker shall pay to the Noteholder any interest accrued on the amount converted and on the amount to be paid by Maker pursuant to the previous sentence. Upon conversion of this Note as provided in this Section 2.4 (including the rounding down to the nearest whole share the shares of capital stock to be issued) and the

6

Docusign Envelope ID: AA568335-85DA-40AD-93B1-555798A4A81C

payment of the amounts specified in this paragraph, this Note shall be cancelled and, whether or not the original of this Note has been delivered to Maker for cancellation, shall no longer be an obligation of Maker.

3.    Security Agreement. Maker's performance of its obligations hereunder is secured by a first priority security interest in the collateral specified in the Security Agreement.

4.    Interest.

4.1    Interest Rate. Except as otherwise provided herein and subject to Section 4.2 below, the outstanding principal amount of the Loan made hereunder shall bear interest at the Applicable Rate from the date first written above until the Loan is paid in full, whether at maturity, upon acceleration, by prepayment, or otherwise.

4.2    Interest Payment Dates. Interest shall be payable monthly in arrears to the Noteholder beginning on May 31, 2025, and on the last day of each month thereafter; provided, however, that in lieu of accepting monthly cash interest payments in accordance with the foregoing with respect to the twelve (12) full calendar months after the date of this Note (the "Initial Period"), the Noteholder may elect, by providing written notice to Maker at least five (5) Business Days before any such payment date, to forego cash interest payments for the remaining months of the Initial Period and in lieu thereof have the outstanding principal amount of the Note accrue interest at 10% per annum (together with any Interest accrued at the Default Rate to be treated as PIK Interest in accordance with Section 4.3, "PIK Interest"). PIK Interest shall be added to the principal of this Note on each remaining interest payment date during the Initial Period. Once added to the principal of this Note, the Applicable Rate shall apply, and interest thereafter shall accrue, also on the portion of the principal of this Note representing PIK Interest added to such principal. On any date of determination, the principal amount of this Note, together with accrued PIK Interest added to the principal of this Note in accordance with this Section 4.2 shall be referred to as the "Accreted Value." Interest on this Note shall accrue from the date hereof until payment of the Accreted Value in full. References in this Note to the "principal amount" or words of similar effect shall be deemed to refer to the "Accreted Value," as applicable.

4.3    Default Interest. If any amount payable hereunder is not paid when due (without regard to any applicable grace periods), whether at stated maturity, by acceleration, or otherwise, such overdue amount shall bear interest at the Default Rate from the date of such non-payment until such amount is paid in full.

4.4    Computation of Interest. All computations of interest shall be made on the basis of 365 or 366 days, as the case may be, and the actual number of days elapsed. Interest shall accrue on the Loan on the day on which the Loan is made, and shall not accrue on the Loan for the day on which it is paid.

4.5    Interest Rate Limitation. If at any time and for any reason whatsoever, the interest rate payable on the Loan shall exceed the maximum rate of interest permitted to be charged by the Noteholder to Maker under applicable Law, such interest rate shall be

7

Docusign Envelope ID: AA568335-85DA-40AD-93B1-555798A4A81C

reduced automatically to the maximum rate of interest permitted to be charged under applicable Law.

5.   Payment Mechanics.

5.1   Manner of Payments. All payments of interest and Accreted Value shall be made in lawful money of the United States of America no later than 12:00 PM on the date on which such payment is due by wire transfer of immediately available funds to the Noteholder's account at a bank specified by the Noteholder in writing to Maker from time to time.

5.2   Application of Payments. All payments made under this Note shall be applied *first* to the payment of any fees or charges outstanding hereunder, *second* to accrued interest. including for the avoidance of doubt, any PIK Interest that has accrued but has not yet been added to the principal of this Note in accordance with Section 4.2 (and therefore has not become part of the Accreted Value of this Note), and *third* to the payment of the Accreted Value outstanding under the Note.

5.3   Business Day Convention. Whenever any payment to be made hereunder shall be due on a day that is not a Business Day, such payment shall be made on the next succeeding Business Day and such extension will be taken into account in calculating the amount of interest payable under this Note.

5.4   Rescission of Payments. If at any time any payment made by Maker under this Note is rescinded or must otherwise be restored or returned upon the insolvency, bankruptcy, or reorganization of Maker or otherwise, Maker's obligation to make such payment shall be reinstated as though such payment had not been made.

6.   Representations and Warranties. Maker hereby represents and warrants to the Noteholder on the date hereof as follows:

6.1   Existence; Power and Authority; Compliance with Laws. Maker (a) is a corporation duly incorporated, validly existing, and in good standing under the laws of the state of its jurisdiction of organization, (b) has the requisite power and authority, and the legal right, to own, lease, and operate its properties and assets and to conduct its business as it is now being conducted, to execute and deliver this Note and the Security Agreement, and to perform its obligations hereunder and thereunder, and (c) is in compliance with all Laws. Maker does not have any direct or indirect Subsidiaries.

6.2   Authorization; Execution and Delivery. The execution and delivery of this Note and the Security Agreement by Maker and the performance of its obligations hereunder and thereunder have been duly authorized by all necessary corporate action in accordance with all applicable Laws. Maker has duly executed and delivered this Note and the Security Agreement.

6.3   No Approvals. No consent or authorization of, filing with, notice to, or other act by, or in respect of, any Governmental Authority or any other Person is required in order

8

Docusign Envelope ID: AA568335-85DA-40AD-03B1-555798A4A81C

for Maker to execute, deliver, or perform any of its obligations under this Note or the Security Agreement.

6.4    No Violations. The execution and delivery of this Note and the Security Agreement and the consummation by Maker of the transactions contemplated hereby and thereby do not and will not (a) violate any Law applicable to Maker or by which any of its properties or assets may be bound; or (b) constitute a default under any material agreement or contract by which Maker may be bound, including, without limitation, any agreement or contract relating to Debt incurred by Maker.

6.5    Enforceability. Each of the Note and the Security Agreement is a valid, legal, and binding obligation of Maker, enforceable against Maker in accordance with its terms, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium, or similar laws affecting the enforcement of creditors' rights generally and by general equitable principles (whether enforcement is sought by proceedings in equity or at law).

6.6    No Litigation. No action, suit, litigation, investigation, or proceeding of, or before, any arbitrator or Governmental Authority is pending or, to the knowledge of Maker, threatened by or against Maker or any of its property or assets (a) with respect to the Note, the Security Agreement, or any of the transactions contemplated hereby or thereby or (b) that would reasonably be expected to materially adversely affect Maker's financial condition or the ability of Maker to perform its obligations under the Note or the Security Agreement.

6.7    Anti-Terrorism Laws. Maker is, and to the knowledge of Maker, its directors, officers, employees, and agents are, in compliance in all material respects with Anti-Terrorism Laws.

6.8    Anti-Corruption Laws and Sanctions. Maker is not, and to the knowledge of Maker, no director, officer, employee of Maker, is a Sanctioned Person. No use of proceeds of the Loan or other transaction contemplated by this Note will violate any Anti-Corruption Law or applicable Sanctions.

7.    Affirmative Covenants. Until all amounts outstanding under this Note have been paid in full, Maker shall:

7.1    Maintenance of Existence. (a) Preserve, renew, and maintain in full force and effect its corporate or organizational existence and (b) take all reasonable action to maintain all rights, privileges, and franchises necessary or desirable in the normal conduct of its business.

7.2    Compliance. Comply with all Laws applicable to it and its business and its obligations under its material contracts and agreements.

7.3    Payment Obligations. Pay, discharge, or otherwise satisfy at or before maturity or before they become delinquent, as the case may be, all its material obligations of whatever nature, except where the amount or validity thereof is currently being contested in

9

Docusign Envelope ID: AA668335-85DA-40AD-93B1-555708A4A81C

good faith by appropriate proceedings, and reserves in conformity with GAAP with respect thereto have been provided on its books.

7.4     Financing and Change of Control Proceeds.  If Maker, or any of its direct or indirect Subsidiaries, receives, directly or indirectly, equity or debt financing, other than a Permitted Refinancing, in excess of $10,000,000 in the aggregate (the "**Base Equity Amount**"), whether in one or more related or unrelated transactions, including from crowdfunding and receipt of funds pursuant to a convertible promissory note, SAFE, or any other instrument convertible into or exchangeable for equity securities, Maker shall, within two (2) Business Days after receiving such funds, pay fifty percent (50%) of all such funds in excess of the Base Equity Amount to the Noteholder as a prepayment of this Note, which prepayment shall be subject to subject to Section 5.2 above.  Maker shall provide regular updates to the Noteholder with respect to any discussions or negotiations regarding potential equity or debt financing transactions.

7.5     Notice of Certain Events. As soon as possible and in any event within one (1) Business Day after it becomes aware that an Event of Default has occurred, notify the Noteholder in writing of the nature and extent of such Event of Default and the action, if any, it has taken or proposes to take with respect to such Event of Default.  As soon as possible and in any event within one (1) Business Day, notify Noteholder in writing of (i) all amendments, modifications, restatements, renewals, refinancings, increases, and extensions of any indebtedness and copies of all communications received from or sent to any other lender regarding a "Default" or "Event of Default" under any loan agreement, (ii) the entry of any agreement with respect to a Change of Control, the acquisition of any assets or securities of any other Person other than in the ordinary course of business, (iii) any claim in writing by any third-party that Maker is in breach of any material contract, (iv) any lawsuit or other proceeding initiated against Maker by any third party that could reasonably result in a material liability of Maker, (v) any reduction in force by Maker, or (vi) the resignation or removal of two (2) or more directors of Maker within any six (6) month period.

7.6     Financial Statements; Account Statements. Beginning with the calendar quarter ending June 30, 2025, within thirty (30) days after the end of each calendar quarter, Maker shall provide the Noteholder with unaudited consolidated and consolidating financial statements of Maker and its Subsidiaries, including a balance sheet and statements of income and of stockholders' equity and cash flows the end of such fiscal quarter.  Beginning with the fiscal year ending December 31, 2025, within five days after their completion, audited consolidated and consolidating financial statements of Maker and its Subsidiaries, including a balance sheet and statements of income and of stockholders' equity and cash flows the end of such fiscal year as well as any other statements, documents or certifications provided to any junior lender.  Maker shall deliver daily account statements to Lender with respect to all bank accounts of Maker.

7.7     Third Party Gift Cards.  If Maker enters into an agreement with a third party that offers for sale or distributes gift cards and/or related or similar products (including any type of physical or electronic prepaid or disbursement product), then (i) Maker shall notify the Noteholder of such agreement within five (5) Business Days, and (ii) whether or not Maker delivers such notice, the outstanding Accreted Value and any interest accrued thereon

10

Docusign Envelope ID: AA568335-85DA-40AD-93B1-555798A4A81C

shall become immediately due and payable on the date Maker enters into the agreement without any notice, declaration, or other act on the part of the Noteholder. Any such agreement with a third-party must contain an obligation for all funds received from the sale of Gift Cards thereunder to be held in an account controlled by Noteholder (on terms acceptable to Noteholder in its sole discretion) until all Accreted Value and interest owed under this Note has been paid in full. Any agreement signed in violation of this Section 7.7 will be null and void *ab initio*.

7.8     Subsidiaries. Each U.S. Subsidiary of Maker in existence on the date hereof shall execute a guaranty of the obligations under this Note, in the form attached hereto as Exhibit A (each, a "**Guaranty**"). If Maker forms or acquires any additional U.S. Subsidiary, or a majority of the voting equity of any other entity, Maker shall cause such entity, within five (5) Business Days to (i) execute and deliver to the Noteholder a Guaranty and (ii) execute a joinder to the Security Agreement, in a form acceptable to the Noteholder, granting the Noteholder a first priority security interest in the assets of such entity as described in Section 2 of the Security Agreement.

7.9     Change of Control. Maker shall pay in full all Accreted Value, interest and any other amounts due under this Note immediately upon a Change of Control.

7.10     Distribution Partner Master Agreement. Maker and Noteholder shall enter into an amendment to that certain Distribution Partner Master Agreement, effective January 27, 2021, by and between Maker and the Noteholder, as amended, acceptable to Noteholder in its sole discretion by April 30, 2025.

7.11     Further Assurances. Upon the request of the Noteholder, promptly execute and deliver such further instruments and do or cause to be done such further acts as may be necessary or advisable to carry out the intent and purposes of this Note and the Security Agreement.

7.12     Information/Inspection Rights.     Maker shall permit the Noteholder, at the Noteholder's expense, to visit and inspect Maker's properties; examine its books of account and records; and discuss Maker's affairs, finances, and accounts with its officers, during normal business hours of Maker as may be reasonably requested by the Noteholder (including all funds flow and transaction records); provided, however, that Maker shall not be obligated pursuant to this Section 7.11 to provide access to any information that it reasonably and in good faith considers to be a trade secret or confidential information or the disclosure of which would adversely affect the attorney-client privilege between Maker and its counsel.     Maker shall also meet with Noteholder monthly to provide all financial performance metrics requested by Noteholder to ensure Maker's ongoing ability to meet its obligations under the this Note and the Security Agreement.

8.     Negative Covenants. Until all amounts outstanding under this Note have been paid in full, Maker shall not:

8.1     Indebtedness. Incur, create, or assume any Debt, other than Permitted Debt.

11

4923-1786-0151.8

Docusign Envelope ID: AA568335-85DA-40AD-93B1-555798A4A81C

8.2    Liens. Incur, create, assume, or suffer to exist any Lien on any of its property or assets, whether now owned or hereafter acquired, except for (a) Liens for taxes not yet due or which are being contested in good faith by appropriate proceedings if adequate reserves with respect thereto are maintained on the books of Maker in conformity with GAAP; (b) non-consensual Liens arising by operation of law, arising in the ordinary course of business, and for amounts which are not overdue for a period of more than 1 Business Day or that are being contested in good faith by appropriate proceedings; and (c) Liens created pursuant to the Security Agreement.

8.3    Dividends. Maker shall not make, or cause to be made, any (i) any dividend or other distribution (whether in cash, securities or other property) with respect to any ownership interests of Maker or any of its Subsidiaries, other than periodic distributions to members made solely to fund the payment of federal or state income taxes, (ii) any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any such interests, or on account of any return of capital to Maker or any of its Subsidiaries' stockholders, members or partners (or the equivalent Person thereof), (iii) any distribution, advance or repayment of indebtedness to or for the account of a holder of membership interests of Maker or any of its Subsidiaries, (iv) other arrangements which have the purpose or effect of circumventing the restrictions set forth in this Section, including without limitation, any arrangements between Maker, any affiliate or related party, including, without limitation, any member, shareholder, Subsidiary, parent, or affiliate of any of the foregoing, which is in excess of the market rate for the goods or services provided.

8.4    Change of Control. Maker shall not consummate a Change of Control or enter into any agreement with respect to a Change of Control without the Noteholder's prior written consent.

8.5    Investments. Maker shall not acquire any securities or assets of any other Person (other than acquisitions of inventory or equipment in the ordinary course of business) or enter into any agreement with respect to any such acquisition without the Noteholder's prior written consent.

8.6    Affiliate Transactions. Maker shall not enter into any agreement or transaction with (other than employment agreements in the ordinary course of business), or make any payments to (other than salary, reasonably bonuses, and reasonable expense reimbursement paid to officers who are employees of Maker), any affiliate of Maker without the Noteholder's prior written consent.

9.    Events of Default. The occurrence and continuance of any of the following shall constitute an Event of Default hereunder:

9.1    Failure to Pay. Maker fails to pay (a) any Accreted Value when due or (b) interest or any other amount when due and such failure continues for three (3) days.

12

4923-1786-0151.8

Docusign Envelope ID: AA568335-85DA-40AD-93B1-555798A4A81C

9.2     Breach of Representations and Warranties. Any representation or warranty made by Maker to the Noteholder herein or in the Security Agreement is incorrect in any material respect on the date as of which such representation or warranty was made.

9.3     Breach of Covenants. Maker fails to observe or perform (a) any covenant, condition, or agreement contained in Section 2.4(b), Section 7.4, or Section 8 or (b) any other covenant, obligation, condition, or agreement contained in this Note or the Security Agreement, other than those specified in clause (a) and Section 9.1, and such failure continues for 1 Business Day after written notice to Maker.

9.4     Cross-Defaults. Maker fails to pay when due any of its Debt (other than Debt arising under this Note), or any interest or premium thereon, when due and such failure continues after the applicable grace period, if any, specified in the agreement or instrument relating to such Debt.

9.5     Bankruptcy.

(a)     Maker commences any case, proceeding, or other action (i) under any existing or future Law relating to bankruptcy, insolvency, reorganization, or other relief of debtors, seeking to have an order for relief entered with respect to it, or seeking to adjudicate it as bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, winding-up, liquidation, dissolution, composition, or other relief with respect to it or its debts or (ii) seeking appointment of a receiver, trustee, custodian, conservator, or other similar official for it or for all or any substantial part of its assets, or Maker makes a general assignment for the benefit of its creditors;

(b)     There is commenced against Maker any case, proceeding, or other action of a nature referred to in Section 9.5(a) which (i) results in the entry of an order for relief or any such adjudication or appointment or (ii) remains undismissed, undischarged, or unbonded for a period of 1 Business Day;

(c)     There is commenced against Maker any case, proceeding, or other action seeking issuance of a warrant of attachment, execution, or similar process against all or any substantial part of its assets which results in the entry of an order for any such relief which has not been vacated, discharged, or stayed or bonded pending appeal within 1 Business Day from the entry thereof;

(d)     Maker takes any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the acts set forth in Section 9.5(a), Section 9.5(b), or Section 9.5(c) above; or

(e)     Maker is generally not, or shall be unable to, or admits in writing its inability to, pay its debts as they become due.

9.6     Judgments. One or more judgments or decrees shall be entered against Maker and all of such judgments or decrees shall not have been vacated, discharged, or stayed or bonded pending appeal within 1 Business Day from the entry thereof.

13

4923-1786-0151.8

Docusign Envelope ID: AA668335-85DA-40AD-93B1-555798A4A81C

10. Remedies. Upon the occurrence of any Event of Default and at any time thereafter during the continuance of such Event of Default, the Noteholder may, at its option, by written notice to Maker (a) declare the entire Accreted Value, together with all accrued interest thereon and all other amounts payable under this Note, immediately due and payable; and (b) exercise any or all of its rights, powers or remedies under the Security Agreement or applicable Law; *provided, however*, that if an Event of Default described in Section 9.5 shall occur, the Accreted Value and all accrued interest on the Loan shall become immediately due and payable without any notice, declaration, or other act on the part of the Noteholder.

11. Miscellaneous.

11.1 Notices.

(a) All notices, requests, or other communications required or permitted to be delivered hereunder shall be made in writing and mailed by certified or registered mail, delivered by hand or overnight courier service, or sent by facsimile or and all notices and other communications expressly permitted to be given by telephone shall be made to the applicable phone number, in each case as follows:

(i) If to the Noteholder: 6220 Stoneridge Mall Road, Pleasanton, CA 94588, Attention of: Legal Department.

(ii) If to Maker, 1815 Purdy Avenue, Miami Beach, FL, 33139 Attention of: Matt Levenson, Email: coach@moocho.com.

(b) Notices if (i) mailed by certified or registered mail or sent by hand or overnight courier service shall be deemed to have been given when received; and (ii) sent by email shall be deemed received upon the sender's receipt of an acknowledgment from the intended recipient (such as by the "return receipt requested" function, as available, return email, or other written acknowledgment).

11.2 Expenses. Maker shall (i) pay to the applicable Governmental Authority any documentary stamp taxes or other similar fees with respect to the Loan and this Note and (ii) reimburse the Noteholder on demand for all reasonable and documented out-of-pocket costs, expenses, and fees (including reasonable expenses and fees of its external counsel) incurred by the Noteholder in connection with the transactions contemplated hereby including the negotiation, documentation, and execution of this Note and the Security Agreement and the enforcement of the Noteholder's rights hereunder and thereunder.

11.3 Governing Law. This Note, the Security Agreement, and any claim, controversy, dispute, or cause of action (whether in contract or tort or otherwise) based upon, arising out of, or relating to this Note, the Security Agreement, and the transactions contemplated hereby and thereby shall be governed by the laws of the State of Florida.

11.4 Submission to Jurisdiction.

14

4923-1786-0151.8

Docusign Envelope ID: AA568335-85DA-40AD-93B1-555798A4A81C

(a)     Maker hereby irrevocably and unconditionally (i) agrees that any legal action, suit, or proceeding arising out of or relating to this Note or the Security Agreement shall be brought exclusively in the courts of the State of Florida in the Ninth Judicial Circuit in Orange County, Florida and (ii) submits to the exclusive jurisdiction of any such court in any such action, suit, or proceeding. Final judgment against Maker in any action, suit, or proceeding shall be conclusive and may be enforced in any other jurisdiction by suit on the judgment.

(b)     Nothing in this Section 11.4 shall affect the right of the Noteholder to (i) commence legal proceedings or otherwise sue Maker in any other court having jurisdiction over Maker or (ii) serve process upon Maker in any manner authorized by the laws of any such jurisdiction.

11.5     Venue. Maker irrevocably and unconditionally waives, to the fullest extent permitted by applicable law, any objection that it may now or hereafter have to the laying of venue of any action or proceeding arising out of or relating to this Note or the Security Agreement in any court referred to in Section 11.4 and the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

11.6     Waiver of Jury Trial. THE MAKER HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY RELATING TO THIS NOTE, THE SECURITY AGREEMENT, OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY, WHETHER BASED ON CONTRACT, TORT, OR ANY OTHER THEORY.

11.7     Integration. This Note and the Security Agreement constitute the entire contract between the Parties with respect to the subject matter hereof and supersede all previous agreements and understandings, oral or written, with respect thereto.

11.8     Successors and Assigns. This Note may be assigned or transferred by the Noteholder to any Person. Maker may not assign or transfer this Note or any of its rights hereunder without the prior written consent of the Noteholder. This Note shall inure to the benefit of, and be binding upon, the Parties and their permitted assigns.

11.9     Waiver of Notice. Maker hereby waives demand for payment, presentment for payment, protest, notice of payment, notice of dishonor, notice of nonpayment, notice of acceleration of maturity, and diligence in taking any action to collect sums owing hereunder.

11.10     USA PATRIOT Act. The Noteholder hereby notifies Maker that pursuant to the requirements of the USA PATRIOT Act and the Beneficial Ownership Regulation, it is required to obtain, verify, and record information that identifies Maker, which information includes the name and address of Maker and other information that will allow the Noteholder to identify Maker in accordance with the USA PATRIOT Act and the Beneficial Ownership Regulation, and Maker agrees to provide such information from time to time to the Noteholder.

15

4923-1786-0151.8

Docusign Envelope ID: AA568335-85DA-40AD-93B1-555798A4A81C

11.11   Amendments and Waivers. No term of this Note may be waived, modified, or amended except by an instrument in writing signed by both of the Parties. Any waiver of the terms hereof shall be effective only in the specific instance and for the specific purpose given.

11.12   Headings. The headings of the various Sections and subsections herein are for reference only and shall not define, modify, expand, or limit any of the terms or provisions hereof.

11.13   No Waiver; Cumulative Remedies. No failure to exercise, and no delay in exercising on the part of the Noteholder, of any right, remedy, power, or privilege hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power, or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power, or privilege. The rights, remedies, powers, and privileges herein provided are cumulative and not exclusive of any rights, remedies, powers, and privileges provided by law.

11.14   Electronic Execution. The words "execution," "signed," "signature," and words of similar import in the Note shall be deemed to include electronic or digital signatures or electronic records, each of which shall be of the same effect, validity, and enforceability as manually executed signatures or a paper-based record-keeping system, as the case may be, to the extent and as provided for under applicable law, including the Electronic Signatures in Global and National Commerce Act of 2000 (15 U.S.C. §§ 7001 to 7031), the Uniform Electronic Transactions Act (UETA), or any state law based on the UETA.

11.15   Severability. If any term or provision of this Note or the Security Agreement is invalid, illegal, or unenforceable in any jurisdiction, such invalidity, illegality, or unenforceability shall not affect any other term or provision of this Note or the Security Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction. Upon such determination that any term or other provision is invalid, illegal, or unenforceable, the Parties shall negotiate in good faith to modify this Note so as to affect the original intent of the parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

[SIGNATURE PAGE FOLLOWS]

16

4923-1786-0151.8

Docusign Envelope ID: AA568335-85DA-40AD-93B1-555798A4A81C

IN WITNESS WHEREOF, Maker has executed this Note as of the date first written above.

MOOCHO, INC.

By:_____

Name:____Matt Levenson_____

Title:_____CEO_____

[Signature Page to Secured Promissory Note]

Docusign Envelope ID: AA568335-85DA-40AD-93B1-555798A4A81C

## EXHIBIT A

## GUARANTY

This GUARANTY (this "**Guaranty**"), dated as of [DATE], is made by [NAME OF GUARANTOR], [a/an] [[STATE OF ORGANIZATION] [ENTITY TYPE] ("**Guarantor**"), in favor and for the benefit of [Blackhawk Network, Inc. ("**Beneficiary**").

Reference is made to the Secured Promissory Note, dated as of April 25, 2025 (the "**Note**"), by Moocho, Inc., a Delaware corporation ("**Obligor**"), and Beneficiary. In consideration of the substantial direct and indirect benefits derived by Guarantor from the transactions under the Note, and in order to induce Beneficiary to extend the Loan to Obligor, Guarantor, the subsidiary of Obligor hereby agrees as follows:

1.      Guaranty. Guarantor absolutely, unconditionally and irrevocably guarantees, as primary obligor and not merely as surety, the full and punctual payment and performance of all present and future obligations, liabilities, covenants and agreements required to be observed and performed or paid or reimbursed by Obligor under or relating to the Note, plus all costs, expenses and fees (including the reasonable fees and expenses of Beneficiary's counsel) in any way relating to the enforcement or protection of Beneficiary's rights hereunder (collectively, the "**Obligations**").

2.      Guaranty Absolute and Unconditional. Guarantor agrees that its Obligations under this Guaranty are irrevocable, continuing, absolute and unconditional and shall not be discharged or impaired or otherwise affected by, and Guarantor hereby irrevocably waives any defenses to enforcement it may have (now or in the future) by reason of:

(a)      Any illegality, invalidity or unenforceability of any Obligation or the Note or any related agreement or instrument, or any law, regulation, decree or order of any jurisdiction or any other event affecting any term of the Obligations.

(b)      Any change in the time, place or manner of payment or performance of, or in any other term of the Obligations, or any rescission, waiver, release, assignment, amendment or other modification of the Note.

(c)      Any taking, exchange, substitution, release, impairment, amendment, waiver, modification or non-perfection of any collateral or any other guaranty for the Obligations, or any manner of sale, disposition or application of proceeds of any collateral or other assets to all or part of the Obligations.

(d)      Any default, failure or delay, willful or otherwise, in the performance of the Obligations.

(e)      Any change, restructuring or termination of the corporate structure, ownership or existence of Guarantor or Obligor or any insolvency, bankruptcy, reorganization or other similar proceeding affecting Obligor or its assets or any resulting restructuring, release or discharge of any Obligations.

4923-1786-0151.8                                      18

Docusign Envelope ID: AA568335-85DA-40AD-93B1-555798A4A81C

(f)    Any failure of Beneficiary to disclose to Guarantor any information relating to the business, condition (financial or otherwise), operations, performance, properties or prospects of Obligor now or hereafter known to Beneficiary, Guarantor waiving any duty of Beneficiary to disclose such information.

(g)    The failure of any other guarantor or third party to execute or deliver this Guaranty or any other guaranty or agreement, or the release or reduction of liability of Guarantor or any other guarantor or surety with respect to the Obligations.

(h)    The failure of Beneficiary to assert any claim or demand or to exercise or enforce any right or remedy under the provisions of any Note or otherwise.

(i)    The existence of any claim, set-off, counterclaim, recoupment or other rights that Guarantor or Obligor may have against Beneficiary (other than a defense of payment or performance).

(j)    Any other circumstance (including, without limitation, any statute of limitations), act, omission or manner of administering the Note or any existence of or reliance on any representation by Beneficiary that might vary the risk of Guarantor or otherwise operate as a defense available to, or a legal or equitable discharge of, Guarantor.

3.    Certain Waivers; Acknowledgments. Guarantor further acknowledges and agrees as follows:

(a)    Guarantor hereby unconditionally and irrevocably waives any right to revoke this Guaranty and acknowledges that this Guaranty is continuing in nature and applies to all presently existing and future Obligations, until the complete, irrevocable and indefeasible payment and satisfaction in full of the Obligations.

(b)    This Guaranty is a guaranty of payment and performance and not of collection. Beneficiary shall not be obligated to enforce or exhaust its remedies against Obligor or under the Note before proceeding to enforce this Guaranty.

(c)    This Guaranty is a direct guaranty and independent of the obligations of Obligor under the Note. Beneficiary may resort to Guarantor for payment and performance of the Obligations whether or not Beneficiary shall have resorted to any collateral therefor or shall have proceeded against Obligor or any other guarantors with respect to the Obligations. Beneficiary may, at Beneficiary's option, proceed against Guarantor and Obligor, jointly and severally, or against Guarantor only without having obtained a judgment against Obligor.

(d)    Guarantor hereby unconditionally and irrevocably waives promptness, diligence, notice of acceptance, presentment, demand for performance, notice of non-performance, default, acceleration, protest or dishonor and any other notice with respect to any of the Obligations and this Guaranty and any requirement that Beneficiary protect, secure, perfect or insure any lien or any property subject thereto.

19

4923-1786-0151.8

Docusign Envelope ID: AA568335-85DA-40AD-93B1-555798A4A81C

(e)     Guarantor agrees that its guaranty hereunder shall continue to be effective or be reinstated, as the case may be, if at any time all or part of any payment of any Obligation is voided, rescinded or recovered or must otherwise be returned by Beneficiary upon the insolvency, bankruptcy or reorganization of Obligor.

4.     Subrogation. Guarantor waives and shall not exercise any rights that it may acquire by way of subrogation, contribution, reimbursement or indemnification for payments made under this Guaranty until all Obligations shall have been indefeasibly paid and discharged in full.

5.     Representations and Warranties. To induce Beneficiary to enter into the Note, Guarantor represents and warrants that: (a) Guarantor is a duly organized and validly existing [ENTITY TYPE] in good standing under the laws of the jurisdiction of its organization; (b) this Guaranty constitutes Guarantor's valid and legally binding agreement in accordance with its terms; (c) the execution, delivery and performance of this Guaranty have been duly authorized by all necessary action and will not violate any order, judgment or decree to which Guarantor or any of its assets may be subject; and (d) Guarantor is currently solvent and will not be rendered insolvent by providing this Guaranty.

6.     Notices. All notices, requests, consents, demands and other communications hereunder (each, a "**Notice**") shall be in writing and delivered to the parties at the addresses set forth herein or to such other address as may be designated by the receiving party in a Notice given in accordance with this section. All Notices shall be delivered by personal delivery, nationally recognized overnight courier, email, or certified or registered mail (return receipt requested, postage prepaid). Except as otherwise provided in this Guaranty, a Notice is effective only (a) with written confirmation of delivery or transmission; (b) upon receipt of the receiving party; and (c) if the party giving the Notice has complied with the requirements of this section.

7.     Assignment. This Guaranty shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns; provided, however, that Guarantor may not, without the prior written consent of Beneficiary, assign any of its rights, powers or obligations hereunder. Beneficiary may assign this Guaranty and its rights hereunder without the consent of Guarantor. Any attempted assignment in violation of this section shall be null and void.

8.     Governing Law; Service of Process. THIS GUARANTY SHALL BE GOVERNED BY AND CONSTRUED UNDER THE LAWS OF THE STATE OF FLORIDA, WITHOUT REFERENCE TO ANY CHOICE OF LAW DOCTRINE. EACH PARTY IRREVOCABLY CONSENTS TO SERVICE OF PROCESS IN THE MANNER PROVIDED FOR NOTICES IN SECTION 6 HEREOF AND AGREES THAT NOTHING HEREIN SHALL AFFECT THE RIGHT OF ANY PARTY HERETO TO SERVE PROCESS IN ANY MANNER PERMITTED BY APPLICABLE LAW.

9.     Waiver of Jury Trial. EACH PARTY HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHTS TO TRIAL BY JURY WITH RESPECT TO ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS GUARANTY OR ANY OF THE OBLIGATIONS HEREUNDER.

4923-1786-0151.8

Docusign Envelope ID: AA568335-85DA-40AD-93B1-555798A4A81C

10.     <u>Cumulative Rights</u>. Each right, remedy and power hereby granted to Beneficiary or allowed it by applicable law or other agreement shall be cumulative and not exclusive of any other, and may be exercised by Beneficiary at any time or from time to time.

11.     <u>Severability</u>. If any provision of this Guaranty is to any extent determined by final decision of a court of competent jurisdiction to be unenforceable, the remainder of this Guaranty shall not be affected thereby, and each provision of this Guaranty shall be valid and enforceable to the fullest extent permitted by law.

12.     <u>Entire Agreement; Amendments; Headings; Effectiveness</u>. This Guaranty constitutes the sole and entire agreement of Guarantor and Beneficiary with respect to the subject matter hereof and supersedes all previous agreements or understandings, oral or written, with respect to such subject matter. No amendment or waiver of any provision of this Guaranty shall be valid and binding unless it is in writing and signed, in the case of an amendment, by both parties, or in the case of a waiver, by the party against which the waiver is to be effective. Section headings are for convenience of reference only and shall not define, modify, expand or limit any of the terms of this Guaranty. Delivery of this Guaranty by facsimile or in electronic (i.e., pdf or tif) format shall be effective as delivery of a manually executed original of this Guaranty.

[SIGNATURE PAGE FOLLOWS]

21

4923-1786-0151.8

Docusign Envelope ID: AA568335-85DA-40AD-93B1-555798A4A81C

IN WITNESS WHEREOF, Guarantor has executed this Guaranty as of the day and year first above written.

GUARANTOR:

[NAME OF GUARANTOR]

By: _____

Name:

Title:

[SWORN TO BEFORE ME THIS [DATE]

_____

Notary Public]

4923-1786-0151.8                          22

# EXHIBIT "B"

## SECURITY AGREEMENT

This SECURITY AGREEMENT, dated as of April 25, 2025 (as amended, supplemented or otherwise modified from time to time in accordance with the provisions hereof, this "**Agreement**"), made by and among MOOCHO, INC., a Delaware corporation (the "**Borrower**") and the guarantors listed on the signature pages hereto (the "**Original Guarantors**") or from time to time party hereto by execution of a joinder agreement (the "**Additional Guarantors**", and together with the Original Guarantors, the "**Guarantors**"), as grantors, pledgors, assignors and debtors (the Borrower, together with the Guarantors, in such capacities and together with any successors in such capacities, the "**Grantors**", and each, a "**Grantor**"), in favor of BLACKHAWK NETWORK, INC., an Arizona corporation (the "**Secured Party**").

**WHEREAS**, on the date hereof, the Secured Party has made a loan to the Grantor in an aggregate unpaid principal amount of $65,000,000 (the "**Loans**"), evidenced by that certain Secured Promissory Note of even date herewith (as amended, supplemented or otherwise modified from time to time, the "**Note**") made by the Grantor and payable to the order of the Secured Party. Capitalized terms used but not otherwise defined herein shall have the meanings assigned to such terms in the Note;

**WHEREAS**, each Guarantor is party to that certain Guaranty pursuant to which they have guaranteed the obligations of the Borrower under the Note;

**WHEREAS**, the Borrower and each Guarantor will receive substantial direct and indirect benefits from the execution, delivery and performance of the obligations under the Note and this Agreement and each is, therefore, willing to enter into this Agreement;

**WHEREAS**, this Agreement is given by the Grantors in favor of the Secured Party to secure the payment and performance of all of the Secured Obligations; and

**WHEREAS**, it is a condition to the obligations of the Lender to make the Loans under the Note that the Grantor execute and deliver this Agreement.

**NOW, THEREFORE**, in consideration of the mutual covenants, terms and conditions set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1. Definitions.

(a) Unless otherwise specified herein, all references to Sections and Schedules herein are to Sections and Schedules of this Agreement.

(b) Unless otherwise defined herein, terms used herein that are defined in the UCC shall have the meanings assigned to them in the UCC. However, if a term is defined in Article 9 of the UCC differently than in another Article of the UCC, the term has the meaning specified in Article 9.

(c) For purposes of this Agreement, the following terms shall have the following meanings:

"**Collateral**" has the meaning set forth in Section 2.

"**Event of Default**" has the meaning set forth in the Note.

"**First Priority**" means, with respect to any lien and security interest purported to be created in any Collateral pursuant to this Agreement, such lien and security interest is the most senior lien to which such Collateral is subject (subject only to liens for Permitted Debt under the Note).

"**Proceeds**" means "proceeds" as such term is defined in section 9-102 of the UCC and, in any event, shall include, without limitation, all dividends or other income from the Collateral, collections thereon or distributions with respect thereto.

"**Secured Obligations**" has the meaning set forth in Section 3.

"**UCC**" means the Uniform Commercial Code as in effect from time to time in the State of Florida or, when the laws of any other state govern the method or manner of the perfection or enforcement of any security interest in any of the Collateral, the Uniform Commercial Code as in effect from time to time in such state.

2.    Grant of Security Interest. The Grantor hereby pledges and grants to the Secured Party, and hereby creates a continuing First Priority lien and security interest in favor of the Secured Party in and to all of its right, title and interest in and to the following, wherever located, whether now existing or hereafter from time to time arising or acquired (collectively, the "**Collateral**"):

(a)    all fixtures and personal property of every kind and nature including all accounts (including health-care-insurance receivables), goods (including inventory and equipment), documents (including, if applicable, electronic documents), instruments, promissory notes, chattel paper (whether tangible or electronic), letters of credit, letter-of-credit rights (whether or not the letter of credit is evidenced by a writing), securities and all other investment property, commercial tort claims described on Schedule 1 hereof as supplemented by any written notification given by the Grantor to the Secured Party pursuant to Section 4(e), general intangibles (including all payment intangibles), money, deposit accounts, and any other contract rights or rights to the payment of money; and

(b)    all Proceeds and products of each of the foregoing, all books and records relating to the foregoing, all supporting obligations related thereto, and all accessions of and to, substitutions and replacements for, and rents, profits and products of, each of the foregoing, and any and all Proceeds of any insurance, indemnity, warranty or guaranty payable to the Grantor from time to time with respect to any of the foregoing.

3.    Secured Obligations. The Collateral secures the due and prompt payment and performance of:

(a)    the obligations of the Grantor from time to time arising under the Note, this Agreement or otherwise with respect to the due and prompt payment of (i) the principal of and premium, if any, and interest on the Loans (including interest accruing during the pendency of any bankruptcy, insolvency, receivership or other similar proceeding, regardless of whether allowed or allowable in such proceeding), when and as due, whether at maturity, by acceleration, upon one or more dates set for prepayment or otherwise and (ii) all other monetary obligations, including fees, costs, attorneys' fees and disbursements, reimbursement obligations, contract causes of action, expenses and indemnities, whether primary, secondary, direct or indirect, absolute or contingent, due or to become due, now existing or hereafter arising, fixed or otherwise (including monetary obligations incurred

2

Docusign Envelope ID: 871B39CB-43BD-4C84-A5C7-274DA7541A02

during the pendency of any bankruptcy, insolvency, receivership or other similar proceeding, regardless of whether allowed or allowable in such proceeding), of the Grantor under or in respect of the Note and this Agreement; and

(b)     all other covenants, duties, debts, obligations and liabilities of any kind of the Grantor under or in respect of the Note, this Agreement or any other document made, delivered or given in connection with any of the foregoing, in each case whether evidenced by a note or other writing, whether allowed in any bankruptcy, insolvency, receivership or other similar proceeding, whether arising from an extension of credit, issuance of a letter of credit, acceptance, loan, guaranty, indemnification or otherwise, and whether primary, secondary, direct or indirect, absolute or contingent, due or to become due, now existing or hereafter arising, fixed or otherwise (all such obligations, covenants, duties, debts, liabilities, sums and expenses set forth in Section 3 being herein collectively called the "**Secured Obligations**").

4.     Perfection of Security Interest and Further Assurances.

(a)     The Grantor shall, from time to time, as may be required by the Secured Party with respect to all Collateral, immediately take all actions as may be requested by the Secured Party to perfect the security interest of the Secured Party in the Collateral, including, without limitation, with respect to all Collateral over which control may be obtained within the meaning of sections 8-106, 9-104, 9-105, 9-106 and 9-107 of the UCC, section 201 of the federal Electronic Signatures in Global and National Commerce Act and, as the case may be, section 16 of the Uniform Electronic Transactions Act, as applicable, the Grantor shall immediately take all actions as may be requested from time to time by the Secured Party so that control of such Collateral is obtained and at all times held by the Secured Party. All of the foregoing shall be at the sole cost and expense of the Grantor.

(b)     The Grantor hereby irrevocably authorizes the Secured Party at any time and from time to time to file in any relevant jurisdiction any financing statements and amendments thereto that contain the information required by Article 9 of the UCC of each applicable jurisdiction for the filing of any financing statement or amendment relating to the Collateral, including any financing or continuation statements or other documents for the purpose of perfecting, confirming, continuing, enforcing or protecting the security interest granted by the Grantor hereunder, without the signature of the Grantor where permitted by law, including the filing of a financing statement describing the Collateral as all assets now owned or hereafter acquired by the Grantor, or words of similar effect. The Grantor agrees to provide all information required by the Secured Party pursuant to this Section promptly to the Secured Party upon request.

(c)     The Grantor hereby further authorizes the Secured Party to file with the United States Patent and Trademark Office and the United States Copyright Office (and any successor office and any similar office in any state of the United States or in any other country) this Agreement and other documents for the purpose of perfecting, confirming, continuing, enforcing or protecting the security interest granted by the Grantor hereunder, without the signature of the Grantor where permitted by law.

(d)     If the Grantor shall at any time hold or acquire any certificated securities, promissory notes, tangible chattel paper, negotiable documents or warehouse receipts relating to the Collateral, the Grantor shall immediately endorse, assign and deliver

3

Docusign Envelope ID: 871B39CB-43BD-4C84-A5C7-274DA7541A02

the same to the Secured Party, accompanied by such instruments of transfer or assignment duly executed in blank as the Secured Party may from time to time specify.

(e)     If the Grantor shall at any time hold or acquire a commercial tort claim, the Grantor shall (i) immediately notify the Secured Party in a writing signed by the Grantor of the particulars thereof and grant to the Secured Party in such writing a security interest therein and in the proceeds thereof, all upon the terms of this Agreement, with such writing to be in form and substance satisfactory to the Secured Party and (ii) deliver to the Secured Party an updated Schedule 1.

(f)     The Grantor shall cause each Subsidiary of the Grantor which, from time to time, after the date hereof shall be required to pledge any assets to the Secured Party pursuant to the provisions of this Agreement, to execute and deliver to the Secured Party a Joinder Agreement within thirty (30) days of the date on which it was acquired or created and, upon such execution and delivery, such Subsidiary shall constitute a "Grantor" for all purposes hereunder with the same force and effect as if originally named as Grantor herein. Upon the execution and delivery by any Subsidiary of a Joinder Agreement, the supplemental schedules attached to such Joinder Agreement shall be incorporated into and become part of and supplement the Schedules to this Agreement and each reference to such Schedules shall mean and be a reference to such Schedules as supplemented pursuant to each Joinder Agreement and from time to time. The execution and delivery of such Joinder Agreement shall not require the consent of any Grantor hereunder. The rights and obligations of each Grantor hereunder shall remain in full force and effect notwithstanding the addition of any new Grantor as a party to this Agreement.

(g)     The Grantor shall cause all Persons, other than the U.S. Small Business Administration, who hold security interests in any assets of the Grantor to subordinate all amounts owed to such Persons and all such security interests granted to such Persons to the Note and the Secured Party's rights under the Note and this Agreement.

(h)     Within thirty (30) days after the date hereof, all depository accounts of the Grantor shall be subject to a deposit account control agreement in favor of the Secured Party in a form acceptable to the Secured Party. Within thirty (30) days of the date hereof, the Grantor shall notify each of its customers in writing and otherwise use its commercially reasonable efforts to ensure that each customer remits all payments owed to the Grantor directly to the account(s) subject to such deposit account control agreement and the Grantor shall not maintain or have any operating account, deposit account, investment account, securities account or similar account at any bank, depositary source, financial intermediary or other financial institution, other than the account(s) subject to such deposit account control agreement.

(i)     The Grantor agrees that at any time and from time to time, at the expense of the Grantor, the Grantor will promptly execute and deliver all further instruments and documents, obtain such agreements from third parties, and take all further action, that may be necessary or desirable, or that the Secured Party may reasonably request, in order to create and/or maintain the validity, perfection or priority of and protect any security interest granted or purported to be granted hereby or to enable the Secured Party to exercise and enforce its rights and remedies hereunder or under any other agreement with respect to any Collateral.

4930-4819-3079.3

Docusign Envelope ID: 871B39CB-43BD-4C84-A5C7-274DA7541A02

5.      Representations and Warranties. The Grantor represents and warrants as follows:

(a)      The Grantor's exact legal name is that indicated in the preamble of this Agreement and on the signature page hereof, (ii) the Grantor is a corporation duly incorporated, validly existing, and in good standing under the laws of the State of Delaware, and (iii) the Grantor's place of business (or, if more than one, its chief executive office) and its mailing address is set forth on the signature page hereof.

(b)      Schedule 2 is a true, correct, and complete list of (i) all the Grantor's United States patents, patent licenses, trademarks, and trademark licenses registered with the United States Patent and Trademark Office and all other patents, patent licenses, trademarks, and trademark licenses, including the name of the registered owner and the registration number of each patent, patent license, trademark, and trademark license, owned by the Grantor; and (ii) all the Grantor's United States copyrights and copyright licenses and all other copyrights and copyright licenses, including the name of the registered owner and the registration number of each material registered copyright or copyright license owned by the Grantor.

(c)      Schedule 3 is a true, correct, and complete list of all real property owned or leased by the Grantor.

(d)      The Collateral consisting of securities, if any, have been duly authorized and validly issued, and are fully paid and non-assessable and subject to no options to purchase or similar rights. The Grantor holds no commercial tort claims except as indicated on Schedule 1. None of the Collateral constitutes, or is the proceeds of, (i) farm products, (ii) as-extracted collateral, (iii) manufactured homes, (iv) health-care-insurance receivables, (v) timber to be cut, (vi) aircraft, aircraft engines, satellites, ships or railroad rolling stock. None of the account debtors or other persons obligated on any of the Collateral is a governmental authority covered by the Federal Assignment of Claims Act or like federal, state or local statute or rule in respect of such Collateral.

(e)      At the time the Collateral becomes subject to the lien and security interest created by this Agreement, the Grantor will be the sole, direct, legal and beneficial owner thereof, free and clear of any lien, security interest, encumbrance, claim, option or right of others except for the security interest created by this Agreement and other liens permitted by the Note.

(f)      The pledge of the Collateral pursuant to this Agreement creates a valid and perfected First Priority security interest in the Collateral, securing the payment and performance when due of the Secured Obligations.

(g)      It has full power, authority and legal right to borrow the Loans and pledge the Collateral pursuant to this Agreement.

(h)      Each of this Agreement and the Note has been duly authorized, executed and delivered by the Grantor and constitutes a legal, valid and binding obligation of the Grantor enforceable in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting creditors' rights generally and subject to equitable principles (regardless of whether enforcement is sought in equity or at law).

5

4930-4819-3079.3

Docusign Envelope ID: 871B39CB-43BD-4C84-A5C7-274DA7541A02

(i)     No authorization, approval, or other action by, and no notice to or filing with, any governmental authority or regulatory body is required for the borrowing of the Loans and the pledge by the Grantor of the Collateral pursuant to this Agreement or for the execution and delivery of the Note and this Agreement by the Grantor or the performance by the Grantor of its obligations thereunder.

(j)     The execution and delivery of the Note and this Agreement by the Grantor and the performance by the Grantor of its obligations thereunder, will not violate any provision of any applicable law or regulation or any order, judgment, writ, award or decree of any court, arbitrator or governmental authority, domestic or foreign, applicable to the Grantor or any of its property, or the organizational or governing documents of the Grantor or any agreement or instrument to which the Grantor is party or by which it or its property is bound.

(k)     The Grantor has taken all action required on its part for control (as defined in sections 8-106, 9-104, 9-105, 9-106 and 9-107 of the UCC, section 201 of the federal Electronic Signatures in Global and National Commerce Act and, as the case may be, section 16 of the Uniform Electronic Transactions Act, as applicable) to have been obtained by the Secured Party over all Collateral with respect to which such control may be obtained pursuant to the UCC. No person other than the Secured Party has control or possession of all or any part of the Collateral.

6.     Voting, Distributions and Receivables.

(a)     The Secured Party agrees that unless an Event of Default shall have occurred and be continuing, the Grantor may, to the extent the Grantor has such right as a holder of the Collateral consisting of securities, other equity interests or indebtedness owed by any obligor, vote and give consents, ratifications and waivers with respect thereto, except to the extent that, in the Secured Party's reasonable judgment, any such vote, consent, ratification or waiver would detract from the value thereof as Collateral or which would be inconsistent with or result in any violation of any provision of the Note or this Agreement, and from time to time, upon request from the Grantor, the Secured Party shall deliver to the Grantor suitable proxies so that the Grantor may cast such votes, consents, ratifications and waivers.

(b)     The Secured Party agrees that the Grantor may, unless an Event of Default shall have occurred and be continuing, receive and retain all dividends and other distributions with respect to the Collateral consisting of securities, other Equity Interests or indebtedness owed by any obligor.

(c)     If any Event of Default shall have occurred and be continuing, the Secured Party may, or at the request and option of the Secured Party the Grantor shall, notify account debtors and other persons obligated on any of the Collateral of the security interest of the Secured Party in any account, chattel paper, general intangible, instrument or other Collateral and that payment thereof is to be made directly to the Secured Party.

7.     Covenants. The Grantor covenants as follows:

(a)     The Grantor will not, without providing at least 30 days' prior written notice to the Secured Party, change its legal name, identity, type of organization, jurisdiction of organization, corporate structure, location of its chief executive office or its principal place of business or its organizational identification number. The Grantor will, prior to any change

6

Docusign Envelope ID: 871B39CB-43BD-4C84-A5C7-274DA7541A02

described in the preceding sentence, take all actions reasonably requested by the Secured Party to maintain the perfection and priority of the Secured Party's security interest in the Collateral.

(b)　　The Collateral, to the extent not delivered to the Secured Party pursuant to Section 4, will be kept at those locations listed on Schedule 3 and the Grantor will not remove the Collateral from such locations without providing at least thirty (30) days' prior written notice to the Secured Party. The Grantor will, prior to any change described in the preceding sentence, take all actions reasonably required by the Secured Party to maintain the perfection and priority of the Secured Party's security interest in the Collateral.

(c)　　The Grantor shall, at its own cost and expense, defend title to the Collateral and the First Priority lien and security interest of the Secured Party therein against the claim of any person claiming against or through the Grantor and shall maintain and preserve such perfected First Priority security interest for so long as this Agreement shall remain in effect.

(d)　　The Grantor will not sell, offer to sell, dispose of, convey, assign or otherwise transfer, grant any option with respect to, restrict, or grant, create, permit or suffer to exist any mortgage, pledge, lien, security interest, option, right of first offer, encumbrance or other restriction or limitation of any nature whatsoever on, any of the Collateral or any interest therein.

(e)　　The Grantor will keep the Collateral in good order and repair and will not use the same in violation of law or any policy of insurance thereon. The Grantor will permit the Secured Party, or its designee, to inspect the Collateral at any reasonable time, wherever located.

(f)　　The Grantor will pay promptly when due all taxes, assessments, governmental charges, and levies upon the Collateral or incurred in connection with the use or operation of the Collateral or incurred in connection with this Agreement.

8.　　Secured Party Appointed Attorney-in-Fact. The Grantor hereby appoints the Secured Party the Grantor's attorney-in-fact, with full authority in the place and stead of the Grantor and in the name of the Grantor or otherwise, from time to time during the continuance of an Event of Default in the Secured Party's discretion to take any action and to execute any instrument which the Secured Party may deem necessary or advisable to accomplish the purposes of this Agreement (but the Secured Party shall not be obligated to and shall have no liability to the Grantor or any third party for failure to do so or take action). This appointment, being coupled with an interest, shall be irrevocable. The Grantor hereby ratifies all that said attorneys shall lawfully do or cause to be done by virtue hereof.

9.　　Secured Party May Perform. If the Grantor fails to perform any obligation contained in this Agreement, the Secured Party may itself perform, or cause performance of, such obligation, and the expenses of the Secured Party incurred in connection therewith shall be payable by the Grantor; provided that the Secured Party shall not be required to perform or discharge any obligation of the Grantor.

10.　　Reasonable Care. The Secured Party shall have no duty with respect to the care and preservation of the Collateral beyond the exercise of reasonable care. The Secured Party shall be deemed to have exercised reasonable care in the custody and preservation of

7

Docusign Envelope ID: 871B39CB-43BD-4C84-A5C7-274DA7541A02

the Collateral in its possession if the Collateral is accorded treatment substantially equal to that which the Secured Party accords its own property, it being understood that the Secured Party shall not have any responsibility for (a) ascertaining or taking action with respect to any claims, the nature or sufficiency of any payment or performance by any party under or pursuant to any agreement relating to the Collateral or other matters relative to any Collateral, whether or not the Secured Party has or is deemed to have knowledge of such matters, or (b) taking any necessary steps to preserve rights against any parties with respect to any Collateral. Nothing set forth in this Agreement, nor the exercise by the Secured Party of any of the rights and remedies hereunder, shall relieve the Grantor from the performance of any obligation on the Grantor's part to be performed or observed in respect of any of the Collateral.

11.    Remedies Upon Default.

(a)    If any Event of Default shall have occurred and be continuing, the Secured Party, without any other notice to or demand upon the Grantor, may assert all rights and remedies of a secured party under the UCC or other applicable law, including, without limitation, the right to take possession of, hold, collect, sell, lease, deliver, grant options to purchase or otherwise retain, liquidate or dispose of all or any portion of the Collateral. If notice prior to disposition of the Collateral or any portion thereof is necessary under applicable law, written notice mailed to the Grantor at its notice address as provided in Section 15 hereof ten (10) days prior to the date of such disposition shall constitute reasonable notice, but notice given in any other reasonable manner shall be sufficient. So long as the sale of the Collateral is made in a commercially reasonable manner, the Secured Party may sell such Collateral on such terms and to such purchaser(s) as the Secured Party in its absolute discretion may choose, without assuming any credit risk and without any obligation to advertise or give notice of any kind other than that necessary under applicable law. Without precluding any other methods of sale, the sale of the Collateral or any portion thereof shall have been made in a commercially reasonable manner if conducted in conformity with reasonable commercial practices of creditors disposing of similar property. At any sale of the Collateral, if permitted by applicable law, the Secured Party may be the purchaser, licensee, assignee or recipient of the Collateral or any part thereof and shall be entitled, for the purpose of bidding and making settlement or payment of the purchase price for all or any portion of the Collateral sold, assigned or licensed at such sale, to use and apply any of the Secured Obligations as a credit on account of the purchase price of the Collateral or any part thereof payable at such sale. To the extent permitted by applicable law, the Grantor waives all claims, damages and demands it may acquire against the Secured Party arising out of the exercise by it of any rights hereunder. The Grantor hereby waives and releases to the fullest extent permitted by law any right or equity of redemption with respect to the Collateral, whether before or after sale hereunder, and all rights, if any, of marshalling the Collateral and any other security for the Secured Obligations or otherwise. At any such sale, unless prohibited by applicable law, the Secured Party or any custodian may bid for and purchase all or any part of the Collateral so sold free from any such right or equity of redemption. Neither the Secured Party nor any custodian shall be liable for failure to collect or realize upon any or all of the Collateral or for any delay in so doing, nor shall it be under any obligation to take any action whatsoever with regard thereto. The Grantor agrees that it would not be commercially unreasonable for the Secured Party to dispose of the Collateral or any portion thereof by utilizing internet sites that provide for the auction of assets of the type included in the Collateral or that have the reasonable capability of doing so, or that match

8

Docusign Envelope ID: 871B39CB-43BD-4C84-A5C7-274DA7541A02

buyers and sellers of assets. The Secured Party shall not be obligated to clean-up or otherwise prepare the Collateral for sale.

(b)     If any Event of Default shall have occurred and be continuing, all rights of the Grantor to (i) exercise the voting and other consensual rights it would otherwise be entitled to exercise pursuant to Section 6(a) and (ii) receive the dividends and other distributions which it would otherwise be entitled to receive and retain pursuant to Section 6(b), shall immediately cease, and all such rights shall thereupon become vested in the Secured Party, which shall have the sole right to exercise such voting and other consensual rights and receive and hold such dividends and other distributions as Collateral.

(c)     If any Event of Default shall have occurred and be continuing, any cash held by the Secured Party as Collateral and all cash Proceeds received by the Secured Party in respect of any sale of, collection from, or other realization upon all or any part of the Collateral shall be applied in whole or in part by the Secured Party to the payment of expenses incurred by the Secured Party in connection with the foregoing or incidental to the care or safekeeping of any of the Collateral or in any way relating to the Collateral or the rights of the Secured Party hereunder, including reasonable attorneys' fees, and the balance of such proceeds shall be applied or set off against all or any part of the Secured Obligations in such order as the Secured Party shall elect. Any surplus of such cash or cash Proceeds held by the Secured Party and remaining after payment in full of all the Secured Obligations shall be paid over to the Grantor or to whomsoever may be lawfully entitled to receive such surplus. The Grantor shall remain liable for any deficiency if such cash and the cash Proceeds of any sale or other realization of the Collateral are insufficient to pay the Secured Obligations and the fees and other charges of any attorneys employed by the Secured Party to collect such deficiency.

(d)     If the Secured Party shall determine to exercise its rights to sell all or any of the Collateral pursuant to this Section, the Grantor agrees that, upon request of the Secured Party, the Grantor will, at its own expense, do or cause to be done all such acts and things as may be necessary to make such sale of the Collateral or any part thereof valid and binding and in compliance with applicable law.

12.     No Waiver and Cumulative Remedies. The Secured Party shall not by any act (except by a written instrument pursuant to Section 14), delay, indulgence, omission or otherwise be deemed to have waived any right or remedy hereunder or to have acquiesced in any Default or Event of Default. All rights and remedies herein provided are cumulative and are not exclusive of any rights or remedies provided by law.

13.     SECURITY INTEREST ABSOLUTE. The Grantor hereby waives demand, notice, protest, notice of acceptance of this Agreement, notice of loans made, credit extended, Collateral received or delivered or other action taken in reliance hereon and all other demands and notices of any description. All rights of the Secured Party and liens and security interests hereunder, and all Secured Obligations of the Grantor hereunder, shall be absolute and unconditional irrespective of:

(a)     any illegality or lack of validity or enforceability of any Secured Obligation or any related agreement or instrument;

(b)     any change in the time, place or manner of payment of, or in any other term of, the Secured Obligations, or any rescission, waiver, amendment or other modification

9

Docusign Envelope ID: 871B39CB-43BD-4C84-A5C7-274DA7541A02

of the Note, this Agreement or any other agreement, including any increase in the Secured Obligations resulting from any extension of additional credit or otherwise;

(c)     any taking, exchange, substitution, release, impairment or non-perfection of any Collateral or any other collateral, or any taking, release, impairment, amendment, waiver or other modification of any guaranty, for all or any of the Secured Obligations;

(d)     any manner of sale, disposition or application of proceeds of any Collateral or any other collateral or other assets to all or part of the Secured Obligations;

(e)     any default, failure or delay, willful or otherwise, in the performance of the Secured Obligations;

(f)     any defense, set-off or counterclaim (other than a defense of payment or performance) that may at any time be available to, or be asserted by, the Grantor against the Secured Party; or

(g)     any other circumstance (including, without limitation, any statute of limitations) or manner of administering the Loans or any existence of or reliance on any representation by the Secured Party that might vary the risk of the Grantor or otherwise operate as a defense available to, or a legal or equitable discharge of, the Grantor or any other grantor, guarantor or surety.

14.     Amendments. None of the terms or provisions of this Agreement may be amended, modified, supplemented, terminated or waived, and no consent to any departure by the Grantor therefrom shall be effective unless the same shall be in writing and signed by the Secured Party and the Grantor, and then such amendment, modification, supplement, waiver or consent shall be effective only in the specific instance and for the specific purpose for which made or given.

15.     Addresses For Notices. All notices and other communications provided for in this Agreement shall be in writing and shall be given in the manner and become effective as set forth in the Note, and addressed to the respective parties at their addresses as specified on the signature pages hereof or as to either party at such other address as shall be designated by such party in a written notice to each other party.

16.     Continuing Security Interest; Further Actions. This Agreement shall create a continuing First Priority lien and security interest in the Collateral and shall (a) subject to Section 17, remain in full force and effect until payment and performance in full of the Secured Obligations, (b) be binding upon the Grantor, its successors and assigns, and (c) inure to the benefit of the Secured Party and its successors, transferees and assigns; provided that the Grantor may not assign or otherwise transfer any of its rights or obligations under this Agreement without the prior written consent of the Secured Party.  Without limiting the generality of the foregoing clause (c), any assignee of the Secured Party's interest in any agreement or document which includes all or any of the Secured Obligations shall, upon assignment in accordance with Section 11.8 of the Note, become vested with all the benefits granted to the Secured Party herein with respect to such Secured Obligations.

17.     Termination; Release. On the date on which all Secured Obligations have been paid and performed in full, the Secured Party will, at the request and sole expense of the

4930-4819-3079.3

Grantor, (a) duly assign, transfer and deliver to or at the direction of the Grantor (without recourse and without any representation or warranty) such of the Collateral as may then remain in the possession of the Secured Party, together with any monies at the time held by the Secured Party hereunder, and (b) execute and deliver to the Grantor a proper instrument or instruments acknowledging the satisfaction and termination of this Agreement.

18.    GOVERNING LAW. This Agreement and the Note and any claim, controversy, dispute or cause of action (whether in contract or tort or otherwise) based upon, arising out of or relating to this Agreement or the Note (except, as to the Note, as expressly set forth therein) and the transactions contemplated hereby and thereby shall be governed by, and construed in accordance with, the laws of the State of Florida. The other provisions of Sections 11.3, 11.4, 11.5, and 11.6 of the Note are incorporated herein, mutatis mutandis, as if a part hereof.

19.    Benefit of Agreement. The terms and provisions of this Security Agreement shall be binding upon and inure to the benefit of the Grantors, the Secured Party and their respective successors and assigns (including all Persons who become bound as a Grantor under this Security Agreement), except that no Grantor shall have the right to assign its rights or delegate its obligations under this Security Agreement or any interest herein without the prior written consent of the Secured Party. Without limiting the generality of the foregoing, the Secured Party may assign or otherwise transfer all or any portion of its rights and obligations under this Security Agreement to any other Person which is an assignee of the Secured Party under the Note, and such other Person shall thereupon become vested with all the benefits in respect hereof granted to the Secured Party herein.

20.    Counterparts. This Agreement and any amendments, waivers, consents or supplements hereto may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all taken together shall constitute a single contract. Delivery of an executed counterpart of a signature page to this Agreement by facsimile or in electronic (i.e., "pdf" or "tif") format shall be effective as delivery of a manually executed counterpart of this Agreement. This Agreement and the Note constitute the entire contract among the parties with respect to the subject matter hereof and supersede all previous agreements and understandings, oral or written, with respect thereto.

[SIGNATURE PAGE FOLLOWS]

11

4930-4819-3079.3

Docusign Envelope ID: 871B39CB-43BD-4C84-A5C7-274DA7541A02

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

BORROWER:

MOOCHO, INC.

By: ___Matt Levenson___

Name:___Matt Levenson___

Title:___CEO___

Address for Notices:

1815 Purdy Avenue
Miami Beach, FL, 33139
Attention: Matt Levenson
Email: coach@moocho.com

SECURED PARTY:

BLACKHAWK NETWORK, INC.

By: _____

Name:___David McLaughlin___

Title:___Chief Financial Officer___

Address for Notices:

6220 Stoneridge Mall Road
Pleasanton, CA 94588
Attention: Legal Department

*[Signature Page to Security Agreement]*

Docusign Envelope ID: 871B39CB-43BD-4C84-A5C7-274DA7541A02

## SCHEDULE 1

## COMMERCIAL TORT CLAIMS

None.

4930-4819-3079.3

Docusign Envelope ID: 871B39CB-43BD-4C84-A5C7-274DA7541A02

## SCHEDULE 2

## INTELLECTUAL PROPERTY

None.

14

Docusign Envelope ID: 871B39CB-43BD-4C84-A5C7-274DA7541A02

## SCHEDULE 3

## REAL PROPERTY

1815 Purdy Avenue, Miami Beach, FL 33139

4930-4819-3079.3

## EXHIBIT A

## JOINDER AGREEMENT

This **JOINDER AGREEMENT** ("**Joinder Agreement**"), dated as of [DATE] is made by [JOINING GRANTOR], a [STATE OF ORGANIZATION] [ENTITY TYPE] (the "**Joining Grantor**"), and delivered to Blackhawk Network, Inc. ("**Lender**") under that certain Security Agreement (as amended, amended and restated, supplemented or otherwise modified from time to time, the "**Security Agreement**"; capitalized terms used but not otherwise defined herein shall have the meanings assigned to such terms in the Security Agreement), dated as of April 25, 2025, made by and among Moocho, Inc., a Delaware corporation (the "**Borrower**"), and the Grantors party thereto, in favor of the Lender.

**WHEREAS**, the Joining Grantor is a Subsidiary of the Borrower and required by the terms of the Note to become a Guarantor (as defined in the Note) and be joined as a party to the Security Agreement as a Grantor; and

**WHEREAS**, this Joinder Agreement supplements the Security Agreement and is delivered by the Joining Grantor pursuant to Section 7.8 of the Note and Section 4(f) of the Security Agreement; and

**WHEREAS**, the Joining Grantor will materially benefit directly and indirectly from the Loan made available to the Borrower by the Lender under the Note; and

**NOW THEREFORE**, the Joining Grantor hereby agrees as follows:

1.      **Joinder.** The Joining Grantor hereby irrevocably, absolutely and unconditionally becomes a party to the Security Agreement as a Grantor and agrees to be bound by all the terms, conditions, covenants, obligations, liabilities and undertakings of each Grantor or to which each Grantor is subject thereunder, all with the same force and effect as if the Joining Grantor were a signatory to the Security Agreement. Without limiting the generality of the foregoing, the Joining Grantor hereby pledges and grants to the Lender, as collateral security for the payment and performance in full of all the Secured Obligations, a First Priority security interest in and to all of its right, title and interest in, to and under the Collateral owned by it, wherever located, and whether now existing or hereafter arising or acquired from time to time and expressly assumes all obligations and liabilities of a Grantor thereunder.

2.      **Affirmations.** The Joining Grantor hereby makes each of the representations and warranties and agrees to each of the covenants applicable to the Grantors contained in the Security Agreement. The Joining Grantor also represents and warrants to the Lender that (a) it has the corporate or limited liability company, as applicable, power and authority, and the legal right, to make, deliver and perform this Joinder Agreement and has taken all necessary corporate or limited liability company, as applicable, action to authorize the execution, delivery and performance of this Joinder Agreement, (b) no consent or authorization of, filing with, notice to or other act by or in respect of, any Governmental Authority or any other Person that has not been obtained, made or completed is required in connection with the execution, delivery and performance, validity or enforceability of this Joinder Agreement, (c) this Joinder Agreement has been duly executed and delivered on behalf of the Joining Grantor and (d) this Joinder Agreement constitutes a legal, valid and binding obligation of the Joining Grantor enforceable against such Joining Grantor in accordance with its terms, subject to the effects of bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium and other similar laws relating to or affecting creditors' rights generally, general

Docusign Envelope ID: 871B39CB-43BD-4C84-A5C7-274DA7541A02

equitable principles (whether considered in a proceeding in equity or at law) and an implied covenant of good faith and fair dealing.

3.   **Supplemental Schedules.** Attached to this Joinder Agreement are duly completed schedules (the "**Supplemental Schedules**") supplementing the respective Schedules to the Security Agreement. The Joining Grantor represents and warrants that the information contained on each of the Supplemental Schedules with respect to such Joining Grantor and its properties is true, complete and accurate as of the date hereof. Such Supplemental Schedules shall be deemed to be part of the Security Agreement.

4.   **Severability.** The provisions of this Joinder Agreement are independent of and separable from each other. If any provision hereof shall for any reason be held invalid or unenforceable, such invalidity or unenforceability shall not affect the validity or enforceability of any other provision hereof, but this Joinder Agreement shall be construed as if such invalid or unenforceable provision had never been contained herein.

5.   **Counterparts.** This Joinder Agreement may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. Delivery of an executed counterpart of a signature page to this Joinder Agreement by facsimile or in electronic (i.e., "pdf" or "tif") format shall be effective as delivery of a manually executed counterpart of this Joinder Agreement.

6.   **Delivery.** The Joining Grantor hereby irrevocably waives notice of acceptance of this Joinder Agreement and acknowledges that the Secured Obligations are incurred and maintained, in reliance on this Joinder Agreement and the Joining Grantor's joinder as a party to the Security Agreement as herein provided.

7.   **Governing Law; Venue; Waiver of Jury Trial.** This Joinder Agreement and any claim, controversy, dispute or cause of action (whether in contract or tort or otherwise) based upon, arising out of or relating to this Joinder Agreement and the transactions contemplated hereby and thereby shall be governed by and construed in accordance with the laws of the State of Florida. The provisions of Section 18 of the Security Agreement are hereby incorporated by reference as if fully set forth herein.

[SIGNATURE PAGE FOLLOWS]

Docusign Envelope ID: 871B39CB-43BD-4C84-A5C7-274DA7541A02

IN WITNESS WHEREOF, the parties hereto have caused this Joinder Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

[NAME OF JOINING GRANTOR]

By:_____

Name:_____

Title:_____

Address for Notices:

_____

_____

_____

AGREED TO AND ACCEPTED:

BLACKHAWK NETWORK, INC.

By: _____

Name:_____

Title:_____

Address for Notices:

6220 Stoneridge Mall Road
Pleasanton, CA 94588
Attention: Legal Department

# EXHIBIT "C"

**From:** Jennifer Philo <Jennifer.Philo@bhn.com>
**Date:** Thursday, August 21, 2025 at 2:27 PM
**To:** Matt Levenson <coach@moocho.com>
**Cc:** Brett Narlinger <Brett.Narlinger@bhn.com>
**Subject:** RE: Moocho/Pepper Proposal & Path Forward

Matt,

We have aligned internally and are unable to accept your proposal to augment our agreements.  Further, we will not be able to PIK another interest payment so your next payment is due in accordance with your signed agreement.


Best Regards,


Jen Philo

Cell: 858-688-4860


**From:** Matt Levenson <coach@moocho.com>
**Sent:** Friday, July 25, 2025 7:01 AM
**To:** Jennifer Philo <Jennifer.Philo@bhn.com>
**Subject:** Fwd: Moocho/Pepper Proposal & Path Forward


**CAUTION:** This email originated from outside of the organization.
Do not click the links or open attachments unless you recognize the sender and know the content is safe.

Hi Jen,

I hope you are feeling better. Thanks again for all your help. I fully understand that BHN does not make formal amendments too early in the year. That makes complete sense.

That said, after going back with my investors to close our initial equity round, I need to provide investors with basic operational certainty for period of time giving us the chance to scale the business and visibility that we're not at imminent risk of foreclosure. Without that, the capital doesn't come in, and we're stuck.

1

To address this, I've drafted a proposed "side letter" that's entirely non-waiving and non-amending. It simply states that BHN does not intend to enforce remedies through the end of 2026, provided we meet the payment terms we discussed: $300K by August 15, and at least $200K more by December 31, 2025. This gives us enough stability to operate and enough incentive to keep performing.

Of course, we're open to edits, revisions, or another form that works better for you. The goal here is to thread the needle, give us just enough to close our raise.

Appreciate your consideration. I've attached the draft for review and happy to jump on a call if helpful.

Thank you,


Matt

---

**Forbearance Side Letter Draft**

**[On Blackhawk letterhead or via PDF]**

**Date:** July 25, 2025
**To:** Matthew Levenson, CEO, Moocho Inc.
**From:** Blackhawk Network

**Re: Temporary Forbearance and Intent Regarding Remedies**

This letter confirms our mutual understanding regarding the current status of the Moocho Inc. obligation to Blackhawk Holdings ("BHN") under the existing financing agreement (the "Agreement").

BHN recognizes that Moocho is working actively to raise capital and restructure its business operations. To facilitate that process and subject to the conditions outlined below, BHN confirms the following:

1. **Limited Forbearance Period:**
   BHN agrees that, provided Moocho makes a payment of $300,000 by August 15, 2025, and an additional minimum payment of $200,000 by December 31, 2025, BHN will not initiate any foreclosure proceedings, UCC enforcement, or legal action related to collection of the current obligations through December 31, 2026.

2. **No Waiver of Rights:**
   This letter does not constitute a waiver of any rights or remedies BHN has under the

2

Agreement or applicable law. BHN expressly retains all rights under the original terms of the Agreement.

3. **Non-Amendment:**
   This letter does not amend, modify, or otherwise alter any terms of the Agreement. It is intended solely to reflect BHN's current position and intent regarding enforcement and to facilitate Moocho's ability to secure capital and remain operational.

4. **Reassessment Clause:**
   BHN reserves the right to reassess its position based on material changes to Moocho's financial status, failure to meet the payment obligations stated herein, or other material adverse events.

5. **Confidentiality:**
   This letter is intended for internal use by Moocho and its investors and is not to be filed publicly or disclosed beyond what is necessary for due diligence and fundraising purposes.

We hope this provides sufficient assurance to support Moocho's current capital raise while preserving BHN's position. Please acknowledge receipt and acceptance below.

Sincerely,
[Blackhawk Signatory Name]
[Title]
Blackhawk Network

**Acknowledged and Agreed:**

Matt Levenson
CEO, Moocho Inc.
Date: July 25, 2025

Begin forwarded message:

**From:** Matt Levenson <coach@moocho.com>

**Subject: Re: Moocho/Pepper Proposal & Path Forward**

**Date:** July 22, 2025 at 8:50:51 AM PDT

**To:** Jennifer Philo <jennifer.philo@bhn.com>

3

Hi Jen,

Thanks again for the continued dialogue. I ran this proposal through our investor group and, to make it work, I've made difficult operating cuts including personnel reductions to free up enough room to deliver something more to you.

We're now prepared to pay $300,000 to BHN by August 15, and a minimum of $200,000 more by December 31, 2025, for a total of $500,000 this year. If it helps internally, you're welcome to treat the full amount as principal even if we haven't fully resolved the past due balance yet.

This is based on the assumption that the rest of the proposal we outlined, specifically PIK interest for the first year and deferral of the $5M principal payment to 12/31/26, is workable on your side.

I hope it's clear that we're doing everything we can to thread the needle, creating something our investors will fund equity into while ensuring Blackhawk is protected and ultimately repaid in full.

The path remains the same: we get through this knot hole, re-scale the business, raise more capital, and begin catching back up in a meaningful way. I'm committed to that and ready to close. With this last bit of cooperation, we can and we will make it happen.

Appreciate everything,

Matt

On Jul 15, 2025, at 3:55 PM, Matt Levenson <coach@moocho.com> wrote:

Hi Jen,

Thanks again for taking the time. I know I am putting you and BHN in a tough position, but I want to be as direct and constructive as possible. We're not negotiating because we want to, we're asking for cooperation again because we have no other path forward.

The current structure is unfinanceable. I've spoken to every investor I can, and the feedback is unanimous: without at least 12 months of operational runway and some key structural changes, they won't invest. I've been able to secure commitments for ~$2-$3

4

million for an initial close, but I can't close unless I can show a survivable capital plan, and that depends on aligning with you now.

**Here's the proposal:**

**1. Good Faith Payment**
We will pay the past-due balance of $340,000, net of any credits owed, ~$300,000, by August 15th, probably sooner. This is my best effort to demonstrate our intent and good faith.

**2. Payment-in-Kind (PIK) Interest Election**
We request that Blackhawk elect to PIK the interest for the remainder of the first year. Without this, the capital we raise gets drained and the business cannot function past a couple of months. This isn't about avoiding cost, it's about enabling survival and showing investors (and you) a path to mutual success.

**3. Defer $5M Principal Payments**
We need to move the first $5 million principal payment from 12/31/25 to 12/31/26. This adjustment provides the time necessary to get back in operation, scale, and raise further capital. Without it, we're set up for failure within five months, investors know that and simply won't fund under those terms.

**Why This Matters: The Path to Blackhawk Getting Repaid in Full**

Our new product is live in beta and showing strong feedback. With your cooperation and this bridge capital, we expect to exit beta in August and scale through the holiday season. This sets up a significant raise in Q1/Q2 2026, our target is to get back to $100M to $200M valuation. And at that level, our goal is to at minimum get caught back up with the original schedule and strive to pay Blackhawk back in full.

The existing agreements provide you 50% of the proceeds of any equity raised over $10 million. We're aligned economically: I want to get you paid, and the faster we grow, the faster we can raise and the faster that happens. This initial $2M-$3M close is the start. With your cooperation, we close on the initial capital, survive, and I'll continue raising and get fully caught up.

Again, I want to make sure to communicate this isn't about avoiding our obligations, it's about structuring a way to meet them. I've done everything I can to get us this far, and I'm not backing down now. But without your support, we are out of runway.

5

I appreciate everything you've done to date. My promise is simple: I will continue fighting to make this right. But this is the moment where cooperation determines whether we survive or shut down.

Thanks again,

Matt

# EXHIBIT "D"

Docusign Envelope ID: 9B07E644-D447-4992-A2A5-0A8A498C53A0



September 4, 2025

Via Email & Overnight Courier

Moocho, Inc.
1815 Purdy Avenue
Miami Beach, FL 33139
Attention: Matt Levenson
Email: coach@moocho.com

Subject: Notice of Default under Secured Promissory Note dated April 25, 2025

Dear Mr. Levenson,

Blackhawk Network, Inc. (the "Noteholder") hereby provides formal notice to Moocho, Inc. (the "Maker") that an Event of Default has occurred under the Secured Promissory Note dated April 25, 2025 (the "Note").

As you are aware, in accordance with Section 4.2 of the Note, the Noteholder agreed to treat the interest installments due on May 31, 2025, June 30, 2025, and July 31, 2025, as "PIK Interest," as that term is defined in the Note. However, the Noteholder expressly advised the Maker on August 21, 2025 that the August 31, 2025 interest installment would not be treated as PIK Interest and was therefore due and payable in cash on that date.

To date, no payment has been received for the August 31, 2025 interest installment.

This constitutes an Event of Default under Section 9.1(b), which provides that failure to pay interest or any other amount when due, and such failure continuing for three (3) days, triggers default. Accordingly, the Maker had until September 3, 2025, to cure this breach. As of the date of this notice, the default remains uncured.

Furthermore, as required under Section 7.5 of the Note, the Maker has failed to provide any written notice regarding the nature and extent of the Event of Default, and to provide the required information identified in Section 7.5(i)-(vi).

To cure the default, the Noteholder hereby demands that the Maker immediately pay the missed August 31, 2025 interest installment in full, no later than September 11, 2025.

The Noteholder reserves all rights and remedies available under the Note, the Security Agreement dated April 25, 2025 ("Security Agreement"), and applicable law, including but not limited to:

- Charging default interest at the rate specified in Section 4.3 of the Note; and

- Declaring the full Accreted Value of the Note and all other amounts due to be immediately payable under Section 10 of the Note.

- Asserting all rights and remedies as a Secured Party under Section 11 of the Security Agreement

Docusign Envelope ID: 9B07E644-D447-4992-A2A5-0A8A498C53A0



Sincerely,

DocuSigned by:

8CEA662686604C3...

David McLaughlin
Chief Financial Officer

MK

cc: Micki Wainhouse, VP Legal Counsel

# EXHIBIT "E"

**From:** Matt Levenson <coach@moocho.com>
**Date:** Monday, 8 September 2025 at 13:03
**To:** Vikram Varma <Vikram.Varma2@bhn.com>
**Cc:** Micki Wainhouse <Micki.Wainhouse@bhn.com>
**Subject:** Notice of Material Adverse Change – Moocho, Inc.

**CAUTION:** This email originated from outside of the organization.
Do not click the links or open attachments unless you recognize the sender and know the content is safe.

September 8, 2025

Vikram Varma
General Counsel
Blackhawk Network
6220 Stoneridge Mall Rd.
Pleasanton, CA 94588

Micki Wainhouse
Interim General Counsel and VP, Legal
BHN
Westside, London Road
Hemel Hempstead, Hertfordshire, HP3 9TD
+44(0)7872 865796

Dear Vick and Micki,

Pursuant to Section 7.5 (Notice of Certain Events) of the Secured Promissory Note and Security Agreement dated April 25, 2025, by and between Moocho, Inc. and Blackhawk Network, Inc. (the "Note"), Moocho, Inc. (the "Maker") hereby provides written notice of a material adverse change in its financial condition and operations.

Despite ongoing efforts to secure additional financing and restructure our obligations, Moocho has not obtained new capital commitments. As a result, Moocho is now preparing to initiate an orderly wind down of its operations.

In connection with this process, the Company is seeking to liquidate its assets for the benefit of its creditors. As of the date of this notice, Moocho has approximately $15 million in senior secured debt obligations that take priority over the debt held by Blackhawk Network.

This notice is provided in compliance with the Maker's obligation to notify the Noteholder of an Event of Default and related developments under the Note. We will continue to update you in writing as required under Section 7.5.

Please contact me directly should you have any questions or require additional information.

Sincerely,

Matthew Levenson
Chief Executive Officer
Moocho, Inc.

# EXHIBIT "F"



September 16, 2025

                                        Via Email & Overnight Courier

Moocho, Inc.
1815 Purdy Avenue
Miami Beach, FL 33139
Attention: Matt Levenson
Email: coach@moocho.com

Subject:     **Acceleration of Secured Promissory Note dated April 25, 2025 –**
             **Immediate Payment Due**

Dear Mr. Levenson,

Blackhawk Network, Inc. (the "Noteholder") acknowledges receipt of Moocho, Inc.'s (the "Maker")
correspondence dated September 8, 2025, in which you provided notice of a material adverse change in the
Maker's financial condition and operations, and indicated that the Maker is preparing to initiate an orderly
wind-down of its business.

As previously communicated in our Notice of Default dated September 4, 2025, the Maker has failed to cure
the payment default under the Secured Promissory Note dated April 25, 2025 (the "Note"), and the default
remains uncured as of today.

Pursuant to Section 10 ("Remedies") of the Note, upon the occurrence and continuance of an Event of
Default, the Noteholder may declare the entire Accreted Value, together with all accrued interest and other
amounts payable under the Note, immediately due and payable. The Maker's notice of its intent to wind down
operations and the uncured payment default constitute continuing Events of Default under the Note.

Accordingly, this letter serves as formal notice that the full Accreted Value of the Note, together with all
accrued interest and any other amounts payable, is hereby declared immediately due and payable. As of
August 31, 2025, the Accredited Value of the Note is $67,178,071.18. The Default Rate of 15% per annum
applies to the Accredited Value, which is equivalent to $27,607.43 per day of interest ("Daily Default
Interest"). *See* Note, Sections 4.3 ("Default Interest") & 4.4 ("Computation of Interest").

Please arrange for payment in full by September 18, 2025 of the Accredited Value and each day of Daily
Default Interest since August 31, 2025, in accordance with the payment instructions set forth in the Note.

The Noteholder reserves all rights and remedies available under the Note, the Security Agreement, and
applicable law.

                                        Sincerely,

                                        *James S McDonald*

                                        James S. McDonald
                                        VP Litigation, Chief IP Counsel

cc: Micki Wainhouse, Interim General Counsel

                                        6220 Stoneridge Mall Road, Pleasanton, CA 94588
                                                            t: 925.226.9990
                                                      **BlackhawkNetwork.com**

# Exhibit I

IN THE CIRCUIT COURT OF THE NINTH JUDICIAL CIRCUIT, IN AND FOR ORANGE COUNTY, FLORIDA

BLACKHAWK NETWORK, INC.,

        Plaintiff,

vs.

MOOCHO, INC.,

        Defendant.

CASE NO. 2025-CA-009150-O

_____/

## FINAL DEFAULT JUDGMENT

THIS CAUSE having come before the Court upon Plaintiff's Motion for Final Default Judgment filed on October 31, 2025 (the "**Motion**"), and the hearing on said Motion which took place on November 17, 2025, and the Court, being fully advised in the premises, hereby **ORDERS AND ADJUDGES** as follows:

1.      Plaintiff's Motion is **GRANTED**. Plaintiff, Blackhawk Network, Inc., is entitled to an enforceable and executable Final Judgment against Defendant Moocho, Inc.

2.      Plaintiff filed its Complaint on September 19, 2025, bringing claims for enforcement of secured promissory note (Count I), enforcement and foreclosure of security interest (Count II), and breach of contract (Count III) against Defendant. In the Complaint, Plaintiff specifically alleged the amounts due to Plaintiff under each of the counts in the Complaint.

3.      Defendant did not file any response to the Complaint. As such, Defendant admitted all well-pled allegations of the Complaint. *See Bowman v. Kingsland Dev., Inc.*, 432 So. 2d 660, 662 (Fla. 5th DCA 1983) (finding that a "default admits every cause of action that is sufficiently well-pled").

1